**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **EUGENE MILLER, JR**., Individually and on behalf of all others similarly situated, <br> Plaintiff, <br><br> v. <br><br> **LENDING TREE, LLC,** a North Carolina Limited Liability Corporation, <br><br> Defendant. | No. 1:08-cv-2300 <br><br> Honorable Judge James B. Zagel |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 12(B)(3)**

### I. PRELIMINARY STATEMENT

Defendant LendingTree, LLC ("**LendingTree**") is an online service, allowing potential mortgage borrowers to obtain multiple quotes from interested lenders. LendingTree does not charge consumers any fee for these services. Plaintiff Eugene Miller, Jr. (**"Miller"**) chose to take advantage of LendingTree's free service. As consideration for use of LendingTree's service, Miller agreed to submit any dispute he might have with LendingTree to binding, individual (non-class) arbitration. Miller also agreed that in the event he did file any lawsuit against LendingTree, it would be venued in Mecklenburg County, North Carolina.

In direct violation of Miller's agreements, he has now brought this current action before this Court. This lawsuit has no merit. Miller seeks to penalize LendingTree for being the victim of criminal acts of data theft. On the face of his own Complaint, it is clear that Miller has suffered no cognizable injury whatsoever. But the first threshold issue for this Court to decide is whether Miller's prior agreements block this suit in this venue altogether.

Miller filed a lawsuit, ignoring his contractual duty to seek arbitration, in which he demands national class treatment for his dispute, despite his binding agreement to arbitrate all disputes with LendingTree only on an individual basis. Miller venued this lawsuit in Illinois, disregarding his clear contractual duty to bring all disputes to Mecklenburg County, North Carolina. LendingTree requested, through counsel, that Miller honor the terms of the agreement by which he obtained the benefit of LendingTree's services. Miller refused. Therefore, in accordance with the plain text of the parties' agreement, the statutory authority of the Federal Arbitration Act, and well-settled precedent, LendingTree brings this Motion to dismiss the present suit and compel the parties to arbitration.

The agreement between Miller and LendingTree provides that if disputes are not compelled to arbitration, they must be brought in state or federal court in Mecklenburg County, North Carolina. Therefore, in the alternative, LendingTree moves to dismiss this action for improper venue.[1] Miller enjoyed the benefits of LendingTree's free service and is legally obliged to meet the commitments he made as a condition of using that service.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. LENDINGTREE'S WEBSITE AND FREE ONLINE SERVICES ARE GOVERNED BY A TERMS OF USE AGREEMENT

Every person who uses the LendingTree website agrees to a Terms of Use Agreement ("**TOU**" or the "**Terms of Use**"). Miller submitted a mortgage application to LendingTree via LendingTree's website on July 25, 2007. Compl. at ¶7. Attached as Ex. A is a true and correct copy of the Affidavit of LendingTree's Senior Director, Product Development and Technology,

---

[1] As discussed below, LendingTree would consent to the transfer of this action via 28 U.S.C.A. §1404(a) to the Western District of North Carolina *in lieu* of dismissal under Rule 12(b)(3).

Donald Norton, which provides as its Attachment 1 a copy of the TOU as constituted on July 25, 2007. The very first paragraph of the TOU, all in bold, tells the consumer:

> **This Agreement contains an agreement to arbitrate all claims and contains disclaimers of warranties and liability. These provisions form an essential basis of our bargain.**
>
> **If you do not agree to these terms and conditions, do not access this Web site.**

(Ex. A, Attachment 1.) The scope of the arbitration agreement is very broad, encompassing "[a]ny claim or controversy arising out of or relating to the use of this Web site" and "any acts or omissions for which you may contend LendingTree is liable." Id. Per the TOU, all such disputes "shall be finally, and exclusively, settled by arbitration" before the American Arbitration Association ("AAA") under the commercial arbitration rules of the AAA in effect at that time. Id.

The TOU makes very clear that the envisioned arbitration will resolve individual disputes, and that no class arbitration will be allowed.

> **THIS AGREEMENT PROVIDES THAT ALL DISPUTES BETWEEN YOU AND LENDINGTREE WILL BE RESOLVED BY <u>BINDING ARBITRATION</u>. YOU THUS GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS. YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS.**

(All emphasis as in original).

In addition to this binding arbitration clause and its class action waiver, the TOU includes a choice of forum provisions.

> **Should a Dispute arise and should the arbitration provisions herein become inapplicable or unenforceable, or in any instance of any lawsuit between you and LendingTree, the parties agree that jurisdiction over and venue of any suit shall be exclusively in the state and federal courts sitting in Mecklenburg County, North Carolina. If either party employs attorneys to enforce any right in connection with any Dispute or lawsuit, the prevailing party shall be entitled to recover reasonable attorneys' fees.**

The TOU also includes a choice of law provision, selecting the law of North Carolina as controlling. In keeping with this provision, all state law analysis in this Motion draws from the law of North Carolina.

> This Agreement shall be subject to and construed in accordance with the laws of the State of North Carolina, excluding its conflict of laws principles.

Id. Any consumer who uses LendingTree's website agrees to these TOU. Moreover, if the website user goes on to submit an application, as did Miller, he must actively agree to the TOU. As an unavoidable part of the application process, the applicant must hit a large red button that says "SAVE AND CONTINUE" indicating that he "agree[s] and accept[s]" the Terms of Use Agreement (which is linked to again) and "could or did print all these documents for [his] records." Ex. A, Attachment 2. The applicant cannot continue in this process without clicking on the button. Ex. A. Therefore, to obtain free services from LendingTree, Miller agreed to these Terms of Use.

### B.  IN VIOLATION OF THE AGREED-TO TERMS OF USE, MILLER HAS SUED LENDINGTREE IN A PUTATIVE CLASS ACTION IN ILLINOIS

In violation of the Terms of Use, on April 22, 2008, Miller sued LendingTree before this Court in a putative class action. Miller brought the present suit, nominally on behalf of all "persons throughout the United States whose consumer credit reports, personal information, and financial information were intentionally and illegally distributed by a representatives [*sic*] and/or agents of the Defendant[.]" Compl. at ¶1. Miller alleges that "to facilitate consumer's mortgage and/or loan application," LendingTree obtains a consumer's most confidential information, including name, social security number, employment information, and phone number, etc." Id., ¶7. Miller further contends this information was "improperly and illegally sold and/or disclosed to a third party by an agent and/or agents of" LendingTree. Id., ¶13. As issues of law and fact

supposedly common to the class, Miller cites, *inter alia*, "whether Defendants took reasonable steps and measures to safeguard the personal and financial information of its clients[.]"  <u>Id.</u>, ¶20(a).  Plaintiff alleges five causes of action, each predicated on an asserted duty owed by LendingTree to the applicant and on a perceived defect in LendingTree's conduct with respect to applicant information.  Plaintiff does not allege that any criminal *has* attempted to impersonate Miller for any purpose.  Miller merely alleges that LendingTree's handling of his account information made such hypothetical criminal attack more likely and seeks to prosecute LendingTree for alleged statutory violations of the Fair Credit Reporting Act.

LendingTree notes that the <u>Miller</u> action is one of six putative national class actions which followed the announcement by LendingTree that it had been the victim of data theft.[2] (Copies of these Complaints are attached as Ex. B).  Plaintiff's counsel in two of these cases has moved before the Judicial Panel for Multidistrict Litigation for consolidation of all cases for the purposes of pre-trial administration in the Western District of North Carolina.  Ex. C.  Plaintiff's counsel in another case, <u>Mitchell</u>, promptly moved to transfer venue from the Western District of Oklahoma to the Western District of North Carolina when shown the TOU.  Ex. D.  The Plaintiff's pending venue Motion in <u>Mitchell</u>, attached, cited to and relied upon the TOU as the governing agreement between the parties.

LendingTree, through counsel, requested that Miller honor the terms of the agreement by which he used LendingTree's service, dismiss this suit, and, should he deem it necessary, submit

---

2 <u>Bercaw v. LendingTree LLC</u>, No. 8:08-cv-660 (C.D.Cal.)(brought, in part, by Plaintiff's counsel in <u>Miller</u>, Larry Drury); <u>Carson v. LendingTree LLC</u>, No. 3:08-cv-247 (W.D.N.C.); <u>Garcia v. Lending Tree LLC</u>, No. 3:08-cv-4551 (S.D.N.Y); <u>Miller v. Lending Tree LLC</u>, No. 1:08-cv-2300 (N.D. Ill.); <u>Mitchell v. Home Loan Center and The Lending Tree</u>, No. 5:08-cv-448 (W.D.Okla.); and <u>Spinozzi v. LendingTree LLC</u>, No. 3:08-cv-229 (W.D.N.C.).

his claims to binding, individual (non-class) arbitration. Ex. E, Demand Letter. Miller refused to

do so. Ex. F, Drury Letter.

### III. THIS ACTION MUST BE DISMISSED IN LIGHT OF PLAINTIFF'S CONTRACTUAL DUTY TO SUBMIT ALL DISPUTES WITH LENDINGTREE TO ARBITRATION

#### A. LENDINGTREE'S MOTION TO COMPEL ARBITRATION MUST BE ANALYZED UNDER THE FEDERAL ARBITRATION ACT

*1. The FAA Creates a Body of Substantive Federal Law on Arbitrability*

The Federal Arbitration Act, 9 U.S.C.A. § 1 et seq., establishes a "national policy

favoring arbitration." Southland Financial Services, Inc. v. Keating, 465 U.S. 1, 10 (1984). The

FAA entails "a congressional declaration of a liberal federal policy favoring arbitration

agreements, notwithstanding any state substantive or procedural policies to the contrary. The

effect…is to create a body of federal substantive law of arbitrability, applicable to any arbitration

agreement within the coverage of the Act." See Moses H. Cone Hospital v. Mercury Constr.

Corp., 460 U.S. 1, 24 (1993).

> Section 2 of the FAA provides in pertinent part:
>
>> A written provision of . . . a contract evidencing a transaction
>> involving commerce to settle by arbitration a controversy
>> thereafter arising out of such contract or transaction . . . shall be
>> ***valid, irrevocable, and enforceable***, save upon such grounds as
>> exists at law or in equity for the revocation of any contract.

(Emphasis added). In enacting Section 2, Congress "withdrew the power of the states to require

a judicial forum for the resolution of claims which the contracting parties agreed to resolve by

arbitration." Southland Corp., 465 U.S. 1, 10 (1984). The United States Supreme Court has

recognized that Congress enacted the FAA for the benefit of businesses and consumers alike.

Allied-Bruce Terminix Companies, Inc., 513 U.S. 265, 280 (1995). "Congress has thus

mandated the enforcement of arbitration agreements." Southland Corp., 465 U.S. at 10; U.S. 1,

24 (1983).

**B.    PLAINTIFF'S CLAIMS MUST BE ARBITRATED BECAUSE HE SIGNED A CONTRACT WHICH INCORPORATED A VALID ARBITRATION AGREEMENT AND HIS CLAIMS FALL WITHIN THE COMPREHENSIVE SCOPE OF THAT AGREEMENT.**

When deciding whether a matter must be submitted to arbitration, the court must determine: (1) whether a valid agreement to arbitrate exists, and (2) whether the specific dispute falls within the substantive scope of that agreement.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985).  If the court concludes that there is a valid agreement to arbitrate and the matter falls within the scope of the arbitration clause, it must refer the case to arbitration without reviewing the merits.

The burden of establishing that the claims at issue are unsuitable for arbitration falls on Plaintiff as the party opposed to arbitration.  Green Tree Financial Corp. - Alabama v. Randolph, 531 U.S. 79, 91 (2000). The burden is not met by "generalized attacks on arbitration that rest on 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants.'"  Id. at 89-90.

Under the United States Supreme Court's two-pronged analysis set forth in Mitsubishi Motors Corp., Miller must be compelled to arbitrate.  First, Miller manifested his consent to the TOU as part of and in consideration for obtaining the free use of LendingTree's online services. The TOU calls for all disputes arising from the use of those services to be submitted to binding, individual (non-class) arbitration.

Second, Plaintiff's challenge to LendingTree's handling of his account information clearly constitutes a claim that falls within the broad scope of the TOU's arbitration provision. The TOU applies to "[a]ny claim or controversy arising out of or relating to the use of this Web site" and, independently, to "any acts or omissions for which you may contend LendingTree is liable." Ex. A, Attachment 1.  Plaintiff says that in submitting an application on LendingTree's Web site, LendingTree required him to provide certain personal information, and that in

maintaining the information submitted on the Web site, LendingTree did an inadequate job. Miller's Complaint contains nothing *but* allegations of acts and omissions for which Miller asks that LendingTree be held liable. The arbitration provision covers these complaints and contains no exception for security- or data-related concerns. The present action falls squarely within the range of those disputes intended, by the parties' prior written agreement, to be resolved through arbitration.

C.    **THE FAA REQUIRES ARBITRATION EVEN WHERE A PLAINTIFF'S CLAIMS ARISE UNDER A CONSUMER PROTECTION STATUTE**

Miller raises a number of claims under laws designed for the protection of the consumer. Under the FAA, an arbitration agreement cannot be held invalid merely because the plaintiff's claim arises under a consumer protection statute. The United States Supreme Court in Green Tree Financial held that "even claims arising under a statute designed to further important social polices may be arbitrated[.]" 531 U.S. at 89. In Green Tree Financial, the Court noted, followed, and affirmed a long line of United States Supreme Court precedents in which statutory claims have been compelled into arbitration. See, e.g., Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989) (Securities Act of 1933); Shearson/American Express Inc. v. McMahon, 482 U.S. 220 (1987) (Securities Exchange Act of 1934 and RICO); Mitsubishi Motors Corp., supra, 473 U.S. at 614 (Sherman Act). Each of the statutes in question provides significant protection for consumers, but never in enacting those important statutes did "Congress … evince[] an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Green Tree Financial, 531 U.S. at 90. Claims brought under these statutes can be vindicated in arbitration and present no conflict with the FAA.

As determined by the United States Supreme Court, even consumer class action allegations of criminal fraud and criminal usury may be vindicated in arbitration. Buckeye

Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006).  In Buckeye Check Cashing, plaintiff alleged that the very contract containing the disputed arbitration clause was void for illegality in that the contract "violated various Florida lending and consumer-protection laws, rendering it criminal on its face." Id. at 1207.  More specifically, plaintiff charged that defendants, through the contract at issue, violated Florida's Lending Practices Act, Consumer Finance Act, Deceptive and Unfair Trade Practices Act, and Civil Remedies for Criminal Practices Act.  See Plaintiffs-Respondents' Brief in Opposition to Certiorari, 2005 WL 1285615 at *5 (attached here as Ex. G).  The Supreme Court, citing extensively to the Federal Arbitration Act, nevertheless compelled arbitration of all these claims.

Likewise, Miller's claims can be effectively vindicated in arbitration, whether they sound in federal or state law, common law, or statute.

### D. THE FAA REQUIRES ARBITRATION EVEN WHERE THE CLAUSE IN QUESTION WILL MANDATE THAT PLAINTIFF PROCEED AS AN INDIVIDUAL AND NOT AS A CLASS REPRESENTATIVE

That Miller casts his claims as a putative consumer class action does not help him evade the arbitration provision.  This Court already rejected the proposition that class action waivers render arbitration agreements unconscionable.  Zawikowski v. Beneficial Nat. Bank, 1999 WL 35304 at *2 (N.D.Ill.)(Zagel, J.).  As the Court noted, "Nothing prevents the Plaintiffs from contracting away their right to a class action." Id., citing to Champ v. Siegel Trading Co., Inc., 55 F.3d 269, 276 (7th Cir. 1995) (enforcing an arbitration provision found to preclude class actions because the provision did not expressly provide for them).

The Seventh Circuit has upheld class action waivers in the arbitration context.  See, e.g., Livingston v. Assocs. Fin., Inc., 339 F.3d 553, 559 (7th Cir. 2003) (noting that where consumer form contract prohibits class action arbitration, the court is "obliged to enforce the type of arbitration to which these parties agreed").  The Third Circuit explained in Johnson v. West

<u>Suburban Bank</u> why it compelled non-class arbitration of claims under the federal Truth-in-Lending Act ("TILA") and Electronic Fund Transfer Act ("EFTA"):

> While it may be true that the benefits of proceeding as a class are unavailable in arbitration, neither statute confers upon plaintiffs the right to proceed as a class. Instead, the right is merely a procedural one, arising under Fed.R.Civ.P. 23, that may be waived by agreeing to an arbitration clause. In sum, because we can discern no congressional intent to preclude the enforcement of arbitration clauses in either statute's text, legislative history, or purpose, we hold that such clauses are effective even though they may render class actions to pursue statutory claims under the TILA or the EFTA unavailable.

225 F.3d 366, 369 (3d Cir. 2000). Likewise, there is nothing in the Fair Credit Reporting Act, much less in the common law, that would suggest the ability to proceed in a class format is a substantive right, rather than a matter of mere procedure. Miller can vindicate his interests fully in individual arbitration, and should not be allowed to press his claims anywhere else.

### E. NORTH CAROLINA LAW FAVORS ENFORCEMENT OF ARBITRATION AGREEMENTS

Having no viable argument under federal law to evade the binding arbitration provision and class action waiver, Miller may argue that the TOU is somehow unconscionable as a matter of state law. As noted above, the state law selected by the parties was that of North Carolina. Ex. A, ¶15. Under North Carolina law, the Terms of Use are enforceable, and this Motion must be granted.

North Carolina's practice of enforcing contracts as written applies equally to consumer contracts with arbitration clauses. North Carolina contract law does not allow parties to pick and choose which provisions they would like to honor. "Where the language of a contract is plain and unambiguous, construction of the agreement is a matter of law; and the court may not ignore or delete any of its provisions[.]" <u>Burrell v. Sparkkles Reconstruction Co.</u>, 657 S.E.2d 712, 716 (N.C. App. 2008). "When competent parties contract at arms length upon a lawful subject, as to

them the contract is the law of their case." Suits v. Old Equity Life Ins. Co., 249 N.C. 383, 386, 106 S.E.2d 579 (1959).

By agreeing to the TOU, including the class action waiver and arbitration clause, Miller obtained the benefit of LendingTree's free services. Miller cannot accrue those benefits and then shrug off the correlative obligations. See, e.g., Pure Oil Co. of the Carolinas v. Baars, 224 N.C. 612, 31 S.E.2d 854 (1944). In Pure Oil Company, the defendants acquired a house by means of a deed of trust. The deed of trust vested in a third party a later option to purchase the house. Defendants objected that the option provision should be deemed in violation of the rule against perpetuities and stricken from the deed. The trial court held, and the North Carolina Supreme Court affirmed, that the deed and option were all part of one transaction and that the defendants could not keep the deed yet strike the option. See id.

LendingTree's TOU tells all users in the first paragraph that:

**This Agreement contains an agreement to arbitrate all claims and contains disclaimers of warranties and liability. These provisions form an essential basis of our bargain.**

Ex. A. In the case at bar, Plaintiff cannot forsake the agreement to arbitrate, having already received the benefit of LendingTree's services. The agreement to arbitrate is "an essential basis of our bargain," as Plaintiff was told from the outset. It "offends every principle of equity and morality to permit a party to enjoy the benefits of a transaction," such as LendingTree's free services, "and at the same time deny its terms or qualifications," such as the requirement for individual, non-class, binding arbitration. Thompson v. Soles, 299 N.C. 484, 487, 263 S.E.2d 599 (1980).

This hardly would be the first time that a party to a contract under North Carolina law calling for arbitration tried to avoid that obligation by asserting that the arbitration clause is

unconscionable.  Arbitration agreements have been enforced by the courts over a wide range of objections.  <u>Miller v. Two State Constr. Co</u>., 118 N.C. App. 412, 455 S.E.2d 678 (1995) (enforcing arbitration)(finding arbitration agreement was not unconscionable merely because it entailed a waiver of jury rights); <u>Rodgers Bldrs., Inc. v. McQueen</u>, 76 N.C. App. 16, 331 S.E.2d 726 (1985)(finding arbitration agreement was not unconscionable merely because it encompasses claims of alleged tortious conduct and/or deceptive and unfair practices), <u>cert</u>. <u>denied</u>, 315 N.C. 590, 341 S.E.2d 29 (1986); <u>Raper v. Oliver House, LLC</u>, 180 N.C. App. 414, 421, 637 S.E.2d 551 (N.C. App. 2006)(reversing a trial court ruling that the arbitration clause, in a nursing home admission agreement, was unconscionable, despite issues concerning senior care being matter of public interest).

No one compelled Plaintiff to obtain mortgage quotes.  No one compelled Plaintiff to use a free online service like LendingTree's to help with this process.  Certainly, no one compelled Plaintiff to use LendingTree's free site as opposed to the sites of LendingTree's many competitors.  Plaintiff had a series of meaningful choices; he chose to use LendingTree's free service, in the process agreeing to non-class arbitration; Plaintiff must be bound by that choice. <u>See</u>, <u>e.g.</u>, <u>Revels v. Miss North Carolina Pageant Organization, Inc</u>., 176 N.C. App. 730, 735, 627 S.E.2d 280 (2006).  In <u>Revels</u>, a beauty contestant had signed an entry form that bound her to arbitrate any disputes she has with the pageant.  The plaintiff still brought a suit in federal court.  The pageant moved to compel arbitration, arguing "that the arbitration clause was unenforceable where the inequality of bargaining power deprived her of a meaningful choice." <u>Id</u>.  The North Carolina Court of Appeals rejected this argument.  "Where Revels could enter other pageants or choose to not enter a pageant at all, we find that this contention lacks merit." <u>Id</u>.  Like Revels, Plaintiff must be held to the consequences of his freely-chosen bargain.

In seeking to evade his contractual obligations, Plaintiff may cite to Tillman v. Commercial Credit Loans, Inc. 362 N.C. 93 (2008). Tillman is the first and only case by a North Carolina appellate court to hold any contract unconscionable. Id. at 111-12 (Newby, J., in dissent)("For the first time in our history, a North Carolina appellate court has found a contract to be unconscionable"). In Tillman, a sharply divided North Carolina Supreme Court found that an arbitration clause in a particular consumer form contract was both procedurally and substantively unconscionable, and therefore could not be enforced. Tillman does not support Miller's opposition to the enforcement of the TOU.

First, as the majority in Tillman noted, "A party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability." Id. at 102. (emphasis added). Here, the TOU is neither procedurally nor substantively unconscionable. The main procedural unconscionability in Tillman was described as follows: "[Mrs.] Tillman and [Mrs.] Richardson were rushed through the loan closings, and the Commercial Credit loan officer indicated where [Mrs.] Tillman and [Mrs.] Richardson were to sign or initial the loan documents. There was no mention of credit insurance or the arbitration clause at the loan closings." Id. at 103. Here, the situation as to the LendingTree TOU was wholly different. Miller was not being "rushed through" anything in submitting an application to LendingTree but was taking just the first tentative step in window-shopping for a new mortgage loan. Miller had all the time in the world to print and read the TOU, or, since they were provided in electronic format, Miller could even enlarge the TOU's font size or search for important key terms. Additionally, the arbitration provision was not hidden in the Terms of Use but was highlighted by the first paragraph of the agreement. There is simply no procedural unconscionability in the LendingTree scenario.

Likewise, the TOU is not substantively unconscionable.  The first stage of the <u>Tillman</u> analysis puts the burden on Plaintiff to show that he, financially, cannot afford to press his claims in arbitration.  The second stage of <u>Tillman</u>'s substantive unconscionability analysis looks to the expenses a consumer may have to bear in proceeding in arbitration.  While both the <u>Tillman</u> and LendingTree arbitration clauses incorporate by reference AAA rules, the <u>Tillman</u> agreement negated those rules by saying that AAA rules would not apply in the event of a conflict with the original contract language.  The LendingTree agreement does precisely the opposite by fully embracing the AAA rules.  Under AAA's Supplementary Procedures for Consumer-Related Disputes[3] the consumer's responsibility for arbitrator fees is capped at a low amount: at $125 for claims under $10,000, and at $375 for claims under $75,000.  (This is less than, or comparable to, the $350 civil filing fee charged by Article III courts to every civil litigant.)  These rules are part of the LendingTree agreement by direct operation of the text.  A proper reading of <u>Tillman</u>, limited to the facts actually before that deeply divided Court, will not aid Miller in eluding his contractual agreements and thwarting federal and North Carolina public policy in favor of arbitration.

<u>Tillman</u> is best understood as a narrow opinion addressing a specific set of facts before the Court.  Reading <u>Tillman</u> this way avoids conflict with and preemption by the FAA.  As the dissent in <u>Tillman</u> properly noted:

> Although the majority ostensibly applies general principles of state contract law to render this arbitration agreement unconscionable, in effect the majority finds it unconscionable precisely because it is an agreement to arbitrate. By holding that the collective effect of provisions unique to arbitration agreements renders the instant agreement unconscionable, the majority treats this contract differently from other contracts. Such an approach is precluded by federal law.

---

[3]      See, Consumer-Related Disputes Supplementary Procedures, http://www.adr.org/sp.asp?id=22014 (effective September 15, 2005) (last viewed June 16, 2008) (attached here as Ex. H).

<u>Tillman</u>, <u>supra</u>, 362 N.C. at 112.

<u>Tillman</u> must be read narrowly, to avoid conflict between federal and North Carolina law. Such conflicts have arisen before in North Carolina, resulting in a finding that state laws that impede arbitration are preempted by the FAA. <u>See</u>, <u>e.g.</u>, <u>Aspen Spa Properties, LLC v. International Design Concepts, LLC</u>, 527 F.Supp.2d 469 (E.D.N.C. 2007)(finding FAA preemption of North Carolina's statute forbidding out-of-state arbitrations). However, a finding of preemption is a last resort, and if <u>Tillman</u> can be read so as to coexist with the <u>FAA</u>, that is the appropriate reading.

**IV. THIS ACTION MUST BE DISMISSED IN LIGHT OF PLAINTIFF'S CONTRACTUAL DUTY TO VENUE ALL LITIGATION IN MECKLENBURG COUNTY, NORTH CAROLINA**

If this action is not compelled to individual (non-class) arbitration, it must be dismissed for improper venue. The TOU requires that:

> Should a Dispute arise and should the arbitration provisions herein become inapplicable or unenforceable, or in any instance of any lawsuit between you and LendingTree, the parties agree that jurisdiction over and venue of any suit shall be exclusively in the state and federal courts sitting in Mecklenburg County, North Carolina.

Such forum selection clauses are enforceable, even if not individually negotiated. <u>See</u>, <u>e.g.</u>, <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. 585, 593 (1991)(enforcing forum selection clause in consumer form contract). As the United States Supreme Court noted:

> a clause establishing <u>ex</u> <u>ante</u> the forum for dispute resolution has the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended, sparing litigants the time and expense of pretrial motions to determine the correct forum and conserving judicial resources that otherwise would be devoted to deciding those motions. Finally, it stands to reason that passengers who purchase tickets containing a forum clause like that at issue in this case benefit in the form of reduced fares reflecting the savings that the cruise line enjoys by limiting the fora in which it may be sued.

Id. at 593.  The Carnival Cruise Lines decision suggests that a forum selection clause must be enforced unless it is fundamentally unfair, i.e., unless there is some evidence that the clause was adopted as a means to discourage consumers from pursuing legitimate claims.  As in Carnival Cruise Lines, the fact that the forum selected is the principal place of business for LendingTree belies any suggestion of bad faith motive.  Id. at 595.

The Courts of the Seventh Circuit routinely dismiss cases which are filed in derogation of forum selection clauses.  See, e.g., Abbott Laboratories v. Takeda Pharmaceutical Co. Ltd., 476 F.3d 421 (7th Cir. 2007) (affirming the dismissal of action for improper venue; commercial contract at issue required litigation of disputes in Japan).  That the forum selected by the contract is less convenient for the non-movant is not a valid basis upon which to object to the enforcement of contractual terms, even when the inconvenienced party is a consumer.  See, e.g., Roberts & Schaefer Co. v. Merit Contracting, Inc., 99 F.3d 248 (7th Cir. 1996)(noting that a forum selection clause will be enforced unless to do so would be to effectively deprive the non-movant of its day in court).  Accord, e.g., Chapman v. Norwegian Cruise Line Ltd., 2001 WL 910102 at *2 (N.D.Ill.)(enforcing forum selection provision in consumer contract despite non-movant's objection that "litigating in Florida would be too inconvenient as their doctors, witnesses, and expert witnesses reside in either Illinois or Las Vegas, Nevada").  If Plaintiff's action is not dismissed in favor of arbitration, it must be dismissed for failure to file in North Carolina as required by contract.

LendingTree would consent to the transfer of this action via 28 U.S.C.A. §1404(a) to the Western District of North Carolina in lieu of dismissal under Rule 12(b)(3).  While, e.g., Abbot Laboratories suggests that dismissal of an action is the appropriate manner in which to enforce a forum selection clause in the Seventh Circuit, it is nevertheless also true that a transfer to the

Western District of North Carolina would serve "the convenience of parties and witnesses," and be "in the interest of justice[.]"

## VI.    CONCLUSION

For all of the foregoing reasons, Defendant LendingTree, LLC respectfully requests that Plaintiff's Complaint be dismissed and that Plaintiff be directed that if he wishes to pursue the matter further, he must do so by submitting to arbitrating his individual claims against LendingTree.  If Plaintiff's Complaint is not dismissed because of the arbitration requirement, LendingTree asks that the Complaint be dismissed for improper venue or transferred *in lieu* of dismissal to the Western District of North Carolina (which sits in Mecklenburg County).  In either event, LendingTree seeks reimbursement of attorney's fees, per the prevailing party provisions of the TOU, expended to prosecute this Motion, which merely seeks to compel Miller to live up to the terms of his agreement.

Dated:  June 23, 2008                                Respectfully submitted,

**LENDING TREE, LLC,**
*Defendant*

By: /s/ David Z. Smith
             One of Its Attorneys

Mark S. Melodia (admission *pro hac vice* pending)
Paul J. Bond (admission *pro hac vice* pending)
REED SMITH LLP
136 Main Street, Suite 250
Princeton, NJ 08543
(609) 987-0050
(609) 951-0824 fax

David Z. Smith (ARDC  No. 6256687)
Marina C. Santini (ARDC No. 6290668)
REED SMITH LLP
10 S. Wacker Drive
Chicago, IL 60606
(312) 207-1000
(312) 207-6400 fax
dzsmith@reedsmith.com

CHILIB-2188025

# Exhibit A

### DECLARATION OF DONALD NORTON

1.      My name is Donald Norton.

2.      I am over 18 years of age, of sound mind, have never been convicted of a felony, and am fully competent to make this affidavit.

3.      I am Senior Director, Product Development and Technology for LendingTree, LLC (ìLendingTreeî).  By virtue of holding that position, I have personal knowledge of the statements made in this Declaration.

4.      LendingTree operates a Web site, located at http://www.lendingtree.com (ìLendingTree Web Siteî).

5.      Part of the LendingTree Web Site is a Terms of Use page.

6.      From January 1, 2006 to the present, the front page of the LendingTree Web Site has always included a link to the Terms of Use page.

7.      Enclosed as Attachment 1 is a true and correct copy of the Terms of Use page, as it existed on July 25, 2007.

8.      Enclosed as Attachment 2 is a true and correct copy of the application step requiring agreement to the Terms of Use, as it existed on July 25, 2007.

9.      I declare, under penalty of perjury under United States law, that to the best of my knowledge the foregoing is true and correct.

Respectfully Submitted,

_____
Donald Norton
Senior Director, Product Development and
Technology
LendingTree, LLC

# Exhibit A
# Attachment 1

# LendingTree Terms of Use

LendingTree, LLC

11115 Rushmore Dr.

Charlotte, NC 28277

General Information: 704-541-5351

Customer Service: 704-944-2110

Fax: 704-541-1834

E-mail: customercare@lendingtree.com

## TERMS OF USE AGREEMENT

Please read this Terms of Use Agreement ("Agreement") carefully. By accessing this Web site and any pages hereof, you agree to be bound by the terms and conditions below. This Agreement contains an agreement to arbitrate all Claims and disclaimers of warranties and liability. These provisions form an essential basis of our bargain. If you do not agree to these terms and conditions, do not access this Web site.

LendingTree, LLC (formerly known as LendingTree, Inc.) operates this Web site. For purposes of this Agreement, "LendingTree" means LendingTree, LLC. In Rhode Island, the loan services made available on this site are provided by Home Loan Center, Inc., and all references on this site to LendingTree shall include Home Loan Center, Inc. for Rhode Island customers. However, LendingTree, LLC will still collect your loan request and provide technical services for Home Loan Center, Inc.

## SECURITY POLICY

LendingTree uses extensive and sophisticated secure technology to protect your data and transmissions between you, LendingTree, banks, lenders and loan brokers participating in this Web site (we refer to all of these as "Lenders"), and real estate professionals participating in this web site (the "real estate professionals"). Here are the highlights:

Transmission between browsers and our web server is implemented using Secure Sockets Layer (SSL) technology. This technology requires an SSL-capable browser such as MS Internet Explorer 3.0 (or later) or Netscape Navigator 2.0 (or later).

Transmissions between LendingTree and participating Lenders or LendingTree and real estate professionals are encrypted using public key cryptography algorithms with a minimum key size of 128 bits.

Our database is physically separated from our web server and is protected by a physical firewall.

Although LendingTree has taken these reasonable and appropriate measures to ensure that your personal information is delivered and disclosed only in accordance with your instructions, LendingTree cannot and does not guarantee that the personal information you provide will not be intercepted by others and decrypted.

## LOAN ORIGINATION SERVICES

LendingTree offers three services, each of which is explained in more detail below.

The first is the traditional LendingTree process that occurs when you complete a full LendingTree loan request and get matched with Lender(s) who will respond with loan offers.

The second option is LendingTree's QuickMatch service which you may select prior to completing the full loan request. If you select the QuickMatch service, we will match you with Lenders on LendingTree's GetSmart network (GetSmart is an internal division of LendingTree) using a subset of the information on the full LendingTree request. Because these matches are generated from a subset of information from the full request, the Lenders on the GetSmart network will not be able to respond with customized offers until they speak with you to get additional information. QuickMatch is not available for all loan programs.

The third option is to complete the full loan request and ask (either before or after you have submitted the full request) that LendingTree supplement your loan offers with additional Lender matches from LendingTree's GetSmart network. LendingTree will only use its GetSmart service to supplement your offers with additional Lender matches if we are not able to match you with five Lenders who are able to return offers based on your initial request. If you elect to have GetSmart supplement your LendingTree loan request, if LendingTree cannot match you with 5 Lenders, we will also submit a loan request to our GetSmart network. You may receive up to 5 Lender matches from GetSmart in addition to any LendingTree Lenders who make you offers. Because these matches are generated from a subset of information from the full request, the Lenders on the GetSmart network will not be able to respond with customized offers until they speak with you to get additional information. LendingTree will always attempt to fulfill your request with Lenders who can respond with offers before supplementing your request with Lender matches from the GetSmart Network.

In either case, you represent that all of the information you have provided in your loan request is

In either case, you represent that all of the information you have provided in your loan request is true and complete. By choosing an option and submitting your loan request form, you also agree to and accept this Agreement in its entirety.

Traditional (Full-Form) LendingTree Experience

LendingTree, LLC arranges for multiple loan offers either through its network of nonaffiliated Lenders or though its affiliate, Home Loan Center (doing business as "LendingTree Loans"). By submitting the full LendingTree loan request form, you authorize LendingTree, LLC to provide your information either to Lenders on the LendingTree network or to Home Loan Center / LendingTree Loans. You also authorize LendingTree, LLC, its Lenders, and Home Loan Center / LendingTree Loans to check your credit history.

LendingTree Network of Lenders. LendingTree, LLC may arrange for multiple offers through its network of nonaffiliated Lenders (U.S. based banks, thrifts, and finance companies). To view LendingTree's network of Lenders, click here.

To determine which Lenders may be matched with you, Lenders provide to us criteria about the type of loan (for example, loan amount, whether purchase, refinance, or equity loan) and the type of loan customer (for example, state of residence or creditworthiness) in which the Lender is interested. LendingTree, LLC will provide your information to up to five Lenders whose criteria match your profile. If fewer than five Lenders match your profile, you will receive offers from fewer than five Lenders. If more than five Lenders match your profile, LendingTree, LLC will match you with five Lenders with a preference for those Lenders that have the highest customer satisfaction

with five Lenders with a preference for those Lenders that have the highest customer satisfaction scores and the best record of making loans to previous LendingTree customers. (If you are requesting a home equity loan or home equity line of credit, we may match you with up to four Lenders based on the above criteria as well as Home Loan Center / LendingTree Loans).

If you request an auto loan and qualify for the Carloan.com, Carloan.com or Auto Second Chance Program, LendingTree will share your information with one of the partners in that program. These partners should also be considered Lenders. In addition, you may be matched with one or more lenders offering unsecured loans with which you could finance your auto.

LendingTree Loans. LendingTree, LLC has an affiliate, Home Loan Center, which does business as "LendingTree Loans." Depending on your credit history and the type of loan you request, you may be matched solely with Home Loan Center / LendingTree Loans instead of with the LendingTree network of Lenders. If matched with Home Loan Center / LendingTree Loans, you will speak with a single loan officer and will be provided with up to four offers based on the rates and terms provided to Home Loan Center / LendingTree Loans by its wholesale mortgage banks and investors. These wholesale mortgage banks and investors update their pricing with us from time-to-time (often daily) and compete for LendingTree's customer business by changing their rates periodically.

The offers you initially receive typically will be the lowest offers based on the interest rates set by the wholesale mortgage lenders or investors willing to acquire all of the types of loan that you requested. On occasion, Home Loan Center / LendingTree Loans may not be allowed to provide the name of the wholesale mortgage bank or investor, in which case, the offer may be simply listed under the name "Home Loan Center." All loans are originated and closed by Home Loan Center /

under the name "Home Loan Center." All loans are originated and closed by Home Loan Center / LendingTree Loans and then sold to the wholesale mortgage bank or investor named in the offer you select.

As always with LendingTree, you may review the loan offers and talk to a Home Loan Center / LendingTree Loans loan officer at no cost. As in the case of most lenders, once you select an offer, Home Loan Center / LendingTree Loans may require a fee to lock-in your rate and to complete the processing and underwriting of your loan application.

If you are matched with Home Loan Center / LendingTree Loans, you are not required to use it. If you would prefer to receive offers from multiple lenders and speak with multiple loan officers, please contact LendingTree Customer Care at 1-888-272-1355, and your loan request will be re-routed to the LendingTree network of Lenders.

*Affiliated Business Arrangement Disclosure.* By law, we are required to disclose that Home Loan Center / LendingTree Loans is an affiliate of LendingTree, LLC, and we are required to provide you an official Affiliated Business Arrangement Disclosure (click here for the official disclosure form). If you are matched with Home Loan Center / LendingTree Loans, please complete the form and return it as indicated.

*Responsibility for Settlement and Closing Costs.* Regardless whether you obtain a loan from LendingTree's network of Lenders or through Home Loan Center / LendingTree Loans, at closing you will be responsible for paying for any settlement or closing costs associated with your loan (such as loan processing, underwriting, or funding fees, title insurance premiums, notary fees, etc.). LendingTree, LLC does not charge you a fee for its service in matching you with Lenders

or with Home Loan Center / LendingTree Loans.

QuickMatch Program

By submitting the shorter LendingTree QuickMatch loan request form, you authorize LendingTree to provide your information to up to five Lenders. The Lenders in this program will be an LendingTree's GetSmart network ("GetSmart is an internal division of LendingTree). These lenders may not be shown on LendingTree's Lender Scorecard, but are certified by LendingTree. NOTE – If you use the QuickMatch program you will not be eligible for any incentives related to filling out the full LendingTree loan request or closing your loan. You are only eligible for such incentives by going through an affinity partner, filling out the full loan request and meeting all other requirements for the incentive.

In the QuickMatch process, you may be given the option to provide your Social Security Number and/or have your credit pulled in order to improve your lender matches. If you elect this option, you authorize LendingTree to check your credit history, and to provide your information, including your credit history, to up to five Lenders. You further authorize the Lenders, along with any additional Lenders or investors necessary to complete your loan transaction and to check your credit history. You further authorize the Lenders along with any additional Lenders or investors necessary to complete your loan transaction, to check your credit history and to return their decision to you via the LendingTree system. At the present time, Fair Isaac Corporation (the company that provides "FICO" credit scores) reports that for mortgage, home equity or auto loans, it consolidates all credit inquiries that occur within a 14-day period into one inquiry for scoring purposes.

Your QuickMatch loan request may be matched with Home Loan Center, Inc., which also does business as LendingTree Loans. Home Loan Center/LendingTree Loans is a wholly-owned subsidiary of LendingTree, LLC and is licensed as a mortgage broker/lender authorized to do business in all fifty states. By law, we are required to disclose that Home Loan Center/LendingTree Loans is an affiliate of LendingTree, LLC and we are required to provide you with this Affiliated Business Disclosure. By submitting your QuickMatch loan request, you acknowledge receipt of the Affiliated Business Disclosure. In the QuickMatch program, you may be matched with other lenders and you are not required to use Home Loan Center/LendingTree Loans.

Simultaneous GetSmart Program

When you fill out LendingTree's long form, you can authorize LendingTree to simultaneously submit a loan request to its GetSmart network if LendingTree cannot match you with 5 lenders who make you loan offers. LendingTree will attempt to match you with Lenders that can make offers first, using the process set forth in the section above entitled "Traditional (Full-Form) LendingTree Experience". If LendingTree is not able to match you with five lenders through the traditional LendingTree network, LendingTree will use its GetSmart network using the process described in the section above entitled "QuickMatch" program. You authorize LendingTree to do all of this. NOTE -- If you close a loan with a Lender that does not provide an initial loan offer (that is, from the QuickMatch or GetSmart programs); you will not be eligible for any incentives related to closing your loan. You are only eligible for such incentives by going through an affinity partner, filling out the full loan request, closing with a lender from the traditional LendingTree program, and meeting all other requirements for the incentive.

Your GetSmart loan request may be matched with Home Loan Center, Inc., which also does business as LendingTree Loans. Home Loan Center/LendingTree Loans is a wholly-owned subsidiary of LendingTree, LLC and is licensed as a mortgage broker/lender authorized to do business in all fifty states. By law, we are required to disclose that Home Loan Center/LendingTree Loans is an affiliate of LendingTree, LLC and we are required to provide you with this Affiliated Business Disclosure. By submitting your GetSmart loan request, you acknowledge receipt of the Affiliated Business Disclosure. In the GetSmart program, you may be matched with other lenders and you are not required to use Home Loan Center/LendingTree Loans.

## Terms Applicable to All Loan Services

LendingTree is not a lender and does not make loans or credit decisions in connection with loans. LendingTree does not endorse or recommend the products of any particular Lender on any of its websites. LendingTree is not an agent of either you, the User, or any participating Lender. LendingTree's services are administrative and consultative only. You should rely on your own judgment in deciding which available loan product best suits your needs and financial means. The Lender is solely responsible for its services to you, and you agree that LendingTree shall not be liable for any damages or costs of any type arising out of or in any way connected with your use of such services. You understand that Lenders may keep your loan request form, whether or not you are qualified for a loan with them.

This Web site and the services provided by LendingTree are available only in connection with (a) mortgage loans made on real property located in the fifty states and the District of Columbia unless

mortgage loans made to citizens and residents of the state (a) may secure and made to residents of a particular state
otherwise specified, and (b) non-mortgage loans made to citizens and residents of the United
States. Loans may only be made to residents of, or secured by real property located in, states
where participating Lenders are licensed or authorized to make such loans, as indicated herein
under the section titled "Lenders." Lenders are not attempting to make loans outside of their
authorized states or country by participating in and offering their products on this Web site.

LendingTree and/or participating Lenders expressly reserve the right to discontinue, suspend or
terminate the offering of any loan product in any specific state through this Web site.

LendingTree does not guarantee acceptance into any particular loan program or specific loan terms
or conditions with any participating Lender; loan approval standards are established and maintained
solely by individual Lenders. Likewise, LendingTree does not guarantee that the loan terms or rates
offered and made available by participating Lenders through this Web site are the best terms or rates
lowest rates available in the market. Unless expressly stated in writing, nothing contained herein
shall constitute an offer or promise for a loan commitment or interest rate lock-in agreement.

LendingTree does not charge you, the User, a fee to use our service. LendingTree is paid a fee by
participating Lenders for the goods, facilities and services provided. Your use of this Web site and/or
LendingTree's services constitutes your agreement with this compensation arrangement.

By hitting submit or requesting to be matched with Lenders under either of the programs, you
understand and agree that you are submitting an inquiry as to a lending product with LendingTree
and each of the Lenders to whom your loan request is transmitted. By submitting the loan request
containing your electronic signature, you are extending an express invitation to each of the Lenders
making you loan offers to contact you by telephone at the numbers you have provided so they may

assist you with your transaction, and you hereby consent to any such calls even if your phone number is on any Do Not Call list. By saving your information with LendingTree and/or submitting a loan request, you give LendingTree permission to make recorded calls to remind you of any deadlines or issues in connection with your loan request.

## REAL ESTATE SERVICES

All of the information you have provided in this referral form is true and complete. You authorize LendingTree to forward your information to its network of real estate professionals. You further understand and agree that by selecting a real estate company or professional, you are extending an express invitation for them to contact you by telephone at the numbers you have provided, and you hereby consent to any such calls even if your phone number is on the Do Not Call list. In addition, by completing and submitting a request for more information regarding a real estate listing or requesting contact with a real estate professional, you understand and agree that you are extending an express invitation to real estate professionals to call you by telephone at the numbers you have provided, and you hereby consent to any such calls even if your phone number is on the Do Not Call list. You understand that these real estate professionals may keep the information you submit whether or not you communicate with them regarding a real estate listing and whether or not you complete a real estate transaction with them. Real estate programs are administered by LendingTree, a licensed real estate broker. In certain geographic areas, LendingTree lists and sells homes. However, in connection with its Find a REALTOR® program, LendingTree does not list or sell homes. Instead, real estate brokerage activities are performed by local licensed real estate brokers. In connection with its Find a REALTOR® program LendingTree acts as a referring broker by referring you to a local real estate broker, and for its services, LendingTree receives a real estate

referring you to a local real estate broker, and for its services, LendingTree receives a real estate brokerage referral fee of up to 35% of the local broker's commission. Your use of this Web site and/or LendingTree's services constitutes your agreement with this compensation arrangement.

Cash, gift certificates, points or mileage incentives are only available to customers who use a LendingTree Network real estate professional to buy or sell their home. Customers must have been connected with the real estate professional through LendingTree's Find a REALTOR® program to be eligible for incentives. Certain states require that incentives be given as either a credit at closing or as a reduction of your real estate commission. The programs may be available on modified terms, or may be prohibited, in certain jurisdictions. Other restrictions may apply.

Real Estate. Create an Account/Registration

By creating an account or otherwise registering with this site, you hereby understand and agree that you have established a business relationship between you and LendingTree, LLC, which is the owner of this site. As such, you agree that LendingTree may contact you using information you provided with information and offers of services available through LendingTree and any of its websites. You hereby consent to any such communication or phone calls even if your phone number is on any Do Not Call list.

COPYRIGHT AND TRADEMARK NOTICES

All contents of this web site are: Copyright © 1998 - 2008 LendingTree, LLC and/or its suppliers, participating Lenders, or real estate professionals, 11115 Rushmore Dr., Charlotte, NC 28277, U.S.A. All rights reserved. LendingTree is a service mark of LendingTree, LLC. Other product and company names mentioned herein, including the names of participating Lenders, may be the trademarks of their respective owners.

## DISCLAIMERS AND LIMITATIONS

LendingTree intends that the information contained in its web site be accurate and reliable; however, errors sometimes occurs. In addition, changes and improvements to the information provided herein may be made by LendingTree at any time. THIS WEB SITE AND THE INFORMATION, SOFTWARE, PRODUCTS AND SERVICES ASSOCIATED WITH IT ARE PROVIDED "AS IS." LENDINGTREE AND/OR ITS SUPPLIERS, PARTICIPATING LENDERS, OR REAL ESTATE PROFESSIONALS DISCLAIM ANY WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, RELATING TO THIS WEB SITE AND ANY INFORMATION, SOFTWARE, PRODUCTS AND SERVICES PROVIDED HEREIN, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NONINFRINGEMENT. USE OF THIS WEB SITE AND/OR LENDINGTREE'S SERVICES IS AT YOUR OWN RISK. LENDINGTREE AND/OR ITS SUPPLIERS, PARTICIPATING LENDERS, OR REAL ESTATE PROFESSIONALS ARE NOT LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR OTHER INJURY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OF THIS WEB SITE AND/OR LENDINGTREE'S SERVICES OR WITH THE DELAY OR INABILITY TO USE THIS WEB SITE, OR FOR ANY INFORMATION, SOFTWARE, PRODUCTS AND SERVICES OBTAINED THROUGH THIS WEB SITE, OR OTHERWISE ARISING OUT OF THE USE OF THIS WEB SITE, WHETHER RESULTING IN WHOLE OR IN PART, FROM BREACH OF CONTRACT, TORTIOUS BEHAVIOR, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF LENDINGTREE AND/OR ITS SUPPLIERS HAD BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

## INDEMNITY

As a condition of use of this Web site and/or LendingTree's services, you agree to indemnify LendingTree and its suppliers, participating Lenders, or real estate professionals from and against any and all liabilities, expenses (including attorneys' fees) and damages arising out of claims resulting from your use of this Web site, including without limitation any claims alleging facts that if true would constitute a breach by you of this Agreement.

## LINKS TO THIRD PARTIES

This Web site may contain links to Web sites maintained by third parties. Such links are provided for your convenience and reference only. LendingTree does not operate or control in any respect any information, software, products or services available on such Web sites. LendingTree's inclusion of a link to a Web site does not imply any endorsement of the services or the site, its contents, or its sponsoring organization.

## ERRORS AND DELAYS

LendingTree is not responsible for any errors or delays in responding to a qualification form or referral form caused by an incorrect e-mail address provided by you or other technical problems beyond our reasonable control.

## DISPUTE RESOLUTION

Any claim or controversy arising out of or relating to the use of this Web site, to the goods or services provided by LendingTree, or to any acts or omissions for which you may contend LendingTree is liable, including but not limited to any claim or controversy as to arbitrability

LendingTree is liable, including but not limited to any claim or controversy as to arbitrability ("Dispute"), shall be finally and exclusively, settled by arbitration. The arbitration shall be held before one arbitrator under the commercial arbitration rules of the American Arbitration Association ("AAA") in force at that time. The arbitration shall be venued in Mecklenburg County, North Carolina except for Maine consumers for whom the location shall be a place reasonably convenient to the consumer. The arbitrator shall be selected pursuant to the AAA rules. Should no AAA rule regarding the selection of an arbitrator be in effect, the consumer shall select an arbitrator from a panel of arbitrators acceptable to LendingTree. In any arbitration, LendingTree will pay the filing fee, plus the costs associated with the first day of arbitration, with the remaining costs of arbitration paid by the non-prevailing party, provided, however, that in Maine any cost to the consumer shall be limited to the cost of filing a court case. To begin the arbitration process, a party must make a written demand therefor.

Any judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction in Mecklenburg County, North Carolina. The arbitrators shall not have the power to award damages in connection with any Dispute in excess of actual compensatory damages and shall not multiply actual damages or award consequential, punitive or exemplary damages, and each party irrevocably waives any claim thereto, except in Maine where state law will control all rights and remedies in the arbitration. The agreement to arbitrate shall not be construed as an agreement to the joinder or consolidation of an arbitration under this agreement with an arbitration of disputes or claims of any non-party, regardless of the nature of the issues or disputes involved.

THIS AGREEMENT PROVIDES THAT ALL DISPUTES BETWEEN YOU AND LENDINGTREE WILL BE RESOLVED BY BINDING ARBITRATION. YOU THUS GIVE UP YOUR RIGHT TO GO TO COURT TO

ASSERT OR DEFEND YOUR RIGHTS, YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS. YOUR RIGHTS WILL BE DETERMINED BY NEUTRAL ARBITRATORS AND NOT A JUDGE OR JURY. You are entitled to a fair hearing, but the arbitration procedures are simpler and more limited than rules applicable in court. Arbitrator decisions are enforceable as any court order and are subject to very limited review by a court. By using LendingTree's goods and services you consent to these restrictions.

Should a Dispute arise and should the arbitration provisions herein become inapplicable or unenforceable, or in any instance of any lawsuit between you and LendingTree, the parties agree that jurisdiction over and venue of any suit shall be exclusively in the state and federal courts sitting in Mecklenburg County, North Carolina. If either party employs attorneys to enforce any right in connection with any Dispute or lawsuit the prevailing party shall be entitled to recover reasonable attorneys' fees.

## OTHER TERMS

This Agreement constitutes the entire agreement between you and LendingTree and it supersedes all prior or contemporaneous communications, promises and proposals, whether oral, written or electronic, between you and LendingTree with respect to this Web site and information, software, products and services associated with it. This Agreement shall be subject to and construed in accordance with the laws of the State of North Carolina, excluding its conflict of laws principles. If any part of this Agreement is determined to be invalid or unenforceable pursuant to applicable law including, but not limited to, the warranty disclaimers and liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid enforceable provision that most closely matches the intent of the original provision, and the remainder of the Agreement

unenforceable, or in any instance of any lawsuit between you and LendingTree, the parties agree that jurisdiction over and venue of any suit shall be exclusively in the state and federal courts sitting in Mecklenburg County, North Carolina. If either party employs attorneys to enforce any right in connection with any Dispute or lawsuit the prevailing party shall be entitled to recover reasonable attorneys' fees.

## OTHER TERMS

This Agreement constitutes the entire agreement between you and LendingTree and it supersedes all prior or contemporaneous communications, promises and proposals, whether oral, written or electronic, between you and LendingTree with respect to this Web site and information, software, products and services associated with it. This Agreement shall be subject to and construed in accordance with the laws of the State of North Carolina, excluding its conflict of laws principles. If any part of this Agreement is determined to be invalid or unenforceable pursuant to applicable law including, but not limited to, the warranty disclaimers and liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid enforceable provision that most closely matches the intent of the original provision, and the remainder of the Agreement shall continue in effect. A printed version of this Agreement and of any notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to this Agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. All rights not expressly granted herein are reserved.

PLEASE PRINT AND RETAIN A COPY OF THIS AGREEMENT FOR YOUR RECORDS.

# Exhibit A

# Attachment 2



**WE ARE HERE TO HELP!**
📞 **1-800-411-TREE**
ℹ️ Or **Chat Now!**

🔒 **PRIVACY & SECURITY PROTECTED**

**PURCHASE LOAN**    Step ① ② ③ ④

**Step 2: Contact Information and Loan Details**
* required fields

### Borrower Information

Our privacy policy (updated) explains how LendingTree protects your information. By clicking "Continue," you acknowledge receipt of our privacy policy and request that LendingTree save the information on your form so that we may complete your transaction and facilitate the loan process.

**Congratulations!**
We are finding qualified lenders that meet your criteria. By providing more information, you can help us find the loan that's right for you.

"I am a full-time employee, have two part-time jobs, am a full-time master's degree student and a single parent. Thank you for helping me when I needed it the most! I love your customer service and customer focus!"
- Ami B., AZ

**As seen on:**
TODAY
TIME
CNBC
USA TODAY

*What is your first name? [        ]

What is your middle initial? [  ]

*What is your last name? [          ]

Please choose a suffix [  ▼]

*Date of birth: [ ▼] / [ ▼] / [  ▼]

*Marital status: [Not Married ▼]

*Citizenship status: [US Citizen      ▼]

*Social Security number: [    ] - [  ] - [    ] 🔒 ❓

*Daytime/Work Phone: [    ] - [   ] - [    ]

*Evening Phone: [    ] - [   ] - [    ]

*Current mailing address: [              ]

*City: [            ]

*State: [            ▼]

*ZIP: [      ]

*How long have you lived at this address? [    ] [Years ▼]

*Do you rent or own your residence? [    ▼]

**IMPORTANT:** We will use this email address to send you details of your lender matches and offers. To ensure you receive your offers, make sure the address you enter is correct. ❓

*What is your email address? [            ]

*Please verify your email address. [            ]

*Please create a password. [        ]

*Please re-enter your password. [        ]

Would you like LendingTree to send you money-saving tips and offers via email?    ○ Yes    ○ No

I agree to and accept the LendingTree Privacy Policy, Lending Disclosures, Affiliated Business Disclosures, and Terms of Use in electronic form, and acknowledge that my loan request may be sent to LendingTree Loans, an affiliate of LendingTree. I acknowledge that I have read and understand these documents. (Please print these documents for your records.)

☐ Yes, I agree and want to receive competing offers with no cost and no obligation.

🔒 **PRIVACY & SECURITY PROTECTED**         << Back    **SAVE AND CONTINUE >>**

Privacy Policy | Terms of Use | Licenses & Disclosures | Glossary

LendingTree technology and processes are patented under US Patent Nos. 6,385,594 and 6,611,816. © 1998 - 2008 LendingTree, LLC All Rights Reserved. This site is directed at, and made available to, persons in the continental U.S., Alaska and Hawaii only.

REALTOR® -- A registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and subscribes to its strict Code of Ethics.

The Today Show™, USA Today®, CNBC®, and Time Magazine® are trademarks of their respective owners. These companies are not affiliated with and do not endorse LendingTree, LLC.



EQUAL HOUSING OPPORTUNITY

# Exhibit B
# Part 1

1  Rosemary M. Rivas (State Bar No. 209147)
2  **FINKELSTEIN THOMPSON LLP**
3  100 Bush Street, Suite 1450
   San Francisco, CA 94104
4  Telephone: (415) 398-8700/Facsimile: (415) 398-8704

5  *Attorneys for Plaintiffs*

6

**UNITED STATES DISTRICT COURT**
7  **CENTRAL DISTRICT OF CALIFORNIA**

8  AMY BERCAW, RUSSELL
9  WINSETT, and TY WOODS, on
   behalf of themselves and all others
10  similarly situated,
11
12              Plaintiffs,
13  v.
14
15  LENDINGTREE, LLC, a Delaware
   limited liability company, NEWPORT
16  LENDING CORP., a Nevada
17  corporation, SAGE CREDIT CO., a
   Delaware corporation, HOME LOAN
18  CONSULTANTS, INC., a California
19  corporation, CHAPMAN CAPITAL,
   INC., a California corporation, and
20  SOUTHERN CALIFORNIA
21  MARKETING CORP., a California
   corporation.
22
23              Defendants.
24
25
26
27

**FILED**
2008 JUN 13 PH 2:05
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

SACV08-660 CJC (ANx)

Case No.

**CLASS ACTION COMPLAINT FOR:**

(1)  **INTENTIONAL VIOLATION OF FCRA, 15 U.S.C. §1681 *et. seq*;**
(2)  **NEGLIGENT VIOLATION OF FCRA, 15 U.S.C. §1681 *et. seq*;**
(3)  **NEGLIGENCE;**
(4)  **BREACH OF IMPLIED CONTRACT;**
(5)  **INVASION OF PRIVACY;**
(6)  **MISAPPROPRIATION OF CONFIDENTIAL INFORMATION IN VIOLATION OF CAL CIV. CODE § 17980.80 *ET SEQ.*;**
(7)  **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**
(8)  **NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS;**
(9)  **CONVERSION;**
(10) **UNJUST ENRICHMENT; AND**
(11) **VIOLATION OF CAL. BUS. AND PROF. CODE §§ 17200 *ET SEQ.***

**DEMAND FOR JURY TRIAL**

*BY FAX*

28

-1-
CLASS ACTION COMPLAINT

1  NOW COME plaintiffs, Amy Bercaw, Ty Woods and Russell Winsett

2  ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and

3  through their attorneys, and in support of Plaintiffs' Class Action Complaint,

4  allege as follows:

5  ## JURISDICTION & VENUE

6  1.  The Court has jurisdiction over the federal claims alleged herein

7  pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the

8  state law claims alleged herein under 28 U.S.C. §1367. Further, the Court also has

9  subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C.

10  §1332, as amended by the Class Action Fairness Act of 2005, because the

11  matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and

12  is a class action in which some members of the Class are citizens of states

13  different than some of defendants. *See* 28 U.S.C. §1332(d)(2)(A).

14  2.  Pursuant to 28 U.S.C. §1391(a)(2), venue is proper in the Central

15  District of California because a substantial part of the acts giving rise to

16  Plaintiffs' claims, such as the transactions by which Defendants became privy

17  to Plaintiffs' Consumer Information (as hereinafter defined), occurred in the

18  Central District of California. Defendants also conduct substantial business

19  within this District.

20  ## NATURE OF ACTION

21  3.  This is a consumer class action lawsuit brought on behalf of

22  Plaintiffs, individually, and on behalf of all other persons similarly situated whose

23  Consumer Reports (as hereinafter defined), personal information, and financial

24  information ("Consumer Information") were intentionally and illegally distributed

25  and/or sold by employees, representatives, and/or agents of defendant

26  LendingTree, LLC ("LendingTree"), to defendants Newport Lending Corp.

27  ("Newport"), Southern California Marketing Corp. ("Southern California

28  Marketing"), Home Loan Consultants, Inc. ("Home Loan"), Chapman Capital, Inc.

CLASS ACTION COMPLAINT

1   ("Chapman"), and Sage Credit Co. ("Sage") (collectively referred to as "Mortgage

2   Lenders"), and which were intentionally and illegally distributed and/or sold by

3   Newport and Southern California Marketing to Sage, Home Loan, and Chapman

4   (all collectively referred to as "Defendants"), in violation of the Fair Credit

5   Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), during the period beginning

6   October 2006, to the present (the "Class").

7       4.     LendingTree deliberately, recklessly, and/or negligently failed to

8   maintain reasonable procedures designed to limit the furnishing of the Consumer

9   Information to the permissible purposes outlined under FCRA. As a result of

10  LendingTree's deliberate, reckless, and/or negligent violations of FCRA, its

11  representatives and/or agents obtained Plaintiffs' and Class members' Consumer

12  Information and sold it to Mortgage Lenders without the consent of Plaintiffs and

13  Class members.

14      5.     LendingTree's actions constitute violations of FCRA, as well as

15  common law negligence, breach of implied contract, invasion of privacy,

16  misappropriation of confidential information in violation of Cal Civ. Code §

17  17980.80 *et seq.*, and violations of Cal. Bus. and Prof. Code §§ 17200 *et seq.*

18      6.     Newport and Southern California Marketing obtained Plaintiffs' and

19  Class members' Consumer Information and sold it to Sage, Home Loan, and

20  Chapman without the consent of Plaintiffs and Class members.

21      7.     Newport's and Southern California Marketing's actions constitute an

22  intentional violation of FCRA, as well as conduct that resulted in their unjust

23  enrichment.

24      8.     Mortgage Lenders intentionally, recklessly, and/or negligently

25  interfered with the existing contracts between LendingTree and Plaintiffs and

26  members of the Class by illegally acquiring, selling and/or disseminating

27  Plaintiffs' and Class members' Consumer Information, by way of selling the

28  passwords necessary to access said information, without the consent of Plaintiffs

CLASS ACTION COMPLAINT

1     and Class members. In doing so, Mortgage Lenders also unlawfully converted

2     Plaintiffs' and Class members' Consumer Information.

3          9.     Mortgage Lenders' actions constitute an invasion of privacy,

4     misappropriation of confidential information in violation of Cal Civ. Code §

5     17980.80 *et seq.*, intentional interference with contractual relations, negligent

6     interference with contractual relations, and conversion.

7          10.     Plaintiffs seek damages suffered as a result of Defendants' practices,

8     including but not limited to statutory damages, compensatory damages, and

9     injunctive relief.

10                           **PARTIES**

11          11.     Plaintiff Amy Bercaw is an individual and resident of Las Vegas,

12     Nevada. Plaintiff Bercaw is a citizen of Nevada.

13          12.     Plaintiff Russell Winsett, is an individual and a resident of Chickasha,

14     Oklahoma. Plaintiff Winsett is a citizen of Oklahoma.

15          13.     Plaintiff Ty Woods is an individual and a resident of Smyrna,

16     Georgia. Plaintiff Woods is a citizen of Georgia.

17          14.     Defendant, LendingTree, LLC, is a Delaware limited liability

18     company. It has headquarters in Irvine, California at 163 Technology Drive where

19     LendingTree's consumer-direct mortgage operations are also located and where it

20     employs over 1,400 people. LendingTree provides financial information services

21     throughout the United States. LendingTree regularly engages in the practice of

22     assembling or evaluating consumer credit information on consumers for the

23     purpose of furnishing this information to third parties.

24          15.     Defendant Newport Lending Corp., is a corporation organized and

25     existing under the laws of the state of Nevada. Newport's headquarters are located

26     at 3 San Joaquin Plaza 255, Newport Beach, California 92660. Newport provides

27     personal loans to consumers. Newport, at all relevant times, conducted business in

28     the State of California.

CLASS ACTION COMPLAINT

1    16.    Defendant Sage Credit Co., is a corporation organized and existing

2  under the laws of the state of Delaware.  Sage's headquarters are located at 8001

3  Irvine Center DT, Suite 200, Irvine, California 92618.  Sage is a mortgage

4  company that provides mortgages, home equity loans, refinancing, and debt

5  consolidation loans to consumers.  Sage, at all relevant times, conducted business

6  in the State of California.

7    17.    Defendant Home Loan Consultants, Inc., is a corporation organized

8  and existing under the laws of the state of California.  Home Loan's headquarters

9  are located at 6815 Flanders Drive, Suite 150, San Diego, California 92121.

10  Home Loan offers mortgages, refinancing, and home equity loans to consumers.

11  Home Loan, at all relevant times, conducted business in the State of California.

12    18.    Defendant Chapman Capital, Inc., is a corporation organized and

13  existing under the laws of the state of California.  Chapman's headquarters are

14  located at 1795-C N Willow Woods Dr., Anaheim, California 92807.  Chapman,

15  on information and belief, offers loans to consumers.  Chapman, at all relevant

16  times, conducted business in the State of California.

17    19.    Defendant Southern California Marketing Corp., is a corporation

18  organized and existing under the laws of the state of California.  Southern

19  California Marketing's headquarters are located in California.  Southern California

20  Marketing, on information and belief, offers loans to consumers.  Southern

21  California Marketing, at all relevant times, conducted business in the State of

22  California.

23                **FACTUAL BACKGROUND**

24    20.    LendingTree provides financial information services throughout the

25  United States, and regularly engages in the practice of assembling or evaluating

26  consumer credit information on consumers for the purpose of furnishing this

27  information to third parties.

28    21.    LendingTree operates an online network that matches consumers and

CLASS ACTION COMPLAINT

1    lenders for the purpose of obtaining mortgage loan products.

2        22.    In exchange for signing up with LendingTree, it allows consumers to,

3    *inter alia*, choose from up to four competitive loan offers from major, national,

4    regional, and local lenders across the United States.

5        23.    When opening an account with LendingTree, consumers are required

6    to complete a qualification form. Through this qualification form, LendingTree

7    obtains a consumer's most confidential information, including their name, social

8    security number, income, employment information, phone number, etc., and

9    provides said information to its network of lenders, wholesale mortgage banks,

10    and investors to facilitate the consumer's mortgage and/or loan application.

11        24.    Plaintiff Bercaw opened an account with LendingTree in July or

12    August 2007, providing LendingTree with the information requested on the

13    qualification form.

14        25.    After the April 21, 2008 announcement, *infra*, Plaintiff Bercaw

15    signed up for a credit monitoring service at her own expense.

16        26.    Plaintiff Winsett opened an account with LendingTree in August

17    2007, providing LendingTree with the information requested on the qualification

18    form.

19        27.    Plaintiff Woods opened an account with LendingTree in 2006,

20    providing LendingTree with the information requested on the qualification form.

21        28.    Since opening her account with LendingTree in 2006, Plaintiff

22    Woods has been the victim of identity theft and her credit score has gone down

23    by approximately 200 points. Upon information and belief, the source of her

24    identity theft has been traced back to California.

25        29.    On April 21, 2008, LendingTree publicly announced that several of

26    its employees provided Mortgage Lenders with unauthorized access to its

27    qualification forms without the consent of Plaintiffs and Class members.

28    LendingTree's employees assisted the unauthorized Mortgage Lenders in

CLASS ACTION COMPLAINT

1  obtaining said forms by providing them with confidential passwords in exchange
2  for payments.

3      30.    These passwords allowed Mortgage Lenders to access LendingTree's
4  customer qualification forms, which are normally available only to
5  LendingTree-approved lenders.   Such approved lenders are only given access
6  to certain consumers' qualification forms, and only those consumers with
7  whom the lenders match up with, depending on the consumer's needs.

8      31.    LendingTree has admitted that, based on its investigation,
9  Mortgage Lenders did make use of the passwords and did access, without
10 authority, LendingTree's customer qualification forms. These forms contained
11 Plaintiffs' and Class members' names, addresses, email addresses, telephone
12 numbers, Social Security numbers, and income and employment information.

13     32.    Newport and Southern California Marketing sold Plaintiffs' and Class
14 members' Consumer Information and/or the requisite passwords required to access
15 said information to Sage, Home Loan, and Chapman.

16     33.    Mortgage Lenders disseminated Plaintiffs' and Class members'
17 Consumer Information to their employees and/or agents.

18     34.    LendingTree stated in its letter of April 21, 2008, that Mortgage
19 Lenders accessed its loan request forms "between October 2006 and early 2008."

20     35.    LendingTree further stated that it had notified the authorities and had
21 filed a lawsuit against its employees and/or agents involved in the breach, in
22 addition to Mortgage Lenders.  LendingTree's lawsuit was filed on April 21, 2008.

23     36.    Despite having taken the time to notify the authorities and prepare a
24 lawsuit on its own behalf, LendingTree failed to notify Plaintiffs or Class members
25 until April 21, 2008.

26     37.    Upon information and belief, when a customer who received the April
27 21, 2008 letter calls LendingTree, the company advises the customer that they
28 should acquire credit-monitoring services to protect their credit.  However,

CLASS ACTION COMPLAINT

1  LendingTree has refused to pay for such credit monitoring services for the affected

2  customers.

3      38.    Furthermore, on information and belief, when a customer calls

4  LendingTree and generally asks about their privacy policy, LendingTree

5  represents to callers that it has never had any problems with its privacy policy.

6  Even when asked about the conduct and events as alleged herein, LendingTree

7  continues to deny any knowledge of said conduct and events, but once pressed,

8  asks the customer whether they received a letter from LendingTree pertaining to

9  said conduct and events.

10     39.    Plaintiffs' and Class members' Consumer Information has been

11 improperly and illegally sold and/or disclosed to Mortgage Lenders by employees

12 and/or agents of LendingTree.

13     40.    Plaintiffs did not agree to allow LendingTree to disseminate their

14 Consumer Information to any unauthorized lender or unauthorized third party,

15 including Mortgage Lenders.

16     41.    Plaintiffs did not agree to allow Mortgage Lenders to disseminate

17 and/or sell their Consumer Information to any unauthorized lender or unauthorized

18 third-party.

19     42.    Plaintiffs did not authorize the employees of LendingTree to access

20 their Consumer Information for purposes of selling, brokering, or otherwise

21 disseminating said information to unauthorized third parties, including Mortgage

22 Lenders.

23     43.    Plaintiffs did not authorize the employees of Mortgage Lenders to

24 access their Consumer Information for purposes of selling, brokering, or

25 otherwise disseminating said information to unauthorized third parties.

26                    **CLASS ACTION ALLEGATIONS**

27     44.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs

28 bring this class action, individually and on behalf of all other persons whose

CLASS ACTION COMPLAINT

consumer reports, personal information, and/or financial information were
disseminated and/or sold by LendingTree and/or LendingTree's employees as
part of an impermissible dissemination to Mortgage Lenders, without the consent
of consumers and/or without a permissible purpose under FCRA, during the
period beginning October 2006 to the present (the "Class"). The Class includes
those persons or entities whose Consumer Reports, personal information, and/or
financial information were disseminated and/or sold by Newport and Southern
California Marketing. The Class does not include LendingTree, Mortgage
Lenders, or their officers, directors, agents, or employees.

45. On information and belief, the Class is comprised of millions of
consumers, making the joinder of such cases impracticable. Disposition of the
claims in a class action will provide substantial benefits to both the parties and the
Court.

46. The rights of each member of the Class were violated in a similar
fashion based upon LendingTree's and Mortgage Lenders' uniform actions.

47. Questions of law and fact common to the Class predominate over
questions that may affect individual Class members and include, but are not
limited to, the following:

  a. Whether LendingTree's employees sold, disseminated or
     otherwise provided access to Plaintiffs' and Class
     members' Consumer Information within the meaning of 15
     U.S.C. §1681a(d)(1) and without Plaintiffs' or Class
     members' authorization;

  b. Whether Newport and Southern California Marketing
     sold, disseminated or otherwise provided access to
     Plaintiffs' and Class members' Consumer Information
     within the meaning of 15 U.S.C. §1681a(d)(1) and without
     Plaintiffs' or Class members' authorization;

CLASS ACTION COMPLAINT

c. Whether LendingTree and/or its employees, representatives, or agents had a permissible purpose under FCRA to sell, disseminate or otherwise provide access to Plaintiffs' and Class members' Consumer Information within the meaning of 15 U.S.C. §1681a(d)(1);

d. Whether Newport and Southern California Marketing or their agents had a permissible purpose under FCRA to sell, disseminate or otherwise provide access to Plaintiffs' and Class members' Consumer Information within the meaning of 15 U.S.C. §1681a(d)(1);

e. Whether LendingTree is a Consumer Reporting Agency, as defined by 15 U.S.C. § 1681a(f);

f. Whether Newport and Southern California Marketing are Consumer Reporting Agencies, as defined by 15 U.S.C. § 1681a(f);

g. Whether LendingTree violated FCRA by failing to properly maintain reasonable procedures designed to limit the furnishing of Consumer Information to the permissible purposes outlined under FCRA;

h. Whether LendingTree violated FCRA when its employee sold, disseminated or otherwise provided access to Plaintiffs' and Class members' Consumer Information to unauthorized third parties;

i. Whether Newport and Southern California Marketing violated FCRA when they sold, disseminated or otherwise provided access to Plaintiffs' and Class members' Consumer Information to unauthorized third parties;

j. Whether LendingTree's conduct was intentional;

CLASS ACTION COMPLAINT

k. Whether Newport's and Southern California Marketing's conduct was intentional;

l. Whether LendingTree's conduct was reckless;

m. Whether Newport's and Southern California Marketing's conduct was reckless;

n. Whether LendingTree was negligent in collecting and storing Plaintiffs' and Class members' Consumer Information;

o. Whether LendingTree took reasonable steps and measures to safeguard Plaintiffs' and Class members' Consumer Information;

p. Whether LendingTree owed a duty to Plaintiffs and Class members to protect their Consumer Information;

q. Whether LendingTree breached its duty to exercise reasonable care in storing Plaintiffs' and Class members' Consumer Information by storing that information on its computer systems in the manner in which it did;

r. Whether LendingTree breached its duty to Plaintiffs and Class members by failing to keep their Consumer Information secure;

s. Whether LendingTree was negligent in failing to keep Plaintiffs' and Class members' Consumer Information secure;

t. Whether implied contracts existed between LendingTree and Plaintiffs and Class members;

u. Whether LendingTree breached the implied contracts between it and Plaintiffs and Class members;

v. Whether Defendants violated Plaintiffs' and Class

CLASS ACTION COMPLAINT

1  members' rights of privacy;

2   w. Whether LendingTree violated Cal Civ. Code § 17980.80 *et*

3    *seq.*;

4   x. Whether Mortgage Lenders acquired Plaintiffs' and Class

5    members' Consumer Information without their

6    authorization, knowledge, and/or consent;

7   y. Whether Mortgage Lenders knew of the existence of the

8    contracts between LendingTree and Plaintiffs and Class

9    members;

10   z. Whether Mortgage Lenders intended to and did disrupt the

11    existing contracts between LendingTree and Plaintiffs and

12    Class members;

13   aa. Whether Mortgage Lenders negligently disrupted the

14    existing contracts between LendingTree and Plaintiffs and

15    Class members;

16   bb. Whether Newport and Southern California Marketing

17    have unjustly retained benefits to the detriment of

18    Plaintiffs and Class members;

19   cc. Whether LendingTree violated Cal. Bus. and Prof. Code

20    §§ 17200 *et seq.*;

21   dd. Whether Plaintiffs and Class members have sustained

22    damages, and if so, what is the proper measure of those

23    damages; and

24   ee. Whether statutory damages are proper in this matter, and in

25    what amount.

26  48. Plaintiffs' claims are typical of the claims of the respective Class they

27 seek to represent, because the Consumer Information of Plaintiffs, like the

28 Consumer Information of all members of the proposed Class, was intentionally

1   and illegally distributed and/or sold by employees, representatives, and/or agents

2   of Defendants.

3       49.    Plaintiffs will fairly and adequately represent and protect the interests

4   of the Class, in that they have no interest that is antagonistic to or that

5   irreconcilably conflicts with those of other members of the Class.

6       50.    Plaintiffs have retained counsel competent and experienced in the

7   prosecution of class action litigation.

8       51.    A class action is superior to all other available methods for the fair

9   and efficient adjudication of Plaintiffs' and Class members' claims. Plaintiffs

10  and Class members have suffered harm as a result of Defendants' conduct.

11  Certification of a class action to resolve these disputes will reduce the possibility

12  of repetitious litigation involving, potentially, millions of class members.

13  Further, certification is appropriate under Federal Rule of Civil Procedure 23, as

14  the Class satisfies the requirements of Federal Rules of Civil Procedure 23(a) and

15  23(b)(3).

16                          **COUNT I**

17              **INTENTIONAL VIOLATIONS OF**

18              **THE FAIR CREDIT REPORTING ACT**

19  **(as to LendingTree, Newport, and Southern California Marketing)**

20      52.    Plaintiffs re-allege the paragraphs of this Complaint as if fully set

21  forth herein in this Count I.

22      53.    The Fair Credit Reporting Act ("FCRA") was created to require that

23  consumer reporting agencies adopt reasonable procedures for meeting the needs of

24  commerce for consumer credit, personnel, insurance, and other information, in a

25  manner which is fair and equitable to the consumer with regard to the

26  confidentiality, accuracy, relevancy, and proper utilization of such information.

27  *See* 15 U.S.C. §1681 *et. seq.*

28      54.    Under FCRA, a "Consumer Report" means any written, oral or other

1   communication of any information by a consumer reporting agency bearing on a

2   consumer's credit worthiness, credit standing, credit capacity, character, general

3   reputation, personal characteristics, or mode of living which is used or expected to

4   be used or collected in whole or in part for the purpose of serving as a factor in

5   establishing the consumer's eligibility for credit or insurance to be used primarily

6   for personal, family, or household purposes, employment purposes, or any other

7   purpose authorized under 15 U.S.C. §1681(b), 15 U.S.C. §1681a(d)(1).

8       55.    Under FCRA, a "Consumer Reporting Agency" means any person

9   which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly

10  engages in whole or in part in the practice of assembling or evaluating consumer

11  credit information or other information on consumers for the purpose of furnishing

12  Consumer Reports to third parties, and which uses any means or facility of

13  interstate commerce for the purpose of preparing or furnishing Consumer Reports.

14      56.    Plaintiffs and other Class members are "consumers" or "persons" as

15  defined and construed under FCRA (15 U.S.C. §1681a(b) & (c)).

16      57.    LendingTree, Newport, and Southern California Marketing are

17  Consumer Reporting Agencies as defined under FCRA because they, for

18  monetary fees, regularly engage in whole or in part in the practice of

19  assembling or evaluating consumer credit information or other information on

20  consumers for the purpose of furnishing Consumer Reports to third parties, and

21  use interstate commerce for the purpose of preparing or furnishing consumer

22  reports.

23      58.    The Consumer Information sold, disseminated, or otherwise provided

24  access to by LendingTree's employees and Newport and Southern California

25  Marketing were Consumer Reports as defined under the FCRA.

26      59.    As a Consumer Reporting Agency, LendingTree is required to

27  maintain reasonable procedures designed to limit the furnishing of Consumer

28  Reports to the permissible purposes outlined under FCRA. *See* 15 U.S.C. §1681e.

**CLASS ACTION COMPLAINT**

60. In conscious disregard of the rights of Plaintiffs and Class members, LendingTree deliberately and/or recklessly did not maintain reasonable procedures designed to limit the furnishing of Consumer Reports, personal and/or financial information to the permissible purposes outlined under FCRA, specifically 15 U.S.C. §1681e.

61. LendingTree's deliberate and/or reckless conduct allowed its employees to obtain the Consumer Reports, personal and/or financial information of Plaintiffs and Class members, and to sell, disseminate, and/or otherwise provide access to Plaintiffs' and Class members' Consumer Information to unauthorized third parties without the consent of Plaintiffs or Class members, and for no permissible purpose under FCRA.

62. LendingTree is responsible for its employees' actions as agents of LendingTree.

63. Newport and Southern California Marketing, with full knowledge that the Consumer Information was unlawfully obtained, deliberately sold, disseminated, and/or otherwise provided access to Plaintiffs' and Class members' Consumer Information to third parties without the consent of Plaintiffs or Class members, and for no permissible purpose under FCRA.

64. LendingTree's, Newport's, and Southern California Marketing's conduct violated FCRA, and Plaintiffs and Class members have been damaged by their deliberate and/or reckless actions. At all times material, LendingTree had full knowledge of its employees' conduct.

65. As a result of LendingTree's, Newport's, and Southern California Marketing's conduct, Plaintiffs are entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000 per violation, as well as the costs and attorneys' fees in bringing this action. 15 U.S.C. §1681n.

## COUNT II
## NEGLIGENT VIOLATION OF
## THE FAIR CREDIT REPORTING ACT
### (as to LendingTree)

66.     Plaintiffs re-allege the paragraphs of this Complaint as if fully set forth herein in this Count II.

67.     LendingTree is a Consumer Reporting Agency as defined under FCRA because it, for monetary fees, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing Consumer Reports to third parties, and uses interstate commerce for the purpose of preparing or furnishing Consumer Reports.

68.     The Consumer Information sold by LendingTree's employees amounted to Consumer Reports as defined under FCRA.

69.     As a Consumer Reporting Agency, LendingTree is required to maintain reasonable procedures designed to limit the furnishing of Consumer Reports to the permissible purposes outlines under FCRA. *See* 15 U.S.C. §1681e.

70.     LendingTree was negligent in failing to maintain reasonable procedures to protect Plaintiffs' and Class members' Consumer Reports, personal and/or financial information.

71.     LendingTree's negligent conduct allowed its employees to obtain Plaintiffs' and Class members' Consumer Reports, personal and/or financial information and sell it to third parties without the consent of Plaintiffs or Class members, and for no permissible purpose under FCRA.

72.     LendingTree is responsible for its employee's actions as agents of LendingTree.

73.     Plaintiffs and Class members have been damaged by LendingTree's negligent actions.

CLASS ACTION COMPLAINT

74.     As a result of LendingTree's negligent conduct, Plaintiffs are entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000 per violation, as well as the costs and attorneys' fees in bringing this action. 15 U.S.C. §1681n.

## COUNT III

## NEGLIGENCE

### (as to LendingTree)

75.     Plaintiffs re-allege the paragraphs of this Complaint as if fully set forth herein in this Count III.

76.     LendingTree came into possession of Plaintiffs' and Class members' Consumer Information, and had a duty to exercise reasonable care in safeguarding and protecting such information from being compromised and/or stolen.

77.     LendingTree had a duty to timely disclose that Plaintiffs' and Class members' Consumer Information within its possession had been, or was reasonably believed to have been, compromised.

78.     LendingTree had a duty to have procedures in place to detect and prevent the dissemination of Plaintiffs' and Class members' Consumer Information by its employees. This breach of security and unauthorized access was reasonably foreseeable to LendingTree.

79.     LendingTree, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class members' Consumer Information within its possession.

80.     LendingTree, through its actions and/or omissions, breached its duty to Plaintiffs and Class members by failing to have procedures in place to detect and prevent dissemination of Plaintiffs' and Class members' Consumer Information by its employees. LendingTree is responsible for its employees' actions.

CLASS ACTION COMPLAINT

1    81. LendingTree, through its actions and/or omissions, breached its duty to

2    timely disclose the fact that Plaintiffs' and Class members' Consumer Information

3    within its possession had been, or was reasonably believed to have been,

4    compromised.

5    82. But for LendingTree's negligent and wrongful breach of its duties

6    owed to Plaintiffs and Class members, Plaintiffs' and Class members' Consumer

7    Information would not have been compromised.

8    83. Plaintiffs' and Class members' Consumer Information was

9    compromised, viewed, and/or stolen as the proximate result of LendingTree

10   failing to exercise reasonable care in safeguarding such information by adopting,

11   implementing, or maintaining appropriate security measures to protect and

12   safeguard Plaintiffs' and Class members' Consumer Information within its

13   possession.

14   84. Plaintiffs and Class members suffered actual damages including, but

15   not limited to, expenses for credit monitoring, anxiety, emotional distress, loss

16   of privacy, and other economic and non-economic harm.

17                          **COUNT IV**

18                **BREACH OF IMPLIED CONTRACT**

19                     **(as to LendingTree)**

20   85. Plaintiffs re-allege the paragraphs of this Complaint as if fully set

21   forth herein in this Count IV.

22   86. LendingTree came into possession of Plaintiffs' and Class members'

23   Consumer Information and had an implied contract with Plaintiffs and Class

24   members to protect such information, by way of Plaintiffs and Class members

25   providing LendingTree with the requisite qualification form information.

26   87. The implied contract required LendingTree to not disclose Plaintiffs'

27   and Class members' Consumer Information to unauthorized third party entities,

28   and to safeguard and protect the information from being compromised and/or

1   stolen.

2      88.    LendingTree did not safeguard and protect Plaintiffs' and Class

3   members' Consumer Information from being compromised and/or stolen. Indeed,

4   LendingTree disclosed this information to unauthorized lenders.

5      89.    Because LendingTree disclosed Plaintiffs' and Class members'

6   Consumer Information and failed to safeguard and protect Plaintiffs' and Class

7   members' Consumer Information from being compromised and/or stolen,

8   LendingTree breached its contract with Plaintiffs and Class members.

9      90.    Plaintiffs and Class members suffered and will continue to suffer

10   actual damages, including but not limited to, anxiety, emotional distress, loss of

11   privacy, and other economic and noneconomic harm.

12                      **COUNT V**

13              **INVASION OF PRIVACY**

14              **(as to all Defendants)**

15      91.    Plaintiffs re-allege the paragraphs of this Complaint as if fully set

16   forth herein in this Count V.

17      92.    Plaintiffs and Class members have a legally protected privacy interest

18   in their confidential credit, financial and other personal information, including

19   their Consumer Information, and a reasonable expectation of privacy in such

20   information. This right of privacy includes the right not to have someone else

21   profit by the misappropriation and sale or dissemination of such confidential

22   personal and financial information.

23      93.    Defendants and their employees made unauthorized intrusions into

24   Plaintiffs' and Class members' privacy by accessing, disclosing, disseminating

25   and/or selling their Consumer Information without their knowledge,

26   authorization or consent. This unauthorized disclosure and/or sale of such

27   private facts and information is one that is highly offensive or objectionable to

28   a reasonable person of ordinary sensibilities. Moreover, the disclosure of such

CLASS ACTION COMPLAINT

1  private facts and information, as alleged herein, does not include information that
2  is of a legitimate public concern.

3      94.   Defendants and their employees violated the rights of privacy of
4  Plaintiffs and Class members by acquiring, disclosing and/or selling their
5  Consumer Information without their consent. Plaintiffs' and Class members'
6  Consumer Information has value, and Defendants' and their employees'
7  unlawful use, disclosure and/or sale of that information, was made for their own
8  benefit.

9      95.   As a result of the unlawful conduct, as alleged herein, the privacy
10  rights of Plaintiffs and Class members have been violated, and Plaintiffs and Class
11  members have been harmed as a result thereof.

12      96.   Defendants' conduct as alleged herein further violates the California
13  constitutional right of privacy.

14      97.   Plaintiffs and Class members suffered and will continue to suffer
15  actual damages, including but not limited to, anxiety, emotional distress, loss of
16  privacy, and other economic and noneconomic harm.

17  <u>**COUNT VI**</u>
18  <u>**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION IN**</u>
19  <u>**VIOLATION OF CAL. CIV. CODE § 17980.80, *ET SEQ.***</u>
20  <u>**(as to all Defendants)**</u>

21      98.   Plaintiffs re-allege the paragraphs of this Complaint as if fully set
22  forth herein in this Count VI.

23      99.   Plaintiffs and Class members have a property interest in their
24  Consumer Information.  This property interest includes the right not to have
25  someone else profit by the misappropriation and sale or dissemination of such
26  information.

27      100.   Defendants and their employees made unauthorized intrusions into
28  Plaintiffs' and Class members' privacy by accessing, disclosing, disseminating

CLASS ACTION COMPLAINT

1 and/or selling their Consumer Information without their knowledge,

2 authorization or consent.

3     101.   Defendants and their employees misappropriated Plaintiffs' and

4 Class members' Consumer Information by acquiring it and disseminating and/or

5 selling it without their consent. Plaintiffs' and Class members' Consumer

6 Information has value, and Defendants' and their employees' unlawful

7 misappropriation, disclosure and/or sale of that information, was made for their

8 own benefit.

9     102.   Defendants' conduct as alleged herein violates Cal Civ. Code §

10 17980.80 *et seq.*, which obligates companies that possess personal information to

11 take all reasonable steps to destroy the personal information no longer needed by

12 the business, notify residents whose unencrypted information has been acquired in

13 an unauthorized manner, and to implement reasonable security measures.

14     103.   As a result of the unlawful conduct, as alleged herein, Plaintiffs and

15 Class members have been harmed by way of having their Consumer Information

16 misappropriated.

17     104.   Plaintiffs and Class members suffered and will continue to suffer

18 actual damages, including but not limited to, anxiety, emotional distress, loss of

19 privacy, and other economic and noneconomic harm.

20                          **COUNT VII**

21                          **CONVERSION**

22                    **(as to Mortgage Lenders)**

23     105.   Plaintiffs re-allege the paragraphs of this Complaint as if fully set

24 forth herein in this Count VII.

25     106.   Consumer Information is property under California law.  Plaintiffs

26 and Class members own all legal and possessory rights to their Consumer

27 Information.

28     107.   Mortgage Lenders wrongfully acquired Plaintiffs' and Class

**CLASS ACTION COMPLAINT**

members' Consumer Information without their authorization, knowledge, and/or consent.

108. Mortgage Lenders, without Plaintiffs' or Class members' authorization, misappropriated their Consumer Information.

109. Upon information and belief, Mortgage Lenders sold access to Plaintiffs' and Class members' Consumer Information to third parties without their consent.

110. Plaintiffs and Class members were damaged as the proximate result of Mortgage Lenders misappropriating and selling Plaintiffs' and Class members' Consumer Information without their consent.

111. Pursuant to Cal. Civ. Code § 3336, Plaintiffs and Class members are entitled to reasonable attorneys' fees, costs and expenses

## COUNT VIII

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### (as to Mortgage Lenders)

112. Plaintiffs re-allege the paragraphs of this Complaint as if fully set forth herein in this Count VIII.

113. A contract existed between LendingTree and Plaintiffs and Class members, whereby the parties agreed that LendingTree would preserve and protect the confidentiality of Plaintiffs' and Class members' Consumer Information.

114. Mortgage Lenders knew of the existence of the contracts between LendingTree and Plaintiffs and Class members.

115. Mortgage Lenders intended to and did disrupt the existing contracts between LendingTree and Plaintiffs and Class members by misappropriating Plaintiffs' and Class members' Consumer Information.

116. Mortgage Lenders' misappropriation of Plaintiffs' and Class members' Consumer Information reduced the value of the existing contracts

-22-

CLASS ACTION COMPLAINT

1   between LendingTree and Plaintiffs and Class members.

2       117.   Mortgage Lenders' misappropriation of Plaintiffs' and Class

3   members' Consumer Information made performance of the contracts more

4   burdensome.

5       118.   Plaintiffs and Class members were damaged by Mortgage Lenders'

6   intentional disruption of Plaintiffs' and Class members' contracts with

7   LendingTree.

8                              **COUNT IX**

9   **NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS**

10                      **(as to Mortgage Lenders)**

11      119.   Plaintiffs re-allege the paragraphs of this Complaint as if fully set

12  forth herein in this Count IX.

13      120.   A contract existed between each Plaintiff and LendingTree, whereby

14  the parties agreed that LendingTree would preserve and protect the confidentiality

15  of each Plaintiff's Consumer Information.

16      121.   Mortgage Lenders knew of the existence of the contracts between

17  Plaintiffs and LendingTree.

18      122.   Mortgage Lenders negligently disrupted the existing contracts

19  between Plaintiffs and LendingTree by misappropriating Plaintiffs' Consumer

20  Information.

21      123.   Mortgage Lenders' misappropriation of Plaintiffs' Consumer

22  Information reduced the value of the existing contracts between Plaintiffs and

23  LendingTree.

24      124.   Mortgage Lenders' misappropriation of Plaintiffs' Consumer

25  Information made performance of the contracts more burdensome.

26      125.   Plaintiffs were damaged by Mortgage Lenders' negligent disruption

27  of Plaintiffs' contracts with LendingTree.

28

## COUNT X

## UNJUST ENRICHMENT

### (as to Newport and Southern California Marketing)

126.  Plaintiffs re-allege the paragraphs of this Complaint as if fully set forth herein in this Count X, and allege this Count in the alternative.

127.  Newport and Southern California Marketing obtained Plaintiffs' and Class members' Consumer Information without Plaintiffs' and Class members' consent.

128.  Newport and Southern California Marketing knew, or should have known, that they had obtained Plaintiffs' and Class members' Consumer Information without Plaintiffs' and Class members' consent.

129.  Newport and Southern California Marketing unjustly and unlawfully sold Plaintiffs' and Class members' consumer information to third parties without Plaintiffs' and Class members' consent.

130.  Newport and Southern California Marketing have retained the benefits they received from unjustly and unlawfully selling Plaintiffs' and Class members' Consumer Information.

131.  Newport and Southern California Marketing, at all relevant times, had knowledge of said benefit.

132.  Newport's and Southern California Marketing's retention of the benefits they received from selling Plaintiffs' and Class members' Consumer Information violates fundamental principles of equity, justice and good conscience.

## COUNT XI

## VIOLATION OF CAL. BUS. AND PROF. CODE §§ 17200 *ET SEQ.*;

## CALIFORNIA UNFAIR COMPETITION LAW

### (as to LendingTree)

133.  Plaintiffs re-allege the paragraphs of this Complaint as if fully set

-24-

CLASS ACTION COMPLAINT

1  forth herein in this Count XI.

2      134.  By reason of the conduct alleged herein, and by failing to provide

3  reasonable security measures for Plaintiffs and Class members' Consumer

4  Information, LendingTree violated the provisions of Cal. Bus. and Prof. Code §§

5  17200 *et seq.*

6      135.  As a result of LendingTree's practices, Plaintiffs and Class members

7  have suffered an injury in-fact by being at an increased risk of identity theft.  In

8  addition, Plaintiffs and Class members have lost property in the form of their

9  Consumer Information.

10      136.  LendingTree's violation of the laws of this state and of common law

11  by the practices complained of herein constitutes an unlawful business practice

12  within the meaning of Cal. Bus. and Prof. Code §§ 17200 *et seq.*  LendingTree's

13  practices, as described herein, violate federal, state, statutory, regulatory, or

14  industry standards as described above, including, but not limited to, the California

15  Constitutional Right to Privacy, and Cal. Civ. Code 1798.80 *et seq.*

16      137.  LendingTree's failure to adequately protect Plaintiffs' and Class

17  members' Consumer Information violates not only the unlawful prong of Cal.

18  Bus. and Prof. Code §§ 17200 *et seq.*, but also constitutes an independent

19  violation of the "unfair" prong of section 17200, independent of the other causes

20  of action asserted herein.  LendingTree's failure to adopt reasonable practices

21  in protecting the Consumer Information of Plaintiffs and Class members has placed

22  them at a higher risk of identity theft crimes.

23      138.  The injury to Plaintiffs and Class members caused by LendingTree's

24  failure to install, adopt, and maintain reasonable security procedures to protect

25  their Consumer Information is substantial. As a result, the Consumer Information

26  of Plaintiff and Class members has been substantially compromised, placing them

27  at a significant risk of being victims of identity theft and other harm.

28      139.  The conduct alleged herein is a "business practice" within the

CLASS ACTION COMPLAINT

1  meaning of Cal. Bus. and Prof. Code §§ 17200 *et seq.*

2  **PRAYER FOR RELIEF**

3  WHEREFORE, Plaintiffs, individually and on behalf of all others similarly

4  situated, respectfully request that the Court enter an Order:

5          a. Certifying this matter as a class action with Plaintiffs as

6             Class Representatives, and designating Plaintiffs' counsel

7             as Class Counsel;

8          b. Finding that LendingTree purposefully and/or recklessly

9             violated FCRA due to its failure to maintain reasonable

10            procedures designed to limit the furnishing of Consumer

11            Reports to the permissible purposes outlined under FCRA;

12         c. Finding that LendingTree negligently violated FCRA due

13            to its failure to maintain reasonable procedures designed to

14            limit the furnishing of reports to the permissible purposes

15            outlined under FCRA;

16         d. Finding that Newport and Southern California Marketing

17            violated FCRA by purposefully selling, disseminating,

18            and/or otherwise providing access to Plaintiffs' and Class

19            members' Consumer Information to third parties without

20            the consent of Plaintiffs or Class members, and for no

21            permissible purpose outlined under FCRA;

22         e. Requiring that LendingTree, Newport, and Southern

23            California Marketing pay actual damages sustained or

24            statutory damages of not less than $100 and not more than

25            $1,000 per violation of FCRA;

26         f. Finding that LendingTree was negligent in protecting

27            Plaintiffs' and Class members' private personal and

28            financial information stored on its computer systems and in

-26-
**CLASS ACTION COMPLAINT**

1      its physical possession;

2      g.  Requiring LendingTree to provide monies required to

3          monitor Plaintiffs' and Class members' financial accounts

4          and provide them with identity theft insurance, as well as

5          to compensate anyone who suffers damage as a result of

6          the unauthorized release of their private information;

7      h.  Finding that LendingTree breached its contract to

8          safeguard and protect Plaintiffs' and Class members'

9          Consumer Information stored on its computer systems and

10         in its physical possession;

11     i.  Finding that Defendants invaded the privacy of Plaintiffs

12         and Class members, wherein Plaintiffs' and Class members'

13         Consumer Information was unlawfully accessed,

14         disclosed, and/or sold;

15     j.  Finding that Defendants' conduct violated the California

16         constitutional right of privacy;

17     k.  Finding that Defendants misappropriated the Consumer

18         Information of Plaintiffs and Class members, wherein

19         Plaintiffs' and Class members' Consumer Information was

20         unlawfully accessed, disclosed, and/or sold;

21     l.  Finding that Defendants' conduct violated Cal Civ. Code §

22         17980.80 *et seq.*;

23     m. Finding that Mortgage Lenders wrongfully acquired

24         Plaintiffs' and Class members' Consumer Information

25         without their authorization, knowledge, and/or consent;

26     n.  Finding that Mortgage Lenders intended to and did disrupt

27         the existing contracts between Plaintiffs and LendingTree

28         by misappropriating Plaintiffs' Consumer Information;

CLASS ACTION COMPLAINT

o.  Finding that Mortgage Lenders negligently disrupted the existing contracts between Plaintiffs and LendingTree by misappropriating Plaintiffs' Consumer Information;

p.  Finding that Newport and Southern California Marketing have unjustly retained benefits resulting from their sale of Plaintiffs' and Class members' Consumer Information, and that said retention violates fundamental principles of equity, justice, and good conscience;

q.  Finding that LendingTree violated the provisions of Cal. Bus. and Prof. Code §§ 17200 *et seq.*;

r.  Finding that Defendants are responsible for their employees' actions as agents of Defendants;

s.  Awarding damages to Plaintiffs and Class members under the common law theories alleged herein;

t.  Enjoining Defendants from action which places consumers at a risk of future security breaches;

u.  Requiring Defendants to disclose, in detail, the scope, extent, and reach of all disseminations of Plaintiffs' and Class members' Consumer Information that were made without their consent;

v.  Requiring Defendants to pay Plaintiffs and Class members reasonable attorneys' fees and costs of litigation; and

w.  Providing for other legal and/or equitable relief as is permitted at law and as justice requires.

//
//
//
//

-28-

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 13, 2008.        **FINKELSTEIN THOMPSON LLP**

By:  *Rosemary M. Rivas*
　　　Rosemary M. Rivas

100 Bush Street, Suite 1450
San Francisco, CA 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

**Of Counsel:**

FINKELSTEIN THOMPSON LLP
BURTON H. FINKELSTEIN
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

LARRY D. DRURY, LTD.
LARRY D. DRURY
205 West Randolph, Suite 1430
Chicago, IL 60606
Telephone: (312) 346-7950
Facsimile: (312) 346-5777

ALLEN ALLEN & TACK
SCOTT R. TACK
P.O. Box 1409
210 Chickasha Ave.
Chickasha, OK 73023

CLASS ACTION COMPLAINT

1    Telephone: (405) 224-3111
2    Facsimile: (405) 224-8312

3    *Attorneys for Plaintiffs Amy Bercaw, Russell Winsett, and Ty Woods*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV08- 660 CJC (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY BERCAW, RUSSELL WINSETT, and TY WOODS, on behalf of themselves and all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>LENDINGTREE, LLC, a Delaware limited liability company, NEWPORT LENDING CORP., a Nevada corporation, SAGE CREDIT CO., a Delaware corporation, HOME LOAN CONSULTANTS, INC., a California corporation, CHAPMAN CAPITAL, INC., a California corporation, and SOUTHERN CALIFORNIA MARKETING CORP., a California corporation.<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV08-660 CJC (ANx)<br><br><br><br>SUMMONS |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within   20   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Rosemary M. Rivas _____, whose address is  Finkelstein Thompson LLP, 100 Bush St., Suite 1450, San Francisco, CA 94104 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

JUN 1 3 2008

Dated: _____

By: _____

**HANA RASHAD**

Deputy Clerk

*(Seal of the Court)*

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                    **SUMMONS**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Amy Bercaw<br>Russell Winsett<br>Ty Woods | LendingTree, LLC, Newport Lending Corp., Sage Credit Co., Home Loan Consultants, Inc., Chapman Capital, Inc., Southern California Marketing Corp. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Rosemary M. Rivas (SBN 209147)<br>FINKELSTEIN THOMPSON LLP<br>100 Bush Street, Suite 1450, San Francisco, CA 94104 (415) 398-8700 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No ☐ MONEY DEMANDED IN COMPLAINT: $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. 1332(d) Class Action Fairness Act and Fair Credit Reporting Act, 15 U.S.C. §1681 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | PROPERTY | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | Habeas Corpus | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☒ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

FOR OFFICE USE ONLY: Case Number: **SACV08-660**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)      CIVIL COVER SHEET      Page 1 of 2

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No   ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | SEE ATTACHMENT A |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| SEE ATTACHMENT A | SEE ATTACHMENT A |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date June 13, 2008

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# ATTACHMENT A TO CIVIL COVER SHEET

IX.    VENUE

Plaintiff Amy Bercaw resides in Nevada.

Plaintiff Russell Winsett resides in Oklahoma.

Plaintiff Ty Woods resides in Georgia.

Defendant LendingTree, LLC, resides in North Carolina.

Defendant Newport Lending Corp. resides in Orange County.

Defendant Sage Credit Co. resides in Orange County.

Defendant Home Loan Consultants, Inc. resides in San Diego County.

Defendant Chapman Capital, Inc. resides in Orange County.

Defendant Southern California Marketing Corp. resides in Los Angeles County.

ATTACHMENT A TO CIVIL COVER SHEET

**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NORTH CAROLINA**
**AT CHARLOTTE**
**No.: 3:08-cv-247**

_____
                                        :

SYLVIA CARSON, on behalf of     :
herself and all others similarly situated,   :
                                          :

               Plaintiff,     :

                                          :        **COMPLAINT**
    v.                     :   **JURY TRIAL DEMANDED**

                                            :

LENDINGTREE, LLC              :

                                          :

               Defendant.   :
_____:

## CLASS ACTION COMPLAINT

Now comes Sylvia Carson ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys, and in support of the Class Action Complaint, states as follows:

## INTRODUCTION

1.      This is a consumer class action lawsuit brought by Plaintiff Sylvia Carson, on behalf of herself and all others similarly situated (the "Class" or "Class Members") throughout the United States whose private personal information including Social Security number, income and employment information, name, address, email address, and/or phone number was intentionally and unlawfully sold to third parties by Defendant LendingTree, LLC ("Defendant") in violation of the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* ("FCRA") and the common law. Defendant willfully or recklessly failed to limit the furnishing of private consumer

1

information to the permissible purposes outlined under the FCRA.  As a result, certain of Defendant's employees and ex-employees accessed Class Members' consumer information and sold it to third parties without the consent of Class Members.  Defendant failed to prevent or detect the ongoing unauthorized activity, which occurred for more than a year from October of 2006 until early 2008.

2.     Defendant's actions constitute violations of the FCRA as well as common law negligence and breach of implied contract.

3.     Plaintiff and the Class seek damages suffered as a result of Defendant's practices, including but not limited to statutory damages, compensatory damages, and injunctive relief.

## PARTIES AND JURISDICTION

4.     Plaintiff Sylvia Carson is a resident of Cobb County in Kennesaw, Georgia.

5.     Defendant LendingTree, LLC is a Delaware limited liability company with its headquarters located at 1115 Rushmore Drive, Charlotte, NC 28277.  Defendant provides financial information services throughout the United States, including engaging in the practice of assembling and evaluating consumer credit information online for the purpose of furnishing consumer credit data to third party lenders.

6.     This Court has jurisdiction over the federal claim herein pursuant to 28 U.S.C. §1331, federal question jurisdiction.  This Court has supplemental jurisdiction over the state law claims herein under 28 U.S.C. §1367.  Further, this Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different

than Defendant. 28 U.S.C. §1332(d)(2)(A). This Court has personal jurisdiction over Defendant because Defendant has its headquarters in, and conducts substantial business in, North Carolina and throughout the United States.

7.　　Venue properly lies in this district pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the acts giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

8.　　Defendant describes itself on its website as an online lending services exchange that matches lenders with borrowers seeking mortgage, home equity, automobile, personal, and credit card loans. Consumers complete an online loan request on LendingTree's website, then LendingTree matches the consumers with up to four lenders based on various matching criteria.

9.　　As part of the application process, Defendant obtains consumers' confidential information, including Social Security number, income and employment information, name, address, email address, and phone number. Defendant then analyzes the information and provides it to appropriate lenders to respond to consumers' loan requests.

10.　　In or around March of 2007, Plaintiff submitted a loan application containing private data to Defendant, via Defendant's website.

11.　　On April 21, 2008, Defendant publicly announced the following on its website:

> Recently, LendingTree learned that several former employees may have helped a handful of mortgage lenders gain access to LendingTree's customer information by sharing confidential passwords with the lenders. . . . We promptly made several system security changes. We also brought lawsuits against those involved.
>
> Based on our investigation, we understand that these mortgage lenders used the passwords to access LendingTree's customer loan request forms, normally available only to LendingTree-approved lenders, to market loans to those customers. The loan request forms contained data such as name,

3

address, email address, telephone number, Social Security number, income and employment information. We believe these lenders accessed LendingTree's loan request forms between October 2006 and early 2008.

12.     In addition to receiving unwanted solicitations from lenders, Class Members are

at risk of fraud and identity theft. LendingTree advised its customers as follows:

> [W]e suggest you get a free credit report. Look for any accounts you didn't open and/or inquiries from creditors that you didn't initiate. If you see anything you don't understand, contact the credit bureau. If you see anything suspicious, you may want to file a fraud alert with the bureaus.

13.     LendingTree did not disclose how many customers' personal data was affected by

the breach. However, according to its website, it processed more than 23 million loan requests

since its inception in 1998.

14.     LendingTree filed a civil complaint in the Superior Court of Orange County,

California, No. 00062376, against several entities on April 21, 2008 (the "State Ct. Compl.").

The complaint stated the following, in relevant part:

> 18.     Plaintiff [LendingTree] operates an online network that helps match consumers and lenders, with the goal of providing consumers with a competitive advantage when seeking a mortgage loan product. Plaintiff essentially provides a marketplace that connects consumers with interested lenders that submit competitive offers for these mortgage loan products.
>
> 19.     By visiting Plaintiff's website and completing a "qualification form" ("QF"), consumers interested in purchasing a mortgage loan product are able to receive "bids" from up to four lenders. The QF includes the consumer's confidential information, contact information, and various other nonpublic information. This information makes it possible for lenders to evaluate the creditworthiness of consumers.
>
> 20.     Plaintiff utilizes a propriety system known as "Apex" to store the completed QFs received from consumers. Consumers that have completed a QF on the Plaintiff's website are known as "leads."
>
> 21.     Plaintiff enrolls financial services companies (including banks, thrifts, and mortgage companies) that are interested in making mortgage loans to consumers.

4

These companies are known as "Network Lenders."  Currently about 300
Network Lenders participate in Plaintiff's online marketplace. . . .

22.     After a QF is completed, Plaintiff forwards the lead to roughly four
Network Lenders based on the consumer's credit data contained in the QF and the
lending criteria specified by the Network Lender.  Network Lenders are then able
to quote offers to the consumer. . . .  These lenders, and only these lenders, are
given authorized access to the Apex system containing the completed QF and
contact information for the lead.  These lenders are provided remote access to the
LendingTree system to allow them to prepare their offers and follow up with the
leads in the future.  Importantly, lenders' access to the Apex system is limited to
only the specific consumers for which they have been sent leads.  Each lender is
assigned a specific user name and password in order to log-on to and access the
Apex system for the information submitted by the lender's designated leads.

23.     Plaintiff receives various fees from Network Lenders in exchange for the
leads and access to the Apex system. . . .

            . . . .

25.  . . . Customers expect Plaintiff to ensure the security of their sensitive
confidential information . . . .

            . . . .

27.     Preventing the disclosure of customer information to unauthorized persons
is of significant importance to Plaintiff and its customers.

            . . . .

31.     Jarod Beddingfield ("Beddingfield") was employed by [LendingTree] in
various positions, including Vice President of Sales, from June 2001 until May
2007.  In these positions, Beddingfield was given administrative access to the
Apex system.  Beddingfield's access was essential to the performance of his job
duties.

            . . . .

33.     Beddingfield's employment at [LendingTree] was terminated on or about
May 11, 2007.

34.     Upon information and belief, during his employment and since his
termination Beddingfield has repeatedly . . . reveal[ed] confidential information of
both [LendingTree] and its customers to competitors and other individuals not

5

affiliated with [LendingTree].

35.    David Anderson ("Anderson") was employed by [LendingTree] in the position of Senior Vice President for New Business Development until suspended in April 2006 and subsequently terminated in June 2006.  In this position, Anderson was given administrative access to the Apex system.  This access was essential to the performance of his job duties.

          . . . .

38.    Upon information and belief, during his employment and since his termination Anderson has repeatedly . . . reveal[ed] confidential information of both [LendingTree] and its customers to competitors and other individuals not affiliated with [LendingTree].

39.    Upon information and belief, the entity defendants – Newport, Sage, Chapman, and Home Loan Consultants ("Entity Defendants") are mortgage lenders in direct competition with the Network Lenders.

          . . . .

43.    On information and belief, both during and after their employment with [LendingTree], Anderson and Beddingfield each used their administrative access to ascertain the user names and Apex passwords of various other Network Lenders and [LendingTree's] employees.  Anderson and Beddingfield then illegally . . . distributed the user names and passwords of [LendingTree's] employees and [LendingTree's] other Network Lenders to Newport, Southern California Marketing, Chapman, and/or Home Loan Consultants.

44.    On information and belief, Newport and Southern California Marketing paid Anderson and Beddingfield for the stolen usernames and passwords necessary to access the Apex system.  Newport and/or Southern California Marketing thus obtained the ability to illegally log-on to and access the Apex system and misappropriate leads and confidential information.

45.    On information and belief, in addition to using the stolen leads to contact consumers itself, Newport and/or Southern California Marketing also sold certain usernames and passwords or the stolen leads to Sage, Chapman, and/or Home Loan Consultants to enable these entities to obtain unauthorized access to the Apex system and to use the information to contact the consumers to provide the loan products, resulting in damage to [LendingTree].

46.    On information and belief, Newport and/or Southern California Marketing used illegally-obtained Apex passwords on a regular basis to download newly-

submitted QFs from the Apex system. Newport then distributed the names of [LendingTree's] customers and their personal information to its loan officers, who contacted the customers directly. Newport also distributed the names of Plaintiff's customers and their personal information to Sage and other Entity Defendants . . . .

47.     On information and belief, Chapman and Home Loan Consultants paid Anderson and Beddingfield for the stolen usernames and passwords necessary to access the Apex system. Chapman and Home Loan Consultants thus obtained the ability to illegally log-on to and access the Apex system and misappropriate leads and confidential information.

48.     On information and belief, Chapman and Home Loan Consultants used illegally-obtained Apex passwords on a regular basis to download newly-submitted QFs from the Apex system. Chapman and Home Loan Consultants then distributed the names of [LendingTree's] consumers and their personal information to its loan officers, who contacted the customers directly.

49.     On information and belief, the scheme resulted in hundreds of unauthorized log-ons to the Apex system.

15.     LendingTree filed a similar complaint in the North Carolina General Court of Justice, Superior Court Division, No. 08-CVS-9108, against Jarrod Beddingfield, David Anderson, and Closing USA, LLC on April 21, 2008. The allegations were substantially similar to the allegations in the California state court complaint.

16.     Despite LendingTree taking the time to hire counsel and file lawsuits on its own behalf on April 21, 2008, LendingTree failed to notify Class Members until that same date, April 21, 2008, that their personal data had been breached. Presumably, LendingTree knew about the breach before hiring counsel to sue the unauthorized third parties and its former employees. LendingTree should have notified Class Members of the breach at that time, *i.e.*, when it first learned of the breach. The delay in notification deprived Class Members of the opportunity to scrutinize lender communications for unauthorized contacts, monitor credit histories for misuse of personal information, and take other protective measures in response to the breach.

17.     As noted in LendingTree's California state court complaint, Jarod Beddingfield and David Anderson repeatedly misappropriated confidential information both before and *after* they were terminated by LendingTree.  (State Ct. Compl. ¶¶ 34, 38.)  The fact that Beddingfield and Anderson continued to access customer data after their termination casts doubt on LendingTree's procedures to freeze Beddingfield's and Anderson's data access rights, strengthen its security procedures, and otherwise improve its data access controls after being on notice of the data breach.

18.     LendingTree noted on the Privacy Policy section of its website that it "will not share information with other lenders not disclosed to you."  It also disclosed that "only . . . authorized third-party service providers are permitted to access personal information, and they may do so only for permitted business functions."  LendingTree failed to meet these representations.

19.     Class Members' private information has been improperly sold and/or disclosed to multiple third parties by Defendant and its agents in violation of the FCRA.  Defendant is responsible and liable here for the actions of its agents.

20.     Plaintiff at no time agreed to allow Defendant or its agents to disseminate her private information to unauthorized third parties.

21.     On or around April 24, 2008, Plaintiff received a letter from LendingTree stating that her personal information was affected by the data breach.  The letter encouraged her to obtain a copy of her credit report.  She did obtain her credit report, and she discovered that two fraudulent phone accounts had been opened in her name. She has since had those accounts removed.  She also signed up for a credit monitoring service at an approximate cost of $115.

## CLASS ACTION ALLEGATIONS

22.     This action is brought by Plaintiff Sylvia Carson, individually and as a class action, on behalf of all persons or entities whose personal or financial information was disclosed by Defendant or its ex-employees to unauthorized third parties (the "Class").  The Class does not include Defendant or its officers, directors, agents, or employees.

23.     Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and 23(b).

24.     On information and belief, the Class is comprised of thousands or millions of consumers, making joinder of such consumers impracticable.  Litigation of the claims in a class context will provide substantial benefits and economies to the parties and the Court.

25.     The rights of each Class Member were violated in a similar fashion based on Defendant's uniform actions.

26.     Questions of law and fact common to the Class predominate over questions that may affect individual Class Members, including the following:

a.      Whether Defendant or its agents disclosed or otherwise provided access to Class Members' private information to unauthorized third parties;

b.      Whether Defendant's conduct alleged herein violated the FCRA;

c.      Whether Defendant's unlawful conduct was willful, reckless, or negligent for purposes of the FCRA;

d.      Whether Defendant owed duties to Class Members to protect their personal information;

e.      Whether Defendant breached its duties it owed to Class Members;

      f.      Whether Defendant failed to exercise reasonable care in supervising its employees and monitoring their access to and/or use of passwords and other information which allowed access to Class Members' private information;

      g.      Whether Defendant entered into and breached implied contracts with Class Members regarding the safeguarding of their private information;

      h.      Whether Class Members sustained damages, and if so, what is the proper measure of those damages; and

      i.      Whether statutory damages under the FCRA, 15 U.S.C. § 1681n(a)(1)(A), are proper in this matter.

27.      Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests that are antagonistic to, or that irreconcilably conflict with, the interests of the Class.

28.      Plaintiff has retained competent counsel who are experienced in class action litigation.

29.      A class action is superior to all other methods for the fair and efficient adjudication of Class Members' claims.

30.      Certification of a Class to resolve this dispute will reduce the possibly of repetitious litigation involving thousands or millions of Class Members.

## COUNT I

## INTENTIONAL VIOLATION OF THE FAIR CREDIT REPORTING ACT

31.      Plaintiff re-alleges paragraphs 1 through 30 of the Complaint as if fully set forth herein.

32. The Fair Credit Reporting Act ("FCRA") was created to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commence for consumer credit . . . and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. §1681(b).

33. The FCRA imposes the following duty: "Every consumer reporting agency shall maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 604 [15 U.S.C. § 1681b]." 15 U.S.C. § 1681e(a). Section 604, 15 U.S.C. § 1681b, sets forth various permissible purposes for the furnishing of consumer reports. LendingTree's disclosure of consumer information to unauthorized third parties did not comply with any of the permissible purposes set forth in 15 U.S.C. § 1681b.

34. The FCRA defines "consumer reporting agency" as follows:

The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of ***assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties***, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis added).

35. The FCRA defines "consumer report" as follows:

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency ***bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living*** which is used or expected to be used or collected in whole or in part for the purpose of serving as a ***factor in establishing the consumer's eligibility for***

(A) ***credit*** or insurance to be used primarily for personal, family, or household purposes;

11

(B) employment purposes; or

(C) any other purpose authorized under section 604 [15 U.S.C. §1681b].

15 U.S.C. §1681a(d)(1) (emphasis added).

36.    LendingTree is a "consumer reporting agency" under the FCRA.  LendingTree

disclosed in its California state court complaint that it assembles information "that makes it

possible for lenders to evaluate the ***creditworthiness*** of consumers."  (State Ct. Compl. ¶ 19)

(emphasis added).  LendingTree also disclosed the following on the Frequently Asked Questions

page of its website:

> On the LendingTree network, Lenders provide to us criteria about the type of loan
> (for example, loan amount, whether purchase, refinance, or equity loan) and the
> type of loan customer (for example, state of residence or ***creditworthiness***) in
> which the Lender is interested.  LendingTree, LLC will provide your information
> to up to five Lenders whose criteria match your profile.
>
> . . . .
>
> [I]n all cases, LendingTree pulls your ***credit report*** when you complete a loan
> request.
>
> (Emphasis added.)

Thus, LendingTree assembles and/or evaluates consumer credit information (creditworthiness

information) and furnishes it to third party lenders.

37.    LendingTree furnishes "consumer reports" to third parties under the FCRA.  Class

Members provided LendingTree with their Social Security number and employment and income

information, among other information.  LendingTree then obtained Class Members' credit

reports.  Together, that information had a direct "bearing on [Class Members'] credit worthiness"

and served as a "factor in establishing the consumer's eligibility for . . . credit."  15 U.S.C.

§1681a(d)(1).

38.     Class Members are "consumers" as defined and construed under the FCRA, 15 U.S.C. §1681a(c).

39.     Defendant received fees for assembling consumer information.

40.     Defendant used the facilities of interstate commerce for purposes of the FCRA when it collected Class Members' private information via its website and shared that information with third parties.

41.     In conscious disregard for the rights of Class Members, Defendant willfully or recklessly failed to maintain reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined in the FCRA.

42.     Defendant and its former employees obtained Class Members' private information, and sold or disseminated it to unauthorized third parties for no permissible purpose under the FCRA.

43.     Defendant is responsible and liable for its employees' actions as agents of Defendant.

44.     Defendant willfully or recklessly failed to properly: (i) supervise its employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

45.     The FCRA states the following with respect to damages:

(a) Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

      (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000

13

. . . .

(B) such amount of punitive damages as the court may allow; and

(C) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

46.     Class Members have been damaged by Defendant's actions.  As a result, Class Members are entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

## COUNT II

## NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT

47.     Plaintiff re-alleges paragraphs 1 through 44 of the Complaint as if fully set forth herein.

48.     Defendant engaged in at least negligent, if not willful or reckless, conduct in violating the FCRA.

49.     In negligent disregard for the rights of Class Members, Defendant failed to maintain reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined in the FCRA.

50.     Defendant and its former employees obtained Class Members' private information, and sold or disseminated it to unauthorized third parties for no permissible purpose under the FCRA.

51.     Defendant is responsible for its employees' actions as agents of Defendant.

52.     Defendant negligently failed to properly: (i) supervise its employees; (ii) monitor

14

for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to consumer information.

53.     The FCRA states the following with respect to damages:

(a) Any person who is negligent in failing to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1) any actual damages sustained by the consumer as a result of the failure; and

(2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681o(a).

54.     Class Members have been damaged by Defendant's actions.  As a result, Class Members are entitled to actual damages sustained, as well as litigation costs and attorney's fees.

## COUNT III

## NEGLIGENCE

55.     Plaintiff re-alleges paragraphs 1 through 30 of the Complaint as if fully set forth herein.

56.     Defendant came into possession of Class Members' private information and had a duty to exercise reasonable care in safeguarding that information.

57.     Defendant owed a duty to Class Members to properly: (i) supervise its employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

58.     Defendant, through its actions, breached its duties to Class Members.

59.     Defendant's employees misappropriated consumer information for more than a

15

year, from "between October 2006 and early 2008." According to LendingTree's California

state court complaint, "the scheme resulted in hundreds of unauthorized log-ons to the Apex

system." (State Ct. Comp. ¶ 49.) Also, according to the California state court complaint,

Beddingfield and Anderson repeatedly misappropriated consumer data both before and after they

were terminated from LendingTree. The length of the breach, the fact that hundreds of

unauthorized log-ons were permitted, and the fact that LendingTree's former employees still had

access to LendingTree's customer data even after they were terminated casts doubt on the

adequacy of LendingTree's procedures to: (i) supervise its employees; (ii) monitor for

unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent

or detect unauthorized access to or disclosure of consumer information.

     60.     LendingTree's violation of the FCRA serves as further evidence of its breach of

duties owed to Class Members. This constitutes negligence *per se*.

     61.     Defendant also had a duty to timely disclose to Class Members that their private

information had been, or was reasonably believed to have been, compromised. Defendant

breached this duty. Defendant investigated the breach, hired legal counsel, and filed complaints

in state court against certain third parties and LendingTree's former employees on April 21,

2008. Defendant did not notify Class Members about the breach until that same date, April 21,

2008. Presumably, LendingTree knew about the breach before hiring counsel to sue the

unauthorized third parties and its former employees. LendingTree should have notified Class

Members of the breach at that time, *i.e.*, when it first learned of the breach. The delay in

notification deprived Class Members of the opportunity to scrutinize lender communications for

unauthorized contacts, monitor credit histories for misuse of personal information, and take other

protective measures in response to the breach.

62.     The breaches of duties were reasonably foreseeable to Defendant.

63.     But for Defendant's breach of duties, Class Members' private information would not have been compromised.  Class Members' private information was compromised as a direct and proximate result of Defendant's breach.

64.     Class Members suffered damages including but not limited to:

a.     out of pocket costs for credit monitoring, identity theft insurance, and similar services;

b.     anxiety;

c.     emotional distress;

d.     loss of privacy;

e.     loss of time spent: (i) obtaining and reviewing credit reports (at Defendant's suggestion); (ii) placing fraud alerts on their credit report (at Defendant's suggestion); (iii) monitoring their accounts and credit reports on an ongoing basis for unauthorized activity; (iv) scrutinizing communications from lenders; and (v) taking other protective measures in response to the breach; and

f.     other economic and non-economic harm.

## COUNT IV

## BREACH OF IMPLIED CONTRACT

65.     Plaintiff re-alleges paragraphs 1 through 30 of the Complaint as if fully set forth herein.

66.     When entering into transactions with Defendant, and providing personal

information to Defendant, Class Members entered into implied contracts with Defendant requiring Defendant to safeguard their private information.  The implied contracts were based on, *inter alia*, Defendant's Privacy Policy, which stated that only authorized third parties had access to consumers' personal information.

67.     As noted in LendingTree's California state court complaint: "Customers expect [LendingTree] to ensure the security of their sensitive confidential information."  (State Ct. Compl. ¶ 25.)  Also, "[p]reventing the disclosure of customer information to unauthorized persons is of significant importance to [LendingTree] and its customers."  (State Ct. Compl. ¶ 27.)  This indicates a meeting of the minds between LendingTree and Class Members regarding data security.

68.     Defendant failed to safeguard Class Members' private information.  Defendant's actions caused Class Members' private information to be disclosed to unauthorized third parties.

69.     Because Defendant disclosed Class Members' private information to unauthorized third parties, Defendant breached its implied contract with Class Members.

70.     Class Members suffered damages including but not limited to:

    a.      out of pocket costs for credit monitoring, identity theft insurance, and similar services;

    b.      anxiety;

    c.      emotional distress;

    d.      loss of privacy;

    e.      loss of time spent: (i) obtaining and reviewing credit reports (at Defendant's suggestion); (ii) placing fraud alerts on their credit report (at Defendant's

f.      other economic and non-economic harm.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a.      Certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as class counsel;

b.      Finding that Defendant willfully, recklessly, or negligently violated the FCRA;

c.      Finding that Defendant was negligent in failing to protect Class Members' private information and in failing to timely disclose the breach;

d.      Finding that Defendant entered into and breached implied contracts to safeguard Class Members' private information;

e.      Finding that Defendant is responsible for its employees' actions as agents of Defendant;

f.      Requiring that Defendant pay statutory damages of not less than $100 and not more than $1,000 under the FCRA;

g.      Requiring that Defendant pay Plaintiff's and Class Members' reasonable attorney's fees and costs of litigation;

h.      Requiring that Defendant pay punitive damages;

i.      Awarding all appropriate damages to Class Members under the common law

theories alleged herein;

j.      Enjoining Defendant from actions which place Class Members at a risk of future security breaches;

k.      Awarding injunctive relief including the requirement that Defendant strengthen its data security procedures to minimize the risk of future security breaches;

l.      Awarding injunctive relief including the provision of credit monitoring, identity theft insurance, identity protection services, or similar services; and

m.      Awarding any other legal and/or equitable relief as justice requires.

Dated: May 30, 2008               Respectfully submitted,


/s/ Gary W. Jackson

**JACKSON & MCGEE, LLP**
Gary W. Jackson, NC State Bar No. 13976
Sam McGee, NC State Bar No. 25343
521 East Blvd.
Charlotte, NC 28203
TEL: (704) 377-6680
FAX: (704) 377-6690
gjackson@ncadvocates.com
smcgee@ncadvocates.com
*Liaison Counsel for Plaintiff and the Class*


**SHELLER, P.C.**
Jamie Sheller
1528 Walnut St., 3rd Floor
Philadelphia, PA 19102
TEL: (215) 790-7300
FAX: (215) 546-0942
jlsheller@sheller.com
*Pro hac vice admission anticipated*

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Michael T. Fantini
Jon Lambiras
1622 Locust Street
Philadelphia, PA  19103
TEL: (215) 875-3000
FAX: (215) 875-4636
*Pro hac vice admission anticipated*

*Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Summons and Complaint was served upon the Defendant's agent by properly depositing copies of said document, enclosed in a first class, postage paid wrapper in a official depository under the exclusive care and custody of the United States Post Office and addressed as follows:

Lending Tree, LLC
c/o National Registered Agents, Inc.
120 Penmarc Drive, Suite 118
Raleigh, North Carolina 27603

This the 30th day of May, 2008.

/s/ Gary W. Jackson_____

**JACKSON & MCGEE, LLP**
Gary W. Jackson, NC State Bar No. 13976
Sam McGee, NC State Bar No. 25343
521 East Blvd.
Charlotte, NC 28203
TEL: (704) 377-6680
FAX: (704) 377-6690
*Liaison Counsel for Plaintiff and the Class*

**SHELLER, P.C.**
Jamie Sheller
1528 Walnut St., 3rd Floor
Philadelphia, PA 19102
TEL: (215) 790-7300
FAX: (215) 546-0942
*Pro hac vice admission anticipated*

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Michael T. Fantini
Jon Lambiras
1622 Locust Street
Philadelphia, PA  19103
TEL: (215) 875-3000
FAX: (215) 875-4636
*Pro hac vice admission anticipated*

*Counsel for Plaintiff and the Class*

22

JUDGE RAKOFF

Jeffrey I. Carton
Jerome Noll
MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000
Attorneys for Plaintiff



'08 CIV 4551

RECEIVED
MAY 16 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MARVIN GARCIA,
on behalf of himself and all
others similarly situated,

                          Plaintiff,

          -against-

LENDING TREE, LLC,

                          Defendant.
-------------------------------------------------------------------X

Docket No.

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiff, Marvin Garcia, by his attorneys, Meiselman, Denlea, Packman, Carton & Eberz P.C., as and for his class action complaint, alleges, with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

<u>Nature of this Case</u>

1.      This action seeks to redress the failure of Defendant Lending Tree, LLC ("Lending Tree") to adequately safeguard certain confidential customer information contained in Lending Tree's customer loan request forms.  As Lending Tree has recently admitted, the loan request forms contain confidential data such as name, address, email address, telephone number, Social Security number, income and employment information of Lending Tree's customers, including Plaintiff.  Because of Lending Tree's failure to maintain adequate computer data security, confidential

customer data was accessed and stolen by several of Lending Tree's employees.

2. As a result of Defendant's actions, millions of its customers have had their personal confidential information compromised, have had their privacy rights violated, have been exposed to the risk of fraud, and have otherwise suffered damages.

3. This suit is brought, pursuant to the common law of this State, on behalf of a class of all persons who have submitted loan request forms to Lending Tree between January 1, 2006 and May 1, 2008, have been exposed to the risk of fraud as a result of Lending Tree's breach, and who were damaged thereby (the "Class"). It seeks, inter alia, compensatory damages for Plaintiff and each class member, including, but not limited to, the time and funds spent, and which will continue to be spent, to monitor financial accounts and credit history for fraudulent activity; attorneys' fees; and the costs of this suit.

### Jurisdiction and Venue

4. Jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as Plaintiff's citizenship is diverse from Defendant, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

5. Venue is proper in this district under 28 U.S.C. § 1391(a)(2), on the grounds that a substantial part of the events relating to Plaintiff's claims occurred in the Southern District of New York.

### Parties

6. Plaintiff Marvin Garcia is a citizen and resident of the State of New York, County of Bronx. Mr. Garcia submitted a loan request form to Lending Tree, his personal information was compromised, and he has suffered damage.

2

7.    Defendant Lending Tree, LLC is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in Charlotte, North Carolina.

8.    Defendant Lending Tree does actual business throughout the State of New York, including through the operation and maintenance of an interactive website -- *lendingtree.com* – accessible to consumers in, and residents of, the State.

<u>Operative Facts</u>

9.    Defendant Lending Tree is the leading online lending and realty services exchange that allows consumers to submit customer loan request forms and then choose from up to four competitive loan offers from major, national, regional, and local lenders across the U.S.

10.    In or about April, 2008, Lending Tree first publicly announced that a wide-reaching security breach had occurred that left millions of its customers exposed to the risk of fraud from the submission of loan request documents dating back to at least October, 2006, if not earlier.

11.    More specifically, in a letter dated April 21, 2008 (the "Letter"), received by Plaintiff and other class members, Lending Tree announced a security breach by its employees that led to the theft of loan submission forms submitted by Plaintiff and members of the class.

12.    According to the Letter, several Lending Tree employees helped various mortgage lenders gain access to Lending Tree's customer information by sharing confidential passwords with these lenders.

13.    Based on Lending Tree's own admissions contained in the Letter, these

3

mortgage lenders used the passwords of Lending Tree's customers, including Plaintiff, to access Lending Tree's customer loan request forms to, among other things, market loans to Plaintiff and other Lending Tree customers, all without the permission or consent of Plaintiff and other members of the class.

14.     The Lending Tree customer loan request forms which were impermissibly accessed contained confidential personal data, including but not limited to, name, address, email address, telephone numbers, Social Security numbers, income and employment information.

15.     Reportedly, the security breach began in or about October, 2006, but was not contained until early 2008. Lending Tree's pending investigation may reveal that the breach occurred even prior to October, 2006, and that the breach is still ongoing. Thus, customer loan request forms were exposed for almost three years, and all of these customers are at risk for, at a minimum, identity theft and credit report fraud.

16.     Indeed, because of the confidential customer information accessed, Lending Tree's customers were, are or may be at risk for identity theft which may lead to credit card and debit card fraud as the personal information breached may be used to obtain credit cards, debit cards and loans without the knowledge or consent of Lending Tree's customers.

17.     The almost three year delay in detecting the breach casts doubt on Lending Tree's intrusion detection procedures and system monitoring controls.

18.     On information and belief, Lending Tree violated applicable credit industry rules, including its own internal privacy protection rules promised to Plaintiff and other customers, which were purportedly put into place to protect customer loan request

4

forms.

19.     Not surprisingly, Lending Tree is now urging its customers to monitor their

credit reports for signs of identity theft or other fraudulent financial activity which

resulted from this breach.

20.     Lending Tree is now urging Plaintiff and its customers, at their own

expense, to obtain and review their credit reports for any fraudulent activity and

inquiries from creditors which were not initiated by Plaintiff and Lending Tree's

authorized lenders.  Lending Tree is also urging Plaintiff and its customers, at their own

expense, to file a fraud alert with the three main credit reporting bureaus.

21.     Rather than informing Plaintiff and its customers immediately of the breach

so that they could mitigate the damage incurred as a result of the breach, Lending Tree

has not offered a reason for the almost five month delay in informing Plaintiff and its

customers of the breach.

22.     Almost immediately after receiving the Letter, Plaintiff, at his own expense,

obtained a copy of his credit report from Trans Union.  He was shocked to see that his

credit report had been pulled for review by almost a dozen lenders without his

permission, severely effecting his credit score and causing him damage.

23.     As a result of Lending Tree's actions, Plaintiff had his privacy rights

violated, has been exposed to fraud and the risk of additional fraud, and has suffered

damage.  Plaintiff has spent, and will continue to spend, considerable time and money

to monitor his credit accounts and credit history for fraudulent activity in seeking to

protect, prevent and undo the harm incurred to his credit.  Plaintiff is also concerned

about his increased exposure to potential theft of his identity

5

24. There have been numerous consumer complaints to various Federal and State authorities about the breach of Lending Tree's customer data, and web sites are full of consumers who have complained about the fact that their confidential information has been breached and that they will now have to monitor, at their own expense, their credit reports for fraudulent activity.

25. As referred to above, no adequate notice has been provided to Plaintiff, and no consent or bargained-for approval has been granted by Plaintiff or other Lending Tree customers who submitted customer loan request forms, that their confidential information may be impermissibly accessed by others. Nor did Defendant provide any notice, adequate notice or full disclosure of the fact that its customers' confidential personal information was breached almost two years ago, in October, 2006.

Class Action Allegations

26. Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") of all persons who have submitted loan request forms, and other forms containing personal and confidential information, to Lending Tree, have been exposed to the risk of fraud as a result of Lending Tree's breach of its customers' information, and who were damaged thereby, during the period from January 1, 2006, to the present.

27. Excluded from the Class is Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

6

28. This action is brought as a class action for the following reasons:

a. The Class consists of at least thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b. There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

i. whether Defendant was negligent in protecting its customers' confidential personal and financial information;

ii. whether Defendant breached its implied contracts with Plaintiff and the class in not safeguarding properly their confidential personal and financial information;

iii. whether members of the Class have sustained damages and, if so, the proper measure thereof; and

iv. whether Defendant should be enjoined from having its customers' confidential personal and financial information breached and publicized.

c. The claims asserted by Plaintiff are typical of the claims of the members of the Class;

d. Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation, including related litigation involving consumer fraud;

e. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i. Absent a class action, Class members as a practical

7

matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional customers will be harmed, and Defendant will continue to retain its ill-gotten gains;

        ii.     It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

        iii.     When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

        iv.     A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense and ensure uniformity of decisions; and

        v.     The lawsuit presents no difficulties that would impede its management by the Court as a class action.

        f.     Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate; and

        g.     The prosecution of separate actions by individual members of the Class would create a risk of incompatible standards of conduct for Defendant and of inconsistent or varying adjudications for all parties.

    29.     Defendant's violations of the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in unlawful conduct in the future.

8

### FIRST CAUSE OF ACTION
(Negligence)

30.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 29 above as if fully set forth herein.

31.     Defendant Lending Tree owed a duty to Plaintiff and the class to use reasonable care to keep Plaintiff's and the class' confidential personal and financial information that is, or was, in its possession and control private and secure.

32.     Defendant breached its duty to use reasonable care in protecting Plaintiff's and the class' confidential personal and financial information from being stolen and compromised by inadequately safeguarding this confidential information in violation of, among other things, common and ordinary industry-wide rules and regulations.

33.     Defendant further breached its duty to Plaintiff and the class to use reasonable care to protect its customers' confidential personal and financial information from being stolen and compromised by failing to use reasonable care to implement and maintain appropriate security procedures designed reasonably to protect the confidential personal, financial and credit report information of Plaintiff and the class. Lending Tree knew or should have known that its network for processing and storing customer loan request forms and customer confidential personal and financial information had security vulnerabilities. As such, Defendant was negligent in continuing such data processing in light of those vulnerabilities and the sensitivity of the data, and this breach of security and access to the private and confidential information of Plaintiff and the Class was reasonably foreseeable.

34.     Lending Tree also owed a duty to Plaintiff and the class to use reasonable

9

care to prevent the unauthorized access, use and dissemination of confidential personal and financial data and other non-public information. Defendant did not do so and unlawfully breached this duty.

35. Moreover, Lending Tree owed a duty to Plaintiff and the class to inform Plaintiff and the class in a timely manner when their confidential personal and financial information became compromised. Disclosure was required so that, among other things, Lending Tree's customers could take appropriate measures to avoid harm to their credit scores, avoid the consequences of identity theft, and monitor their credit reports for fraudulent activity.

36. Defendant breached this duty by failing to notify Plaintiff and the class in a timely manner when their confidential information became compromised. Thus, Plaintiff and the class were harmed by Defendant's delay in notification because, among other things, credit reports have been obtained without the permission of Plaintiff and the class, resulting in, among other things, lower credit scores and other fraudulent activity.

37. The resulting personal and financial burden, including but not limited to, the loss of time and money spent by Plaintiff and the class in seeking to prevent or undo further harm and other economic and non-economic damages, were the direct and proximate result of Defendant's violations of its duties of care, as described above.

38. By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's negligence, the amount of such damages to be determined at trial.

10

## SECOND CAUSE OF ACTION
(Breach of Implied Contract)

39.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 38 above as if fully set forth herein.

40.     Upon providing confidential personal and financial information to Lending Tree in order to transact business with Lending Tree, Plaintiff and the class entered into implied contracts with Lending Tree such that Lending Tree would safeguard this confidential information and notify Plaintiff and the class promptly of any and all theft of their information.

41.     Without such implied contracts, Lending Tree's customers (including Plaintiff and the class) would not have submitted their confidential personal and financial information to transact business with Lending Tree

42.     By reason of the foregoing, Defendant breached its implied contracts with Plaintiff and the class, and Defendant is liable to Plaintiff and the Class for damages incurred as a result of Defendant's actions, the amount of such damages to be determined at trial.

## THIRD CAUSE OF ACTION
(Injunctive Relief)

43.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 42 above as if fully set forth herein.

44.     Given Defendant's wrongful actions as set forth above, which may be ongoing and continuing to harm Plaintiff and members of the Class, the Court should a) preliminarily and permanently enjoin Defendant Lending Tree from having its customers' confidential personal and financial information breached and publicized; b)

11

order Defendant to strengthen the security of its computer network used to process customer loan request forms; c) immediately to take all steps necessary to disclose to Defendant Lending Tree's current and past customers the extent of the breach, and the exact dates of the breach; and d) order Defendant to provide for credit monitoring services for Plaintiff and the class.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

1. Certifying this action as a class action, pursuant to Rule 23(a) and 23(b)(3) of the Fed.R.Civ.P., with a class as defined above;

2. On Plaintiff's First Cause of Action, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial;

3. On Plaintiff's Second Cause of Action, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial;

4. On Plaintiff's Third Cause of Action, a) preliminarily and permanently enjoining Defendant Lending Tree from having its customers' confidential personal and financial information breached and publicized; b) ordering Defendant to strengthen the security of its computer network used to process customer loan request forms; c) immediately to take all steps necessary to disclose to Defendant Lending Tree's current and past customers the extent of the breach, and the exact dates of the breach; and d) ordering Defendant to provide for credit monitoring services for Plaintiff and the class;

5. Awarding Plaintiff interest, costs and attorneys' fees; and

12

6.     Awarding Plaintiff such other and further relief as this Court deems just

and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Fed.R.Civ.P., Plaintiff hereby demands a trial by jury.

Dated:     White Plains, New York
           May 15, 2008

MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.

By:   _____

Jeffrey I. Carton (JC8296)
Jerome Noll (JN7542)
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000

Attorneys for Plaintiff

207421.WPD

13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EUGENE MILLER, JR., on behalf of himself and all others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No.** |
| **v.** | ) ) ) | |
| **LENDING TREE, LLC a North Carolina Limited Liability Corporation,** | ) ) ) ) | **Judge:** |
| **Defendant.** | ) ) | **Mag. Judge:** |

```
FILED: APRIL 22, 2008
08cv2300 LCW
JUDGE ZAGEL
MAGISTRATE JUDGE SCHENKIER
```

## CLASS ACTION COMPLAINT

NOW COMES Eugene Miller, Jr., (hereinafter "Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, LARRY D. DRURY, LTD., and complains of Lending Tree, LLC, (hereinafter "Defendant"), as follows:

## INTRODUCTION

1.  This is a consumer class action lawsuit brought on behalf of Plaintiff, individually, and on behalf of all persons throughout the United States whose consumer credit reports, personal information, and financial information were intentionally and illegally distributed by a representatives and/or agents of the Defendant in violation of the Fair Credit Reporting Act, 15 U.S.C. §1681 et. seq. ("FCRA") because Defendant deliberately and/or recklessly did not maintain reasonable procedures designed to limit the furnishing of such information for the permissible purposes outlined under FCRA. Defendant's actions constitute violations of FCRA, as well as common law negligence, breach of contract, and invasion of privacy..

## PARTIES & JURISDICTION

2.   Plaintiff, Eugene Miller, Jr., is an individual and a resident of Illinois.

3.   Defendant, Lending Tree, LLC, is a subsidiary of Interactive Corp (IAC), a New York corporation. Defendant is a North Carolina corporation and its headquarters are located in Charlotte, NC.  Defendant provides financial information services throughout the United States, including engaging in the practice of assembling or evaluating consumer credit information on consumers for the purpose of furnishing Consumer Reports to third parties.

4.   This Court has jurisdiction over the federal claim herein pursuant to 28 U.S.C. §1331. This Court has supplemental jurisdiction over the state law claims herein under 28 U.S.C. §1367.  Further, this Court also has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. §1332(d)(2)(A).

5.   Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the acts giving rise to Plaintiff's claims, such as the transactions by which Defendant became privy to Plaintiff's consumer credit reports, personal information, and financial information occurred in this District.

## GENERAL ALLEGATIONS

6.   Defendant is a financial information company doing business in the United States.

7.   Defendant obtains a consumer's most confidential information, including name, social security number, income, employment information, phone number, etc., and provides

same to its network of lenders, wholesale mortgage banks, and investors to facilitate

consumer's mortgage and/or loan application. Plaintiff submitted a mortgage application

to Defendant, via its website, on or about July 25, 2007.

8.    On April 21, 2008 Defendant publicly announced that several of its employees provided

unauthorized access to its loan request forms to a handful of mortgage lenders without the

consent of the Plaintiff and Class members. Defendant's employees assisted

unauthorized lenders to obtain said forms by providing them with confidential passwords.

9.    These passwords allowed the unauthorized lenders to access Defendant's customer loan

request forms which are normally available only to Defendant-approved lenders.

Defendant has admitted that, based on its investigation, the unauthorized lenders did

make use of the passwords and did access, without authority, Defendant's loan request

forms. These forms contained Plaintiff's and the Class members' name, address, email

address, telephone number, Social Security number, income and employment

information.

10.    Defendant stated in its letter of April 21, 2008 that the unauthorized lenders accessed its

loan request forms "between October 2006 and early 2008".

11.    Defendant further stated that it had notified the authorities and had filed lawsuits against

its employees and/or agents involved in the breach.

12.    Despite having taken the time to notify authorities and file lawsuits on its own behalf,

Defendant failed to notify Plaintiff and the Class members until April 21, 2008.

13.    Plaintiff's and the Class' private, nonpublic personal and financial information has been

improperly and illegally sold and/or disclosed to a third party by an agent and/or agents of

Defendant.

15. Plaintiff at no time agreed to allow Defendant to disseminate his Consumer Report and financial information to any unauthorized lender or unauthorized third-party.

16. Plaintiff at no time authorized an employee of Defendant to access his private credit and financial information to sell, broker or otherwise disseminate his financial information and Consumer Report to unauthorized third parties.

## CLASS ACTION ALLEGATIONS

17. This action is brought on behalf of Plaintiff, individually and as a class action, on behalf of all persons or entities whose Consumer Reports, personal information, and/or financial information were sold by Defendant and/or Defendant's employees as part of an impermissible dissemination to unauthorized lenders without the consent of consumers and/or without a permissible purpose under FCRA. The Class does not include Defendants, or their officers, directors, agents, or employees[1].

18. On information and belief, the Class is comprised of tens of millions of consumers, making the joinder of such cases impracticable. Disposition of the claims in a class action will provide substantial benefits to both the parties and the Court.

19. The rights of each member of the Class were violated in a similar fashion based upon Defendant's uniform actions.

20. Questions of law and fact common to the Class predominate over questions that may affect individual Class members, including the following:

   a. Whether Defendant's employees sold, disseminated or otherwise provided access to Plaintiff's and the Class Members' Consumer Reports, personal information,

---

[1]Plaintiff specifically reserves the right to amend or change the definition or scope of the alleged Plaintiff class as set forth herein, and further reserves the right to add or delete classes or subclasses, depending upon the development of facts and the state of the law at the time Plaintiff brings his motion to certify a class or classes.

and/or financial information within the meaning of 15 U.S.C. §1681a(d)(1) without Plaintiff's and the Class members' authorization;

b. Whether Defendant or its agents had a permissible purpose under FCRA to sell, disseminate or otherwise provide access to Plaintiff's and the Class members' Consumer Reports, personal information, and/or financial information within the meaning of 15 U.S.C. §1681a(d)(1);

c. Whether Defendant is a consumer reporting agency as defined by 15 U.S.C. §1681a(f);

d. Whether Defendant violated the FCRA by failing to properly maintain reasonable procedures designed to limit the furnishing of Consumer Reports, personal information and/or financial information to the permissible purposes outlined under FCRA;

e. Whether Defendant violated FCRA when it allowed its employees access to Plaintiff and the Class Members' consumer reports, personal information, and/or financial information;

f. Whether Defendant violated FCRA when its employee sold, disseminated or otherwise provided access to Consumer Reports, personal information and/or financial information to unauthorized third parties in violation of FCRA;

g. Whether the Defendant's conduct was intentional;

h. Whether the Defendant's conduct was reckless;

i. Whether Defendant was negligent in collecting and storing personal and financial information of its clients;

j. Whether Defendant took reasonable steps and measures to safeguard the personal

and financial information of its clients;

k.  Whether Defendant owed a duty to Plaintiff and/or the Class to protect the personal and financial information of its clients;

l.  Whether Defendant breached its duty to exercise reasonable care in storing its clients' personal and financial information by storing that information on its computer systems in their physical possession;

m.  Whether Defendant breached a duty by failing to keep Plaintiff's and the Class members' personal and financial information secure;

n.  Whether Defendant was negligent in failing to keep Plaintiff's and the Class members' personal and financial information secure;

o.  Whether Plaintiff and the Class members have sustained damages, and if so, what is the proper measure of those damages; and

p.  Whether statutory damages are proper in this matter.

21.  Plaintiff will fairly and adequately represent and protect the interests of the Class in that they have no interest that is antagonistic to or that irreconcilably conflicts with those of other members of the Class.

22.  Plaintiff has retained counsel competent and experienced in the prosecution of class action litigation.

23.  A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiff's and the Class Members' claims.  Plaintiff and the members of the Class have suffered irreparable harm as a result of Defendant's deceptive, negligent, and unlawful conduct.

24.  Certification of a class action to resolve these disputes will reduce the possibility of

repetitious litigation involving, potentially, millions of class members.  Further,

certification is appropriate under Federal Rule of Civil Procedure 23(a) and also under

Federal Rules of Civil 23(b)(1), 23(b)(2) and/or 23(b)(3).

## COUNT I

## INTENTIONAL VIOLATION OF THE FAIR CREDIT REPORTING ACT

(1)-(24)    Plaintiff re-alleges paragraphs 1 through 24 of this Complaint as if fully set forth

herein in this Count I.

25.    The Fair Credit Reporting Act ("FCRA") was created to require that consumer reporting

agencies adopt reasonable procedures for meeting the needs of commerce for consumer

credit, personnel, insurance, and other information in a manner which is fair and equitable

to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper

utlization of such information. *See* 15 U.S.C. §1681 *et. seq.*

26.    Under FCRA, a "consumer report" means any written, oral or other communication of

any information by a consumer reporting agency bearing on a consumer's credit

worthiness, credit standing, credit capacity, character, general reputation, personal

characteristics, or mode of living which is used or expected to be used or collected in

whole or in part for the purpose of serving as a factor in establishing the consumer's

eligibility for credit or insurance to be used primarily for personal, family, or household

purposes; employment purposes; or any other purpose authorized under 15 U.S.C.

§1681(b), 15 U.S.C. §1681a(d)(1).

27.    Under FCRA, a "consumer reporting agency" means any person which, for monetary

fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the

practice of assembling or evaluating consumer credit information or other information on

consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

28. Plaintiff and other Class Members are "consumers" or "persons" as defined and construed under FCRA (15 U.S.C. §1681a(b) & ©)).

29. Defendant is a Consumer Reporting Agency as defined under FCRA because it, for monetary fees, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing Consumer Reports to third parties, and uses interstate commerce for the purpose of preparing or furnishing consumer reports.

30. The consumer information sold, disseminated, or otherwise provided access to by Defendant's employees amounted to Consumer Reports as defined under the FCRA.

31. As a Consumer Reporting Agency, Defendant is required to maintain reasonable procedures designed to limit the furnishing of Consumer Reports to the permissible purposes outlines under FCRA. *See* 15 U.S.C. §1681e.

32. In conscious disregard for the rights of Plaintiff and the class, Defendant deliberately and/or recklessly did not maintain reasonable procedures designed to limit the furnishing of Consumer Reports, personal and/or financial information to the permissible purposes outlined under FCRA, specifically 15 U.S.C. §1681e.

33. As enumerated above, the Defendant's reckless conduct allowed its employees to obtain the subject Consumer Reports, personal and/or financial information of the Plaintiff and class and sell, disseminate, or otherwise provide access to unauthorized third parties without the consent of Plaintiff or Class members, and for no permissible purpose under

FCRA.

34. Further, Defendant is responsible for its employee's actions as an agent of the Defendant.

35. Defendant's conduct violated the FCRA and Plaintiff and the Class members have been damaged by Defendant's reckless actions. At all times material, Defendant had full knowledge of its employee's conduct.

36. As a result of Defendant's conduct Plaintiff is entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000, as well as the costs and attorney's fees in bringing this action. 15 U.S.C. §1681n.

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

[a] Certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as class counsel;

[b] Finding that Defendant purposefully and/or recklessly violated the FCRA due to its failure to maintain reasonable procedures designed to limit the furnishing of reports to the permissible purposes outlined under FCRA;

[c] Finding that Defendant is responsible for its employees' actions as an agent of the Defendant;

[d] Requiring that Defendant pay actual damages sustained or statutory damages of not less than $100 and not more than $1,000;

[e] Enjoining Defendant from action which places consumers at a risk of future security breaches;

[f] Requiring Defendant to pay Plaintiff and Class Members reasonable attorney's fees and costs of litigation; and

[g]    Providing for the other legal and/or equitable relief as justice requires.

## COUNT II

## NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT

(1)-(24)    Plaintiff re-alleges paragraphs 1 through 24 of this Complaint as if fully set forth

herein in this Count II.

37.    The Fair Credit Reporting Act ("FCRA") was created to require that consumer reporting

agencies adopt reasonable procedures for meeting the needs of commerce for consumer

credit, personnel, insurance, and other information in a manner which is fair and equitable

to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper

utlization of such information. *See* 15 U.S.C. §1681 *et. seq.*

38.    Under FCRA, a "consumer report" means any written, oral or other communication of

any information by a consumer reporting agency bearing on a consumer's credit

worthiness, credit standing, credit capacity, character, general reputation, personal

characteristics, or mode of living which is used or expected to be used or collected in

whole or in part for the purpose of serving as a factor in establishing the consumer's

eligibility for credit or insurance to be used primarily for personal, family, or household

purposes; employment purposes; or any other purpose authorized under 15 U.S.C.

§1681(b), 15 U.S.C. §1681a(d)(1).

39.    Under FCRA, a "consumer reporting agency" means any person which, for monetary

fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the

practice of assembling or evaluating consumer credit information or other information on

consumers for the purpose of furnishing consumer reports to third parties, and which uses

any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

40. Plaintiff and other Class Members are "consumers" or "persons" as defined and construed under FCRA (15 U.S.C. §1681a(b) & ©)).

41. Defendant is a Consumer Reporting Agency as defined under FCRA because it, for monetary fees, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing Consumer Reports to third parties, and uses interstate commerce for the purpose of preparing or furnishing consumer reports.

42. The consumer information sold by Defendant's employee amounted to Consumer Reports as defined under the FCRA.

43. As a Consumer Reporting Agency, Defendant is required to maintain reasonable procedures designed to limit the furnishing of Consumer Reports to the permissible purposes outlines under FCRA. *See* 15 U.S.C. §1681e.

44. Defendant was negligent in failing to maintain reasonable procedures to protect Plaintiff and the Class members' Consumer Reports, personal and/or financial information.

45. As enumerated above, the Defendant's negligent conduct allowed its employees to obtain the subject Consumer Reports, personal and/or financial information of the Plaintiff and class and sell them to third parties without the consent of Plaintiff or Class members, and for no permissible purpose under FCRA.

46. Further, Defendant is responsible for its employee's actions as an agent of the Defendant.

47. Defendant's conduct violated the FCRA and Plaintiff and the Class members have been damaged by Defendant's negligent actions.

48.     As a result of Defendant's negligent conduct Plaintiff is entitled to actual damages

sustained or statutory damages of not less than $100 and not more than $1,000, as well as

the costs and attorney's fees in bringing this action. 15 U.S.C. §1681n.

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, respectfully

requests that this Court enter an Order:

[a]     Certifying this matter as a class action with Plaintiff as Class Representative, and

designating Plaintiff's counsel as class counsel;

[b]     Finding that Defendant negligently violated the FCRA due to its failure to

maintain reasonable procedures designed to limit the furnishing of reports to the

permissible purposes outlined under FCRA;

[c]     Finding that Defendant is responsible for its employee's actions as an agent of the

Defendant;

[d]     Requiring that Defendant pay actual damages sustained or statutory damages of

not less than $100 and not more than $1,000;

[e]     Enjoining Defendant from action which places consumers at a risk of future

security breaches;

[f]     Requiring Defendant to pay Plaintiff and Class Members reasonable attorney's

fees and costs of litigation; and

[g]     Providing for the other legal and/or equitable relief as justice requires.

## COUNT III

## NEGLIGENCE

(1)-(24)     Plaintiff re-alleges paragraphs 1 through 24 of this Complaint as if fully set forth

herein in this Count III.

49. Defendant came into possession of Plaintiff's and the Class' private, non-public personal and financial information and had a duty to exercise reasonable care in safeguarding and protecting such information from being compromised and/or stolen.

50. Defendant had a duty to timely disclose the fact that Plaintiff's and the Class' private, non-public personal and financial information within its possession had been, or was reasonably believed to have been, compromised.

51. Defendant had a duty to protect Plaintiff's private, non-public personal and financial information within its possession.

52. Defendant had a duty to hire and supervise trustworthy employees as well as to have procedures in place to detect and prevent dissemination of Plaintiff's and the Class' private and financial information by its employees. This breach of security and unauthorized access was reasonably foreseeable to Defendant.

53. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and the Class by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and the Class' private, non-public, financial and personal information within its possession.

54. Defendant through its actions and/or omissions breached its duty to Plaintiff and the Class by failing to hire and supervise trustworthy employees as well as to have procedures in place to detect and prevent dissemination of Plaintiff's private information by its employees. Defendant is responsible for its employees' actions as agents of the Defendant.

55. Defendant through its actions and/or omissions breached its duty to timely disclose the

fact that Plaintiff's and the Class' private, non-public personal and financial information within its possession had been, or was reasonable believed to have been, compromised.

56.    But for Defendant's negligent and wrongful breach of its duties owed to Plaintiff and the Class, Plaintiff's and the Class' private, non-public personal and financial information would not have been compromised.

57.    Plaintiff's and the Class' private, non-public personal and financial information was compromised, viewed, and/or stolen as the proximate result of Defendant failing to exercise reasonable care in safeguarding such information by adopting, implementing, or maintaining appropriate security measures to protect and safeguard the Plaintiff's and the Class' private, non-public personal and financial information within its possession.

58.    Plaintiff and the Class suffered actual damages including, but not limited to, expenses for credit monitoring, anxiety, emotional distress, loss of privacy, and other economic and non-economic harm.

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

[a]    Certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as class counsel;

[b]    Finding that Defendant was negligent in protecting Plaintiff's and the Class' private personal and financial information stored on their computer systems and in their physical possession;

[c]    Requiring Defendant to provide monies required to monitor Plaintiff's and the Class' financial accounts as well as to compensate anyone who suffers damage as a result of the unauthorized release of their private information;

[d]     Finding that Defendant is responsible for its employee's actions as an agent of the

        Defendant;

[e]     Enjoining Defendant from action which places consumers at a risk of future

        security breaches;

[f]     Awarding damages to Plaintiff and the Class under the common law theory

        alleged;

[g]     Requiring Defendant to pay Plaintiff and Class Members reasonable attorney's

        fees and costs of litigation; and

[h]     Providing for the other legal and/or equitable relief as justice requires.

## COUNT IV

## BREACH OF IMPLIED CONTRACT

(1)-(24)     Plaintiff re-alleges paragraphs 1 through 24 of this Complaint as if fully set forth

             herein in this Count IV.

59.     Defendant came into possession of Plaintiff's and the Class' private, non-public, personal

        and financial information and had an implied contract to protect such information with

        Plaintiff and the Class, via Plaintiff's and the Class' financial institution's privacy

        notices.

60.     The implied contract required Defendant to not disclose the Plaintiff's and the Class'

        private, non-public personal information to unauthorized third party entities, and to

        safeguard and protect the information from being compromised and/or stolen.

61.     Defendant did not safeguard and protect Plaintiff's and the Class' private, non-public

        personal and financial information from being compromised and/or stolen.  Indeed,

        Defendant disclosed this information to unauthorized lenders.

62. Because Defendant disclosed Plaintiff's and the Class' private, non-public personal information and failed to safeguard and protect Plaintiff and the Class' private, non-public personal and financial information from being compromised and/or stolen, Defendant breached its contract with Plaintiff and the Class.

63. Plaintiff and the Class suffered and will continue to suffer actual damages, including but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic harm.

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

[a] Certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as class counsel;

[b] Finding that Defendant breached its contract to safeguard and protect Plaintiff's and the Class' private personal and financial information stored on their computer systems and in their physical possession;

[c] Requiring Defendant to provide monies required to monitor Plaintiff's and the Class' financial accounts as well as to compensate anyone who suffers damage as a result of the unauthorized release of their private information;

[d] Finding that Defendant is responsible for its employee's actions as an agent of the Defendant;

[e] Enjoining Defendant from action which places consumers at a risk of future security breaches;

[f] Awarding damages to Plaintiff and the Class under the common law theory alleged;

[g]     Requiring Defendant to pay Plaintiff and Class Members reasonable attorney's

fees and costs of litigation; and

[h]     Providing for the other legal and/or equitable relief as justice requires.

## COUNT V

## INVASION OF PRIVACY AND

## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

(1)-(24)       Plaintiff re-alleges paragraphs 1 through 24 of this Complaint as if fully set forth

herein in this Count V.

64.     Plaintiff and the Class have a legally protected privacy interest in their confidential credit,

financial and other personal information and a reasonable expectation of privacy in such

information.  This right of privacy includes the right not to have someone else profit by

the misappropriation and sale or dissemination of such confidential personal and financial

information.

65.     As alleged herein, Defendant's employees made an unauthorized intrusion into Plaintiff's

and the Class' privacy by accessing, disclosing and selling the private financial, credit and

other confidential information of Plaintiff and the Class without such persons'

knowledge, authorization or consent.  This unauthorized disclosure and/or sale of such

private facts and information is one that is highly offensive or objectionable to a

reasonable person of ordinary sensibilities.  Moreover, the disclosure of such private facts

and information, as alleged herein, does not include information which is of a legitimate

public concern.

66.     Defendant's employees violated the rights of privacy of Plaintiff and the Class by

misappropriating and disclosing and selling their private and confidential information,

and other information, without their consent. The Plaintiff's and the Class' names and private and confidential financial and other information have value, and Defendant's employee's unlawful use, disclosure and sale of that information, was made for their own benefit.

67. As a result of the unlawful conduct, as alleged herein, the privacy rights of Plaintiff and the Class have been violated, and Plaintiff and the Class have been harmed as a result thereof.

68. Plaintiff and the Class suffered and will continue to suffer actual damages, including but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic harm.

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

[a] Certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as class counsel;

[b] Finding that Defendant invaded the privacy of, and misappropriated confidential information of, Plaintiff and the Class wherein Plaintiff's and the Class' private personal and financial information was unlawfully accessed, disclosed, and/or sold;

[c] Requiring Defendant to provide monies required to monitor Plaintiff's and the Class' financial accounts as well as to compensate anyone who suffers damage as a result of the unauthorized release of their private information;

[d] Finding that Defendant is responsible for its employee's actions as an agent of the Defendant;

[e]     Enjoining Defendant from action which places consumers at a risk of future

        security breaches;

[f]     Awarding damages to Plaintiff and the Class under the common law theory

        alleged;

[g]     Requiring Defendant to pay Plaintiff and Class Members reasonable attorney's

        fees and costs of litigation; and

[h]     Providing for the other legal and/or equitable relief as justice requires.



Dated:          April 22, 2008                    Eugene Miller, Jr., on behalf of himself and
                                                  all others similarly situated,

                                                  By:_____s/Larry D. Drury_____

LARRY D. DRURY
JAMES R. ROWE
LARRY D. DRURY, LTD.
205 W. RANDOLPH, SUITE 1430
CHICAGO, ILLINOIS 60606
312.346.7950
ARDC# 0681024

**IN THE DISTRICT COURT OF THE UNITED STATES
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1)Angela Mitchell, on behalf of herself and all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | |
| (1) Home Loan Center, Inc. dba Lending Tree Loans, a California Corporation; (2)Lending Tree LLC., a Delaware Limited Liability Company; and (3) Lending Tree, Inc., a Delaware Corporation. ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | **CLASS ACTION COMPLAINT JURY TRIAL DEMANDED** |

## COMPLAINT

1. Plaintiff brings this action individually and on behalf of a class of similarly situated individuals defined below (the "Class") to redress injuries suffered as a result of Defendants' (hereinafter referred to as "Lending Tree" et al) wrongful conduct. Lending Tree et al has announced in an email on April 22, 2008 that some of its own employees divulged personal information of the Class to outside lenders and individuals who were unknown to the Class and was done without the Class' knowledge and/or consent. The breach involved such information as name, address, telephone numbers, social security numbers, income and employment information. This breach by Lending Tree's et. al, own employees has compromised thousands of clients' information.

2. Accordingly, Plaintiff brings this action on behalf of herself and a class of those persons similarly situated to recover damages caused by Defendants' breach of contract, negligence, negligence per se, negligent misrepresentations, and unfair and/or deceptive acts or practices.

1

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), in that (1) the Class (as defined below) has more than 100 Class members, (2) the amount at issue exceeds five million dollars ($5,000,000.00), exclusive of interest and costs, and (3) minimal diversity exists as at least one plaintiff and one defendant are citizens of different states.

4. Venue in the United States District Court for the Western District of Oklahoma is appropriate, pursuant to 29 U.S.C. § 1391(a)(2), since the cause of action arose in the District.

## Class Action Allegations

5. Plaintiff brings this action on his own behalf and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff seeks certification of a class under Rule 23(b)(1), (b)(2) and (b)(3).

6. Class definition: The class that Plaintiff seeks to represent (the "Class") is defined as follows:

> All persons that have suffered damages and/or harm as a result of data breaches set forth herein with respect to personal and financial information of customers who gave their financial or personal information to Lending Tree et al.

7. Numerosity: The Class is composed of thousands of individuals the joinder of which would be impracticable. The individual identities of the class members are ascertainable through Defendants' records or by public notice.

8. Commonality: There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class. The questions of law and fact common to the Class predominate over questions affect only individual Class members, and include, but are not limited to, the following:

2

a. Whether Defendants failed to provide, or failed to ensure that Lending Tree et al provided adequate security and/or protection for its computer systems containing Lending Tree et al customers' financial and personal data;

b. Whether Defendants breached a contractual duty to Plaintiff and the Class by failing to provide, or failing to ensure that Lending Tree et al provided adequate security and/or protection for its computer systems containing Lending Tree et al customers' financial and personal data;

c. Whether Defendants breached a duty and were negligent in failing to provide, or failing to ensure that Lending Tree et al provided adequate security and/or protection for its computer systems containing Lending Tree et al customers' financial and personal data;

d. Whether the conduct (action or inaction) of Defendants resulted in the unauthorized breach of Lending Tree's et al computer systems containing Lending Tree et al customers' financial and personal data.

e. Whether Defendants knew or should have known of the vulnerability of Lending Tree's et al computer systems prior to the data security breach;

f. Whether Defendants knew or should have known of the risks to individuals inherent in failing to protect such financial and personal information;

g. Whether Defendants improperly retained customer personal and financial information or allowed Lending Tree et al to retain such information despite representations that it would not do so;

h. Whether Defendants disclosed (or directly or indirectly caused to be disclosed) private financial and personal information of customers;

i. Whether Defendants negligently entrusted this information to employees;

3

j. Whether Defendants negligently supervised their employees causing a breach of the personal data;

k. Whether Plaintiff and the Class have been damaged by the conduct of Defendants.

l. Whether Plaintiff and the Class are entitled to notice as to whether the security of their customers' financial and personal data was compromised as a result of the data security breach;

m. Whether Plaintiff and the Class are entitled to remedies such as covering the cost of replacing cards on account of the breach of duties of Defendants, or the losses resulting from fraudulent transactions;

n. Whether Plaintiff and the Class are entitled to declaratory relief;

o. Whether Plaintiff and the Class are entitled to injunctive relief;

p. Whether the Class is entitled to an award of reasonable attorneys' fees and costs of suit.

q. Whether Lending Tree et al is responsible for negligence and damage of its employees under respondent superior;

r. Whether Lending Tree et al violated the Graham-Leach-Bliley Act, 15 U.S.C. § 6801, et seq. and its supporting regulations, 16 C.F.R. § 313, et seq., to protect and keep customer information confidential. 15 U.S.C. § 6801 provides that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."

4

9. Typicality and Adequacy: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent and he is similarly situated with members of the Class. Plaintiff will fairly and adequately represent and protect the interests of the Class, and Plaintiff's interests are not antagonistic to the Class. Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation.

10. Predominance: Common questions of fact or law predominate over individualized issues. Because this case centers on the Defendants' failure to adequately secure non-public financial information (i.e. name, address, phone numbers, social security numbers, income and employment records), the facts surrounding Defendants' practices will clearly predominate over any individualized issues. A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's and Class members' claims. Plaintiff and the members of the Class have suffered irreparable harm as a result of Defendants unfair, deceptive and unlawful conduct.

## COUNT I

### (Breach of Contract)

11. Plaintiff repeats and restates that allegations contained above as if fully stated herein.

12. Plaintiff and Class members were beneficiaries to contracts and/or agreements with Lending Tree et al. This contract and/or agreement required Defendants to adequately safeguard personal and financial information from theft or unauthorized disclosure.

13. Defendants breached their agreements with Plaintiff and Class members by failing to adequately safeguard personal data belonging to Plaintiff and Class members, allowing it to be accessed by third parties without authorization.

5

14. Plaintiff and the Class were forced to incur other costs and expenses as a result of Defendants' conduct.

15. Plaintiff and the Class have been injured and suffered damaged as a proximate result of these breaches in amounts to be determined at trial.

## COUNT II

### (Negligence)

16. Plaintiff repeats and restates that allegations contained above as if fully stated herein.

17. Defendants were responsible for the private personal and financial data of Plaintiff, the Class and their customers and owed a duty to Plaintiff and the Class to adequately protect it from theft. Defendants breached this duty by failing to exercise reasonable care in safeguarding such information, allowing an unlawful intrusion into Lending Tree's et al computer systems, failing to adequately supervise and/or monitor its employees' use of such information, and allowing the information to be accessed by third parties without authorization.

18. In this regard, Defendants knew, or with the reasonable exercise of care should have known, of the risks inherent in retaining such information, and the importance of providing adequate security.

19. In addition, Defendants negligently delayed disclosure of the security breach, thus unreasonably exposing Plaintiff and/or Class members to additional harm.

20. Plaintiff and the Class have been injured as a proximate result of Defendants' breaches in amounts to be determined at trial.

## COUNT III

### (Negligence Per Se)

21. Plaintiff repeats and restates the allegations contained above as if fully stated herein.

22. Defendants had a duty pursuant to the Graham-Leach-Bliley Act, 15 U.S.C. § 6801, et seq. and its supporting regulations, 16 C.F.R. § 313, et seq., to protect and keep customer information confidential. 15 U.S.C. § 6801 provides that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."

23. 15 U.S.C. § 6809 defines the term "nonpublic personal information" as follows:

(A) The term "nonpublic personal information" means personally identifiable financial information-(i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution.

(B) Such term does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title.

(C) Notwithstanding subparagraph (B), such term-(iv) shall include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information....

24. Pursuant to C.F.R. § 313(iii), financial institutions and other entities that receive nonpublic personal information, such as Defendants, are generally prohibited from using or disclosing such information except to the extent they do so "in the ordinary course of business to carry out the activity covered by the exception under which [it] received the information." In other

7

words, financial institutions and other entities that handle nonpublic personal information may only use it to the extent necessary to process and service customers' financial transactions.

25. Defendants failed to comply with the requirements of 15 U.S.C. § 6801, et seq. and C.F.R. § 313, et seq., by not providing for adequate safeguards in its handling of nonpublic personal information and allowing unauthorized access to that information by third parties.

26. The failure to comply with 15 U.S.C. § 6801, et seq. and C.F.R. § 313, et seq. constitutes negligence per se.

27. Plaintiff and the Class have been injured and suffered damages as a proximate result of these breaches in amounts to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter an order:

28. Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying plaintiff as the representative of the Class and designating its counsel as counsel for the Class;

29. Declaring that Defendants have committed the violations alleged herein;

30. Requiring Defendants to pay Plaintiff and the Class money damages for any losses suffered by Plaintiff and the Class as a result of their misconduct, including, but not limited to, the cost of replacing the losses attributable to fraudulent transactions connected to and/or arising from the security breach;

31. Enjoining Defendants from further actions which place the Class at risk of future data security breaches

8

32. Requiring Defendants to pay Plaintiff and the Class reasonable attorneys' fees and costs incurred in prosecuting this litigation;

33. Requiring the Defendants to pay for the replacement of any accounts and credit cards;

34. Requiring the Defendants to pay for credit monitoring;

35. Requiring the Defendants to pay for Identity Theft Insurance;

36. Requiring the Defendants to pay for Drivers License Replacement Cost;

37. Requiring the Defendants to pay for identity theft loss; and

38. Providing for such other legal and/or equitable relief as justice requires.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b) Plaintiff demands a trial by jury on all issues so triable.

GRIFFIN, REYNOLDS & ASSOCIATES

Billy D. Griffin, OBA No. 17945
Jason B. Reynolds, OBA No. 18132
416 S.W. 79th, Suite 200
Oklahoma City, OK 73139
(405) 721-9500 Telephone
(405) 721-9503 Facsimile
ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE
No: 3:08-cv-229

| | | |
|---|---|---|
| **CONSTANCE SPINOZZI, on behalf of**<br>**Herself and all others similarly situated,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | **COMPLAINT** |
| **LENDINGTREE, LLC** | : | **(Jury Trial Demanded)** |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## CLASS ACTION COMPLAINT

Now comes Constance Spinozzi ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys, and in support of the Class Action Complaint, states as follows:

## INTRODUCTION

1.      This is a consumer class action lawsuit brought by Plaintiff Constance Spinozzi, on behalf of herself and all others similarly situated (the "Class" or "Class Members") throughout the United States whose private personal information including Social Security number, income and employment information, name, address, email address, and/or phone number was intentionally and unlawfully sold to third parties by Defendant LendingTree, LLC ("Defendant") in violation of the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq*. ("FCRA")

and the common law.  Defendant willfully or recklessly failed to limit the furnishing of private

consumer information to the permissible purposes outlined under the FCRA.  As a result, certain

of Defendant's employees and ex-employees accessed Class Members' consumer information

and sold it to third parties without the consent of Class Members.  Defendant failed to prevent or

detect the ongoing unauthorized activity, which occurred for more than a year from October of

2006 until early 2008.

     2.     Defendant's actions constitute violations of the FCRA as well as common law

negligence and breach of implied contract.

     3.     Plaintiff and the Class seek damages suffered as a result of Defendant's practices,

including but not limited to statutory damages, compensatory damages, and injunctive relief.

## PARTIES AND JURISDICTION

     4.     Plaintiff Constance Spinozzi is a resident of Pennsylvania.

     5.     Defendant LendingTree, LLC is a Delaware limited liability company with its

headquarters located at 1115 Rushmore Drive, Charlotte, NC 28277.  Defendant provides

financial information services throughout the United States, including engaging in the practice of

assembling and evaluating consumer credit information online for the purpose of furnishing

consumer credit data to third party lenders.

     6.     This Court has jurisdiction over the federal claim herein pursuant to 28 U.S.C.

§1331, federal question jurisdiction.  This Court has supplemental jurisdiction over the state law

claims herein under 28 U.S.C. §1367.  Further, this Court has subject matter jurisdiction over this

nationwide class action pursuant to 28 U.S.C. §1332, as amended by the Class Action Fairness

2

Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and

costs, and is a class action in which some members of the Class are citizens of states different

than Defendant. 28 U.S.C. §1332(d)(2)(A). This Court has personal jurisdiction over Defendant

because Defendant has its headquarters in, and conducts substantial business in, North Carolina

and throughout the United States.

7.      Venue properly lies in this district pursuant to 28 U.S.C. §1391(a)(2) because a

substantial part of the acts giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

8.      Defendant describes itself on its website as an online lending services exchange

that matches lenders with borrowers seeking mortgage, home equity, automobile, personal, and

credit card loans. Consumers complete an online loan request on LendingTree's website, then

LendingTree matches the consumers with up to four lenders based on various matching criteria.

9.      As part of the application process, Defendant obtains consumers' confidential

information, including Social Security number, income and employment information, name,

address, email address, and phone number. Defendant then analyzes the information and

provides it to appropriate lenders to respond to consumers' loan requests.

10.      In or around September 2007, Plaintiff submitted a loan application containing

private data to Defendant, via Defendant's website. Soon thereafter, Plaintiff received phone

calls and emails from many more than four lenders soliciting her for a loan.

11.      On April 21, 2008, Defendant publicly announced the following on its website:

> Recently, LendingTree learned that several former employees may have
> helped a handful of mortgage lenders gain access to LendingTree's
> customer information by sharing confidential passwords with the lenders. .
> . . We promptly made several system security changes. We also brought
> lawsuits against those involved.

3

Based on our investigation, we understand that these mortgage lenders used the passwords to access LendingTree's customer loan request forms, normally available only to LendingTree-approved lenders, to market loans to those customers. The loan request forms contained data such as name, address, email address, telephone number, Social Security number, income and employment information. We believe these lenders accessed LendingTree's loan request forms between October 2006 and early 2008.

12.    In addition to receiving unwanted solicitations from lenders, Class Members are at risk of fraud and identity theft. LendingTree advised its customers as follows:

[W]e suggest you get a free credit report. Look for any accounts you didn't open and/or inquiries from creditors that you didn't initiate. If you see anything you don't understand, contact the credit bureau. If you see anything suspicious, you may want to file a fraud alert with the bureaus.

13.    LendingTree did not disclose how many customers' personal data was affected by the breach. However, according to its website, it processed more than 23 million loan requests since its inception in 1998.

14.    LendingTree filed a civil complaint in the Superior Court of Orange County, California, No. 00062376, against several entities on April 21, 2008 (the "State Ct. Compl."). The complaint stated the following, in relevant part:

(a) Plaintiff [LendingTree] operates an online network that helps match consumers and lenders, with the goal of providing consumers with a competitive advantage when seeking a mortgage loan product. Plaintiff essentially provides a marketplace that connects consumers with interested lenders that submit competitive offers for these mortgage loan products.

(b) By visiting Plaintiff's website and completing a "qualification form" ("QF"), consumers interested in purchasing a mortgage loan product are able to receive "bids" from up to four lenders. The QF includes the consumer's

4

confidential information, contact information, and various other nonpublic information. This information makes it possible for lenders to evaluate the creditworthiness of consumers.

(c) Plaintiff utilizes a propriety system known as "Apex" to store the completed QFs received from consumers. Consumers that have completed a QF on the Plaintiff's website are known as "leads."

(d) Plaintiff enrolls financial services companies (including banks, thrifts, and mortgage companies) that are interested in making mortgage loans to consumers. These companies are known as "Network Lenders." Currently about 300 Network Lenders participate in Plaintiff's online marketplace. . . .

(e) After a QF is completed, Plaintiff forwards the lead to roughly four Network Lenders based on the consumer's credit data contained in the QF and the lending criteria specified by the Network Lender. Network Lenders are then able to quote offers to the consumer. . . . These lenders, and only these lenders, are given authorized access to the Apex system containing the completed QF and contact information for the lead. These lenders are provided remote access to the LendingTree system to allow them to prepare their offers and follow up with the leads in the future. Importantly, lenders' access to the Apex system is limited to only the specific consumers for which they have been sent leads. Each lender is assigned a specific user name and password in order to log-on to and access the Apex system for the information submitted by the lender's designated leads.

(f)  Plaintiff receives various fees from Network Lenders in exchange for the leads and access to the Apex system . . .

(g)  . . . Customers expect Plaintiff to ensure the security of their sensitive confidential information . . .

(h)  Preventing the disclosure of customer information to unauthorized persons is of significant importance to Plaintiff and its customers.

(i)  Jarod Beddingfield ("Beddingfield") was employed by [LendingTree] in various positions, including Vice President of Sales, from June 2001 until May 2007.  In these positions, Beddingfield was given administrative access to the Apex system.  Beddingfield's access was essential to the performance of his job duties.

(j)  Beddingfield's employment at [LendingTree] was terminated on or about May 11, 2007.

(k)  Upon information and belief, during his employment and since his termination Beddingfield has repeatedly . . . reveal[ed] confidential information of both [LendingTree] and its customers to competitors and other individuals not affiliated with [LendingTree].

(l)  David Anderson ("Anderson") was employed by [LendingTree] in the position of Senior Vice President for New Business Development until suspended in April 2006 and subsequently terminated in June 2006.  In this position, Anderson was given administrative access to the Apex system.  This access was essential to the performance of his job duties.

6

(m) Upon information and belief, during his employment and since his termination Anderson has repeatedly . . . reveal[ed] confidential information of both [LendingTree] and its customers to competitors and other individuals not affiliated with [LendingTree].

(n) Upon information and belief, the entity defendants – Newport, Sage, Chapman, and Home Loan Consultants ("Entity Defendants") are mortgage lenders in direct competition with the Network Lenders.

(o) On information and belief, both during and after their employment with [LendingTree], Anderson and Beddingfield each used their administrative access to ascertain the user names and Apex passwords of various other Network Lenders and [LendingTree's] employees. Anderson and Beddingfield then illegally . . . distributed the user names and passwords of [LendingTree's] employees and [LendingTree's] other Network Lenders to Newport, Southern California Marketing, Chapman, and/or Home Loan Consultants.

(p) On information and belief, Newport and Southern California Marketing paid Anderson and Beddingfield for the stolen usernames and passwords necessary to access the Apex system. Newport and/or Southern California Marketing thus obtained the ability to illegally log-on to and access the Apex system and misappropriate leads and confidential information.

(q) On information and belief, in addition to using the stolen leads to contact consumers itself, Newport and/or Southern California Marketing also sold

7

certain usernames and passwords or the stolen leads to Sage, Chapman, and/or Home Loan Consultants to enable these entities to obtain unauthorized access to the Apex system and to use the information to contact the consumers to provide the loan products, resulting in damage to [LendingTree].

(r) On information and belief, Newport and/or Southern California Marketing used illegally-obtained Apex passwords on a regular basis to download newly-submitted QFs from the Apex system. Newport then distributed the names of [LendingTree's] customers and their personal information to its loan officers, who contacted the customers directly. Newport also distributed the names of Plaintiff's customers and their personal information to Sage and other Entity Defendants . . . .

(s) On information and belief, Chapman and Home Loan Consultants paid Anderson and Beddingfield for the stolen usernames and passwords necessary to access the Apex system. Chapman and Home Loan Consultants thus obtained the ability to illegally log-on to and access the Apex system and misappropriate leads and confidential information.

(t) On information and belief, Chapman and Home Loan Consultants used illegally-obtained Apex passwords on a regular basis to download newly-submitted QFs from the Apex system. Chapman and Home Loan Consultants then distributed the names of [LendingTree's] consumers and their personal information to its loan officers, who contacted the customers directly.

(u) On information and belief, the scheme resulted in hundreds of unauthorized

8

log-ons to the Apex system.

15.     Despite LendingTree taking the time to hire counsel and file a lawsuit on its own behalf on April 21, 2008, LendingTree failed to notify Class Members until that same date, April 21, 2008, that their personal data had been breached.  Presumably, LendingTree knew about the breach before hiring counsel to sue the unauthorized third parties.  LendingTree should have notified Class Members of the breach at that time, *i.e.*, when it first learned of the breach.  The delay in notification deprived Class Members of the opportunity to scrutinize lender communications for unauthorized contacts, monitor credit histories for misuse of personal information, and take other protective measures in response to the breach.

16.     As noted in LendingTree's state court complaint, Jarod Beddingfield and David Anderson repeatedly misappropriated confidential information both before and *after* they were terminated by LendingTree.  (State Ct. Compl. ¶¶ 34, 38.)  The fact that Beddingfield and Anderson continued to access customer data after their termination casts doubt on LendingTree's procedures to freeze Beddingfield's and Anderson's data access rights, strengthen its security procedures, and otherwise improve its data access controls after being on notice of the data breach.

17.     LendingTree noted on the Privacy Policy section of its website that it "will not share information with other lenders not disclosed to you."  It also disclosed that "only . . . authorized third-party service providers are permitted to access personal information, and they may do so only for permitted business functions."  LendingTree failed to comply with these representations.

18.     Class Members' private information has been improperly sold and/or disclosed to

multiple third parties by Defendant and its agents in violation of the FCRA. Defendant is responsible and liable here for the actions of its agents.

19.     Plaintiff at no time agreed to allow Defendant or its agents to disseminate her private information to unauthorized third parties.

20.     On April 21, 2008, Plaintiff received an email from LendingTree stating that her personal information was affected by the data breach.

## CLASS ACTION ALLEGATIONS

21.     This action is brought by Plaintiff Constance Spinozzi, individually and as a class action, on behalf of all persons or entities whose personal or financial information was disclosed by Defendant or its ex-employees to unauthorized third parties (the "Class"). The Class does not include Defendant or its officers, directors, agents, or employees.

22.     Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and 23(b).

23.     On information and belief, the Class is comprised of thousands or millions of consumers, making joinder of such consumers impracticable. Litigation of the claims in a class context will provide substantial benefits and economies to the parties and the Court.

24.     The rights of each Class Member were violated in a similar fashion based on Defendant's uniform actions.

25.     Questions of law and fact common to the Class predominate over questions that may affect individual Class Members, including the following:

        a.     Whether Defendant or its agents disclosed or otherwise provided access to Class Members' private information to unauthorized third parties;

10

b.    Whether Defendant's conduct alleged herein violated the FCRA;

c.    Whether Defendant's unlawful conduct was willful, reckless, or negligent for purposes of the FCRA;

d.    Whether Defendant owed duties to Class Members to protect their personal information;

e.    Whether Defendant breached its duties it owed to Class Members;

f.    Whether Defendant failed to exercise reasonable care in supervising its employees and monitoring their access to and/or use of passwords and other information which allowed access to Class Members' private information;

g.    Whether Defendant entered into and breached implied contracts with Class Members regarding the safeguarding of their private information;

h.    Whether Class Members sustained damages, and if so, what is the proper measure of those damages; and

i.    Whether statutory damages under the FCRA, 15 U.S.C. § 1681n(a)(1)(A), are proper in this matter.

26.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests that are antagonistic to, or that irreconcilably conflict with, the interests of the Class.

27.    Plaintiff has retained competent counsel who are experienced in class action litigation.

28.    A class action is superior to all other methods for the fair and efficient adjudication of Class Members' claims.

11

29.     Certification of a Class to resolve this dispute will reduce the possibly of repetitious litigation involving thousands or millions of Class Members.

## COUNT I

## INTENTIONAL VIOLATION OF THE FAIR CREDIT REPORTING ACT

30.     Plaintiff re-alleges paragraphs 1 through 29 of the Complaint as if fully set forth herein.

31.     The Fair Credit Reporting Act ("FCRA") was created to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commence for consumer credit . . . and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. §1681(b).

32.     The FCRA imposes the following duty: "Every consumer reporting agency shall maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 604 [15 U.S.C. § 1681b]."  15 U.S.C. § 1681e(a).  Section 604, 15 U.S.C. § 1681b, sets forth various permissible purposes for the furnishing of consumer reports. LendingTree's disclosure of consumer information to unauthorized third parties did not comply with any of the permissible purposes set forth in 15 U.S.C. § 1681b.

33.     The FCRA defines "consumer reporting agency" as follows:

The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of *assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties*, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis added).

12

34.    The FCRA defines "consumer report" as follows:

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency ***bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living*** which is used or expected to be used or collected in whole or in part for the purpose of serving as a ***factor in establishing the consumer's eligibility for***

(A) ***credit*** or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 604 [15 U.S.C. §1681b].

15 U.S.C. §1681a(d)(1) (emphasis added).

35.    LendingTree is a "consumer reporting agency" under the FCRA.  LendingTree disclosed in its state court complaint that it assembles information "that makes it possible for lenders to evaluate the ***creditworthiness*** of consumers."  (State Ct. Compl. ¶ 19) (emphasis added).  LendingTree also disclosed the following on the Frequently Asked Questions page of its website:

On the LendingTree network, Lenders provide to us criteria about the type of loan (for example, loan amount, whether purchase, refinance, or equity loan) and the type of loan customer (for example, state of residence or ***creditworthiness***) in which the Lender is interested.  LendingTree, LLC will provide your information to up to five Lenders whose criteria match your profile.

. . . .

[I]n all cases, LendingTree pulls your ***credit report*** when you complete a loan request.

(Emphasis added.)

Thus, LendingTree assembles and/or evaluates consumer credit information (creditworthiness

13

information) and furnishes it to third party lenders.

36.     LendingTree furnishes "consumer reports" to third parties under the FCRA.  Class

Members provided LendingTree with their Social Security number and employment and income

information, among other things.  LendingTree then obtained Class Members' credit reports.

Together, that information had a direct "bearing on [Class Members'] credit worthiness" and

served as a "factor in establishing the consumer's eligibility for . . . credit."  15 U.S.C.

§1681a(d)(1).

37.     Class Members are "consumers" as defined and construed under the FCRA, 15

U.S.C. §1681a(c).

38.     Defendant received fees for assembling consumer information.

39.     Defendant used the facilities of interstate commerce for purposes of the FCRA

when it collected Class Members' private information via its website and shared that information

with third parties.

40.     In conscious disregard for the rights of Class Members, Defendant willfully or

recklessly failed to maintain reasonable procedures designed to limit the furnishing of consumer

reports to the permissible purposes outlined in the FCRA.

41.     Defendant and its former employees obtained Class Members' private

information, and sold or disseminated it to unauthorized third parties for no permissible purpose

under the FCRA.

42.     Defendant is responsible and liable for its employees' actions as agents of

Defendant.

43.     Defendant willfully or recklessly failed to properly: (i) supervise its employees;

(ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt

procedures to prevent or detect unauthorized access to or disclosure of consumer information.

44.     The FCRA states the following with respect to damages:

(a) Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000

. . . .

(B) such amount of punitive damages as the court may allow; and

(C) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

45.     Class Members have been damaged by Defendant's actions.  As a result, Class

Members are entitled to actual damages sustained or statutory damages of not less than $100 and

not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

## COUNT II

## NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT

46.     Plaintiff re-alleges paragraphs 1 through 45 of the Complaint as if fully set forth

herein.

47.     Defendant engaged in at least negligent, if not willful or reckless, conduct in

violating the FCRA.

48.     In negligent disregard for the rights of Class Members, Defendant failed to

maintain reasonable procedures designed to limit the furnishing of consumer reports to the

permissible purposes outlined in the FCRA.

49.     Defendant and its former employees obtained Class Members' private

information, and sold or disseminated it to unauthorized third parties for no permissible purpose

under the FCRA.

50.     Defendant is responsible for its employees' actions as agents of Defendant.

51.     Defendant negligently failed to properly: (i) supervise its employees; (ii) monitor

for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to

prevent or detect unauthorized access to consumer information.

52.     The FCRA states the following with respect to damages:

(a) Any person who is negligent in failing to comply with any requirement
imposed under this title with respect to any consumer is liable to that consumer in
an amount equal to the sum of

> (1) any actual damages sustained by the consumer as a result of the
> failure; and

> (2) in the case of any successful action to enforce any liability under this
> section, the costs of the action together with reasonable attorney's fees as
> determined by the court.

15 U.S.C. § 1681o(a).

53.     Class Members have been damaged by Defendant's actions.  As a result, Class

Members are entitled to actual damages sustained, as well as litigation costs and attorney's fees.

<u>**COUNT III**</u>

<u>**NEGLIGENCE**</u>

54.     Plaintiff re-alleges paragraphs 1 through 53 of the Complaint as if fully set forth

herein.

55.     Defendant came into possession of Class Members' private information and had a duty to exercise reasonable care in safeguarding that information.

56.     Defendant owed a duty to Class Members to properly: (i) supervise its employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

57.     Defendant, through its actions, breached its duties to Class Members.

58.     Defendant's employees misappropriated consumer information for more than a year, from "between October 2006 and early 2008." According to LendingTree's state court complaint, "the scheme resulted in hundreds of unauthorized log-ons to the Apex system." (State Ct. Comp. ¶ 49.)  Also, according to the state court complaint, Beddingfield and Anderson repeatedly misappropriated consumer data both before and after they were terminated from LendingTree.  The length of the breach, the fact that hundreds of unauthorized log-ons were permitted, and the fact that LendingTree's former employees still had access to LendingTree's customer data even after they were terminated casts doubt on the adequacy of LendingTree's procedures to: (i) supervise its employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

59.     LendingTree's violation of the FCRA serves as further evidence of its breach of duties owed to Class Members.  This constitutes negligence *per se*.

60.     Defendant also had a duty to timely disclose to Class Members that their private information had been, or was reasonably believed to have been, compromised.  Defendant breached this duty.  Defendant investigated the breach, hired legal counsel, and filed a complaint

in state court against certain third parties on April 21, 2008.  Defendant did not notify Class

Members about the breach until that same date, April 21, 2008.  Presumably, LendingTree knew

about the breach before hiring counsel to sue the unauthorized third parties.  LendingTree should

have notified Class Members of the breach at that time, *i.e.*, when it first learned of the breach.

The delay in notification deprived Class Members of the opportunity to scrutinize lender

communications for unauthorized contacts, monitor credit histories for misuse of personal

information, and take other protective measures in response to the breach.

       61.     The breaches of duties were reasonably foreseeable to Defendant.

       62.     But for Defendant's breach of duties, Class Members' private information would

not have been compromised.  Class Members' private information was compromised as a direct

and proximate result of Defendant's breach.

       63.     Class Members suffered damages including but not limited to:

       a.     out of pocket costs for credit monitoring, identity theft insurance, and

similar services;

       b.     anxiety;

       c.     emotional distress;

       d.     loss of privacy;

       e.     loss of time spent: (i) obtaining and reviewing credit reports (at

Defendant's suggestion); (ii) placing fraud alerts on their credit report (at Defendant's

suggestion); (iii) monitoring their accounts and credit reports on an ongoing basis for

unauthorized activity; (iv) scrutinizing communications from lenders; and (v) taking other

protective measures in response to the breach; and

f.    other economic and non-economic harm.

## COUNT IV

## BREACH OF IMPLIED CONTRACT

64.    Plaintiff re-alleges paragraphs 1 through 63 of the Complaint as if fully set forth herein.

65.    When entering into transactions with Defendant, and providing personal information to Defendant, Class Members entered into implied contracts with Defendant requiring Defendant to safeguard their private information.  The implied contracts were based on, *inter alia*, Defendant's Privacy Policy, which stated that only authorized third parties had access to consumers' personal information.

66.    As noted in LendingTree's state court complaint: "Customers expect [LendingTree] to ensure the security of their sensitive confidential information."  (State Ct. Compl. ¶ 25.)  Also, "[p]reventing the disclosure of customer information to unauthorized persons is of significant importance to [LendingTree] and its customers."  (State Ct. Compl. ¶ 27.)  This indicates a meeting of the minds between LendingTree and Class Members regarding data security.

67.    Defendant failed to safeguard Class Members' private information.  Defendant's actions caused Class Members' private information to be disclosed to unauthorized third parties.

68.    Because Defendant disclosed Class Members' private information to unauthorized third parties, Defendant breached its implied contract with Class Members.

69.    Class Members suffered damages including but not limited to:

a.    out of pocket costs for credit monitoring, identity theft insurance, and

19

similar services;

      b.    anxiety;

      c.    emotional distress;

      d.    loss of privacy;

      e.    loss of time spent: (i) obtaining and reviewing credit reports (at Defendant's suggestion); (ii) placing fraud alerts on their credit report (at Defendant's suggestion); (iii) monitoring their accounts and credit reports on an ongoing basis for unauthorized activity; (iv) scrutinizing communications from lenders; and (v) taking other protective measures in response to the breach; and

      f.    other economic and non-economic harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a.    Certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as class counsel;

b.    Finding that Defendant willfully, recklessly, or negligently violated the FCRA;

c.    Finding that Defendant was negligent in failing to protect Class Members' private information and in failing to timely disclose the breach;

d.    Finding that Defendant entered into and breached implied contracts to safeguard Class Members' private information;

e.    Finding that Defendant is responsible for its employees' actions as agents of Defendant;

f.      Requiring that Defendant pay statutory damages of not less than $100 and not more than $1,000 under the FCRA;

g.      Requiring that Defendant pay Plaintiff's and Class Members' reasonable attorney's fees and costs of litigation;

h.      Requiring that Defendant pay punitive damages;

i.      Awarding all appropriate damages to Class Members under the common law theories alleged herein;

j.      Enjoining Defendant from actions which place Class Members at a risk of future security breaches;

k.      Awarding injunctive relief including the requirement that Defendant strengthen its data security procedures to minimize the risk of future security breaches;

l.      Awarding injunctive relief including the provision of credit monitoring, identity theft insurance, identity protection services, or similar services; and

m.      Awarding any other legal and/or equitable relief as justice requires.


Dated: May 15, 2008

                        Respectfully submitted,


                        /s/ Sam McGee_____

                        JACKSON & MCGEE, LLP
                        Gary W. Jackson, NC State Bar No. 13976
                        Sam McGee, NC State Bar No. 25343
                        521 East Blvd.
                        Charlotte, NC 28203
                        TEL: (704) 377-6680
                        FAX: (704) 377-6690
                        *Liaison Counsel for Plaintiff and the Class*

21

SHELLER, P.C.
Jamie Sheller
1528 Walnut St., 3rd Floor
Philadelphia, PA 19102
TEL: (215) 790-7300
FAX: (215) 546-0942

BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Michael T. Fantini
Jon Lambiras
1622 Locust Street
Philadelphia, PA  19103
TEL: (215) 875-3000
FAX: (215) 875-4636

*Counsel for Plaintiff and the Class*
*Pro Hac Vice Admission Anticipated*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Summons and Complaint was served upon the Defendant's agent by properly depositing copies of said document, enclosed in a first class, postage paid wrapper in a post office or an official depository under the exclusive care and custody of the United States Post Office and addressed as follows:

Lending Tree, LLC
c/o National Registered Agents, Inc.
120 Penmarc Drive, Suite 118
Raleigh, North Carolina 27603

This the 15th day of May, 2008.

/s/ Sam McGee_____

JACKSON & MCGEE, LLP
Gary W. Jackson, NC State Bar No. 13976
Sam McGee, NC State Bar No. 25343
521 East Blvd.
Charlotte, NC 28203
TEL: (704) 377-6680
FAX: (704) 377-6690

*Liaison Counsel for Plaintiff and the Class*

SHELLER, P.C.
Jamie Sheller
1528 Walnut St., 3rd Floor
Philadelphia, PA 19102
TEL: (215) 790-7300
FAX: (215) 546-0942

BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Michael T. Fantini
Jon Lambiras
1622 Locust Street
Philadelphia, PA 19103
TEL: (215) 875-3000
FAX: (215) 875-4636

*Counsel for Plaintiff and the Class*
*Pro Hac Vice Admission Anticipated*

# Exhibit C

**FILED**
**CHARLOTTE, NC**

JUN 1 1 2008

**U.S. DISTRICT COURT**
**WESTERN DISTRICT OF NC**

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

| In re: LendingTree, LLC Customer Data Breach Litigation | MDL Docket No: MDL_____ |
|---|---|

### MEMORANDUM OF THE SPINOZZI GROUP PLAINTIFFS
### IN SUPPORT OF THEIR MOTION FOR TRANSFER OF ACTIONS
### TO THE WESTERN DISTRICT OF NORTH CAROLINA
### PURSUANT TO 28 U.S.C. §1407 FOR COORDINATED OR
### CONSOLIDATED PRETRIAL PROCEEDINGS

Plaintiffs Constance Spinozzi and Sylvia Carson (the "Spinozzi Group"), who filed two

separate class action cases against LendingTree, LLC,[1] submit this memorandum in support of their

Motion to the Judicial Panel on Multidistrict Litigation (the "Panel") to exercise jurisdiction of all

related actions currently pending in four different federal district courts, and to transfer, consolidate,

and coordinate them for pretrial purposes in the United States District Court for the Western District

of North Carolina (Charlotte).

---

[1] The cases are: Spinozzi v. LendingTree, LLC, No. 3:08-cv-229-RJC-DCK (W.D.N.C.) (Charlotte); Carson v. LendingTree, LLC, No. 3:08-cv-247-FDW-DCK (W.D.N.C.) (Charlotte).

## PRELIMINARY STATEMENT

The primary goal of a transfer under 28 U.S.C. §1407 is to promote the "convenience of parties and witnesses" and "the just and efficient conduct of such actions." 28 U.S.C. §1407(a). With those principles in mind, the Spinozzi Group believes that these five related cases should be consolidated and transferred to one forum, and that that forum should be the United States District Court for the Western District of North Carolina (Charlotte). Respectfully, in making its decision, the Panel should consider the following facts:

(1) The wrongful conduct at issue occurred at defendant LendingTree's headquarters, located in Charlotte, North Carolina;

(2) The Western District of North Carolina is also located in Charlotte, North Carolina, so it is the forum closest to the location where the critical documents and witnesses exist;

(3) The Western District of North Carolina has a favorable docket condition compared to the other courts where cases were filed;

(4) The Western District of North Carolina has the experience and resources to handle this complex class action;

(5) There are two pending cases in the Western District of North Carolina, and only one in each of the other three forums; and

(6) The Western District of North Carolina is readily accessible to all parties.

Based upon the above considerations, the consolidated cases should be transferred to the Western District of North Carolina (Charlotte).

### FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

Movant's actions, like all of the related actions, arise out of the unlawful conduct of defendant LendingTree, LLC, in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et. seq. ("FCRA") and common law.

Defendant willfully or recklessly failed to limit the furnishing of private consumer information to the permissible purposes set forth in the FCRA. As a result, certain of defendant's employees and ex-employees accessed Class members' consumer information and sold it to third parties without the consent of Class members. Defendant failed to prevent or detect the ongoing unauthorized activity, which occurred for more than a year from October 2006 until early 2008. The consumer information included social security numbers, income and employment information, names, addresses, e-mail addresses, and phone numbers.

Defendant LendingTree maintains its headquarters in Charlotte, North Carolina. The unlawful actions of defendant and its employees occurred there. The two class actions filed by Movants are pending in the Western District of North Carolina (Charlotte). Since LendingTree publicly announced the misuse of Class members' information on April 21, 2008, three cases were filed, other than Movants' actions, in the Northern District of Illinois (Chicago), the Western District of Oklahoma (Oklahoma City), and the Southern District of New York (Foley Square).

Transfer of the actions pending in other districts to the Western District of North Carolina (Charlotte) is warranted because these related actions involve overlapping classes and common issues of law and fact, transfer will serve the convenience of the parties and witnesses, and transfer will provide for the efficient and consistent conduct of the litigation.

The Western District of North Carolina (Charlotte) is the most appropriate forum because it is the locus of the litigation: LendingTree's headquarters is located in Charlotte, North Carolina; the wrongful use of Class member's information occurred there; and the key witnesses and evidence in the case are all located there. The other locations where cases are pending have no connection whatsoever with the defendant, the wrongful conduct, or the evidence in this case.

## ARGUMENT

### I. THE CASES SHOULD BE CONSOLIDATED.

This Panel is authorized under 28 U.S.C. § 1407(a) to transfer civil actions pending in more than one district "involving one or more common questions of fact" to a single district for "coordinated or consolidated pretrial proceedings" upon its determination that such action "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." These statutory objectives are served if transfer would "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." Manual for Complex Litigation, Fourth § 20.131 (2004).

The threshold requirement of § 1407 – that there be one or more questions of fact common to the cases for which MDL treatment is sought – plainly is met in this instance. The claims in the cases proposed for transfer and coordination each arise from the same course of conduct by defendant LendingTree, namely, whether it violated the FCRA in failing to adequately safeguard Class members' private information. Thus, each pending case in the four federal districts are brought on behalf of the same class of persons, they arise from the same set of facts, they allege the same legal claims, and they seek the same relief.

malta437556-00e.wpd                    -4-

Given the commonality of factual and legal issues for determination in each of the related cases, MDL treatment clearly is appropriate. See In re the TJX Companies, Inc. Customer Data Security Breach Litigation, 493 F. Supp. 2d 1382, 1383 (J.P.M.L. 2007) ("These actions share factual allegations concerning an electronic intrusion into TJX's computer system."); In re: Hannaford Bros. Co. Customer Data Security Breach Litigation, MDL 1954 (June 9, 2008 Order) ("All of these actions arise from an intrusion into defendant Hannaford Brothers Co.'s computer network.") .

In addition, MDL treatment will further the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. This litigation presently comprises five putative class action cases, two of which (Movants' Actions) are pending in the Western District of North Carolina (Charlotte), with one in the Northen District of Illinois, one in the Southern District of New York, and one in the Western District of Oklahoma. Given that each of these cases arises from a common core of factual allegations, counsel for plaintiffs in all actions will be seeking documents from the same defendant and depositions of the same witnesses relating to LendingTree's liability for the inadequate safeguarding of its customers' personal data.

Fairness and efficiency will be furthered in this litigation by a single centralized and coordinated pretrial program, which will minimize the inconvenience and expense of redundant and duplicative discovery, which is precisely the purpose of transfer and coordination under § 1407. See, e.g., In re: TJX, 493 F. Supp. 2d at 1383 ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary."); In re: Hannaford, MDL 1954 (June 9, 2008 Order) ("Centralization under Section 1407 will eliminate

duplicative discovery, prevent inconsistent pretrial rulings (particularly with respect to class certification), and conserve the resources of the parties, their counsel and the judiciary.").

## II. THE CONSOLIDATED CASES SHOULD BE TRANSFERRED TO THE DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA (CHARLOTTE).

The District Court for the Western District of North Carolina (Charlotte) is the most appropriate forum for consolidated pretrial proceedings. All of the factors relevant to the issue of transfer weigh in favor of transferring the consolidated case to North Carolina.

First, the wrongful conduct at issue in the various actions occurred in Charlotte, North Carolina. The misappropriation and wrongful use of Class members' private personal information (such as social security numbers), which are at the heart of this case, occurred at LendingTree's headquarters, located in Charlotte, North Carolina, which is also the location of the Western District of North Carolina.

Second, the Western District of North Carolina (Charlotte) is the forum closest to the location where the production of discovery documents and depositions of witnesses will occur. This is a significant factor for the Panel to consider. As noted above, since the wrongful conduct occurred at defendant LendingTree's headquarters, located in Charlotte, North Carolina, then most if not all of the discovery, including LendingTree's document productions and the depositions of LendingTree employees, will occur in Charlotte, North Carolina. Since the Western District of North Carolina (Charlotte) is the forum closest to all of the documents and witnesses in this case, it should be selected as the transferee forum. See In re Hannaford, MDL 1954 (June 9, 2008 Order) (cases transferred to Maine because, *inter alia,* "Hannaford has its headquarters in that district, and thus relevant documents and witnesses may be found there."); In re TJX 493 F. Supp. 2d at 1383 (in

security breach case, Panel chose forum where defendant has its headquarters and where evidence is located); In re Southwestern Life Insurance Company Sales Practices Litigation, 268 F. Supp. 2d 1377 (J.P.M.L. 2003) (court closest to witnesses and documents was chosen); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, 601 F. Supp. 1035 (J.P.M.L. 1985) (Panel chose forum closest to defendant's corporate headquarters, where relevant witnesses and documents might be located); In re Richardson-Merrell, Inc., 533 F. Supp. 489 (J.P.M.L. 1982) (same). See also Wright, Miller & Cooper, Federal Practice and Procedure, Jurisdiction 3d §3864 pp. 445-48 (collecting cases).

Third, the Western District of North Carolina has the most favorable docket condition among the courts where cases are pending. Among the federal courts where cases against LendingTree are pending, the Western District of North Carolina has the lowest number of overall case filings, the lowest number of civil filings per judge, and the lowest number of total case filings per judge.[2] North Carolina's favorable docket condition, when viewed together with the other relevant factors, weighs in favor of selecting the Western District of North Carolina. See In re Amtel, Inc. Securities Litigation, 447 F. Supp. 466, 467 (J.P.M.L. 1987).

Fourth, the Western District of North Carolina has experience handling complex class action cases such as this one. The Panel should consider that the Western District of North Carolina has the expertise, experience, and resources to handle this complex case. See In re Gator Comp. Software

---

[2] According to the Federal Court Management Statistics, for the 12-month period ending September 30, 2007, for overall case filings - W.D.N.C. had 1,602; S.D.N.Y. had 17,699; N.D. Ill. had 8,422; and W.D. Ok. had 1,950. For the number of civil filings per judge - W.D.N.C. had 210; S.D.N.Y. had 576; N.D. Ill. had 346; and W.D. Ok. had 256. For the number of total case filings per judge – W.D.N.C. had 321; S.D.N.Y. had 632; N.D. Ill. had 382; and W.D. Ok. had 325.

Trademark & Copyright Litigation, 259 F. Supp. 2d 1378 (J.P.M.L. 2003) (Panel chose court which was accessible, metropolitan court, not overtaxed in its docket, and which had "necessary resources and expertise" to handle case); In re Wireless Telephone 911 Calls Litigation, 259 F. Supp. 2d 1372, 1374 (J.P.M.L. 2003).

Fifth, there are two pending cases in the Western District of North Carolina, while each of the other courts entertain only one suit each. This fact weighs in favor of transfer to North Carolina. See In re Series 7 Broker Qualification Exam Scoring Litigation. 444 F. Supp. 2d 1330 (J.P.M.L. 2006).

Finally, the Western District of North Carolina is readily accessible to all parties due to the ease and variety of transportation in and out of Charlotte. The Charlotte Douglas International Airport is an international airport located near both the Western District of North Carolina (Charlotte) and LendingTree's headquarters in Charlotte, North Carolina. This litigation will benefit from having a location readily available to all parties involved in that major accessible metropolitan center. See In re WorldCom, Inc. Securities & ERISA Litigation, 226 F. Supp. 2d 1352, 1355 (J.P.M.L. 2002).

In sum, based on the above considerations, the District Court for the Western District of North Carolina (Charlotte) is the most appropriate forum for this litigation.

# CONCLUSION

For the reasons stated above, the Panel should exercise jurisdiction over the currently pending actions and enter an order transferring them, and any "tag-along" actions, to the United States District Court for the Western District of North Carolina (Charlotte).

Dated: June 10, 2008

Respectfully Submitted,
BERGER & MONTAGUE, P.C.

By _M Fantini_

Sherrie R. Savett
Michael T. Fantini
Jon Lambiras
1622 Locust Street
Philadelphia, PA 19103
Tel: (215)875-3000
Fax: (215)875-4636

SHELLER, P.C.
Jamie Sheller
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
Tel: (215)790-7300
Fax: (215) 546-0942

JACKSON & McGEE, LLP
Gary W. Jackson
Sam McGee
521 East Boulevard
Charlotte, NC 28202
Tel: (704) 377-6680
Fax: (704) 377-6690

Counsel for Plaintiffs Spinozzi
and Carson

malta437556-00e.wpd

# Exhibit D

**IN THE DISTRICT COURT OF THE UNITED STATES
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1)Angela Mitchell, on behalf of herself<br>and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>(1) Home Loan Center, Inc.<br>dba Lending Tree Loans, a California<br>Corporation; (2)Lending Tree LLC., a<br>Delaware Limited Liability Company; and<br>(3) Lending Tree, Inc., a Delaware<br>Corporation.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. CIV-08-448-HE<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CLASS ACTION COMPLAINT<br>)     JURY TRIAL DEMANDED |

## PLAINTIFF'S MOTION TO TRANSFER

The Plaintiff, Angela Mitchell, moves the Court for an Order transferring the instant action to the United States District Court for the Western District of North Carolina.  In support of this Motion, Plaintiff would the show the Court the following:

1.    The Plaintiff filed her lawsuit on April 28, 2008.

2.    Plaintiff has since learned that jurisdiction and venue better lies in the United States District Court for the Western District of North Carolina, as this location is specified within the "Terms Of Use" Agreement between Plaintiff and Defendants provided to Plaintiff by Defendants.   (See attached Exhibit A – Lending Tree "Terms Of Use" Agreement, Paragraph 14.)

3.    Neither Plaintiff nor her counsel were aware of these contract provisions prior to filing suit in the United States District Court for the Western District of Oklahoma.

4.    Title 28, U.S.C. Section 1406(a) provides that a district court of a district in which an action is filed, if it be in the interest of justice, may transfer a case to any district in which it could have been brought.

5.    It has also become apparent that the Defendants are principally located in Charlotte, North Carolina, in the district to which Plaintiff seeks to transfer the case.  Additionally, all the witnesses, computer systems, and related pieces of evidence are also located principally in that venue. Therefore, most of the discovery will occur in North Carolina.

6.    Plaintiff has since become aware that two other actions are pending in the United States District Court for the Western District of North Carolina: <u>Spinozzi v. Lending Tree, LLC</u>, Case No. CIV-08-229-RJC-DCK; and <u>Carson v. Lending Tree, LLC</u>, Case No. CIV-08-247-FDW-DCK.

WHEREFORE, premises considered, Plaintiff seeks an Order of this Court transferring her case to the United States District Court for the Western District of North Carolina.

Respectfully submitted,

GRIFFIN, REYNOLDS & ASSOCIATES


/s Jason B. Reynolds_____
Jason B. Reynolds, OBA No. 18132
Billy D. Griffin, OBA No. 17945
416 SW 79th St., Suite 200
Oklahoma City, OK  73139
(405) 721-9500  Telephone
(405) 721-9503  Facsimile
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF MAILING

This is to certify that on this 19th day of June, 2008, a true and correct copy of the above and foregoing instrument was electronically submitted to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electrnic Filing to the following ECF registrants:

Mia Vahlberg
Ronald Ricketts
Leslie Lynch
GABLE GOTWALS
1100 ONEOK Plaza
100 W. 5th St.
Tulsa, OK  74103


s/  Jason B. Reynolds
Jason B. Reynolds

# LendingTree

WHEN BANKS COMPETE, YOU WIN™

Need help?
**1-800-555-TREE**

Home | Find a Loan | Find a Home | High Yield Savings | Credit Resources | Tools & Advice | More >>

## LendingTree Terms of Use Agreement

LendingTree, LLC and its Companies

11115 Rushmore Dr.

Charlotte, NC 28277

Customer Service: 888.272.1355

Fax: 704.541.1824

E-mail: customercare@lendingtree.com

### Table of Contents

1. Terms Of Use Agreement for All Services and Uses Of The Websites
2. Consumer Information Security Policy
3. Mortgage Loan Request Services
   A. Terms Applicable to All Mortgage Loan Request Services
   B. Traditional (Full-Form) LendingTree Loan Request Service
   C. QuickMatch and GetSmart Loan Request Services
4. Non-Mortgage Loan Request Services
   A. Terms Applicable to All Non-Mortgage Loan Request Services
   B. LendingTree and GetSmart Non-Mortgage Loan Request Services
   C. Additional Terms Applicable to Auto Loan Request Services
   D. Additional Terms Applicable to Credit Card, Personal Loan and Commercial Loan Request Services
   E. Additional Terms Applicable to Student Loan Request Service
5. Non-Loan Request Products and Services
   A. Terms Applicable to All Non-Loan Request Products and Services

LendingTree -- Terms of Use

Page 2 of 15

6.  Realty Services
7.  Copyright, Trademark and Service Mark Notices
8.  Disclaimers and Liability
9.  Electronic Communications/Notices and Information Delivered Electronically
10. Privacy Policy
11. Indemnity
12. Links To Third Party Websites
13. Errors And Delays
14. Dispute Resolution
15. Other Terms

---

1.  **TERMS OF USE AGREEMENT FOR ALL SERVICES AND USES OF THE WEBSITES**

Please review this Terms of Use Agreement ("Agreement"). By accessing, browsing or using this website, and the websites of the below listed companies or divisions, by any page thereof, through any direct or indirect means (individually or collectively, "Websites" or "Website"), or by using the goods, facilities or services offered in or through the Websites through alternative methods (including, for example, telephone, mail, email or facsimile), you accept and agree and agree to be bound by these Terms of Use (the terms "Website" and "Websites" include use through these alternative methods).

**THIS AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE ALL CLAIMS AND CONTAINS DISCLAIMERS OF WARRANTIES AND LIABILITY** (please see sections 8 and 14). These provisions form an essential basis of our bargain.

If you do not agree to these terms and conditions, you are not authorized to access or use the Websites and you are to cease accessing or otherwise using the Websites.

For purposes of this Agreement, "You" or "Your" means the person(s) using the Websites, and/or the good, facilities or services of LendingTree offered through alternative methods, including persons that allow others to provide information about themselves to LendingTree, the banks, lenders and brokers on LendingTree's network ("Lenders"). Providers (as defined in section 5) or real estate professionals (as defined in section 6). "LendingTree", "us" or "we" means, but is not limited to the following entities:

*   LendingTree, LLC
*   LT Realty Services and LendingTree, Inc. in CA
*   LT Technologies, LLC
*   LendingTree, Inc. (MN, MT, NH, NJ, OH, PA, TN, UT, WV)
*   LendingTree, LLC d/b/a LT Technologies (NV, TX)
*   LendingTree, LLC d/b/a LT Technologies, LLC (NJ, RI, WA)
*   Home Loan Center, Inc.
*   Home Loan Center, Inc. dba LT Loans (CT)
*   Home Loan Center USA, Inc. (AL, FL, ID, ME, MN, OH, OK, VT, WY)
*   Loan Center, Inc. (WA)
*   HLC Escrow, Inc.

http://www.lendingtree.com/nhnc/terms-of-use/?ic=ltnavbar

* LendingTree Settlement Services, LLC
* LendingTree Alabama Title Services, LLC
* iNest Realty, Inc.
* and their divisions /service groups (including, but not limited to, LendingTree Loans, LT Loans (NV), Domania.com, Online Home Center (MA), LT Realty Services, RealEstate.com, RealEstate.com REALTORS®, ServiceMagic Home Loans, ServiceMagic Real Estate, Get Smart, GetSmart.com, LendingTree's RealEstate.com REALTORS® (WI)). REALTOR® is a federally registered collective membership mark which identifies a real estate professional who is a member of the NATIONAL ASSOCIATION OF REALTORS® and subscribes to its strict Code of Ethics.

LendingTree is licensed as set forth in the Licenses and Disclosures section, which is incorporated into this Agreement by reference.

**THE DISCLOSURES AND CONSENTS REQUIRED UNDER CERTAIN STATE LAWS ARE DEEMED TO BE PROVIDED, RECEIVED AND AGREED TO BY USE OF THE WEBSITES.**

LendingTree operates the Websites and shall have the right at any time to change or discontinue any aspect or feature of the Websites and the right to modify the terms and conditions applicable to users of the Websites, including these Terms of Use, or any part hereof. Such changes, modification, additions or deletions shall be effective immediately upon posting on the Websites. Any use by you of the Websites or the good, facilities or services offered in or through the Websites shall be deemed to constitute acceptance of such changes.

## 2. CONSUMER INFORMATION SECURITY POLICY

The LendingTree Consumer Information Security Policy, hereby incorporated by reference into this Agreement, explains the policy applicable to the information that is collected through the Websites, received directly from you or transmitted to or from third parties.

## 3. MORTGAGE LOAN REQUEST SERVICES

LendingTree offers two mortgage loan request services, each of which is explained in more detail below.

* The first service option is the LendingTree process that occurs when you complete a traditional (full-form) LendingTree loan request and get matched with Lenders who will respond with conditional loan offers.

* The second service option is LendingTree's QuickMatch or GetSmart service, which you may either (i) select prior to completing the full-form loan request or (ii) directly select. If you select the QuickMatch or GetSmart service, we will match you with Lenders on LendingTree's GetSmart network using a subset of the information contained on the full-form LendingTree loan request. Because these matches are generated from a subset of information from the full-form loan request, the Lenders on the GetSmart network will not be able to respond with customized offers until they speak with you to get additional information. QuickMatch is not available for all loan programs.

### A. Terms Applicable to All Mortgage Loan Request Services

LendingTree is a computerized loan originator for mortgage loans and performs computerized loan origination services for Lenders and is compensated for such services by the Lenders. Lenders are not to directly charge you any computerized loan fee, and the fee should appear on your settlement statement. Depending on the Lender, the computerized loan origination fee paid by the Lender may be included in your rate, points or loan terms. Although some state licensing laws treat fees paid in exchange for computerized loan origination services as mortgage

broker fees or origination fees, this is not the case under federal law. LendingTree is not a lender nor is acting as a lender or broker and does not make loans or credit decisions in connection with loans. LendingTree does not endorse or recommend the products of any particular Lender. LendingTree is not an agent of you or any Lender. LendingTree's services are only administrative. You should rely on your own judgment in deciding which available loan product, terms and Lender best suits your needs and financial means. The Lender is solely responsible for its services to you, and you agree that LendingTree shall not be liable for any damages or costs of any type arising out of or in any way connected with your use of such services. You understand that Lenders may keep your loan request information and any other information provided by LendingTree or received by them in the processing of your loan request, whether or not you are qualified for a loan with them or if you make a loan with them. You agree to notify any particular Lender directly if you no longer want to receive communications from them.

The Websites and the services provided by LendingTree are available in connection with mortgage loans made on real property located in the fifty states and the District of Columbia unless otherwise specified. Loans may only be made to residents of, or secured by real property located in, states where Lenders are licensed or authorized to make such loans. Lenders are not attempting to make loans outside of their authorized states or country by participating in and offering their products on the Websites. LendingTree Lenders expressly reserve the right to discontinue, suspend or terminate the offering of any loan product in any specific state through the Websites at any time, without prior notice.

The data and other information you may provide LendingTree is not, and is not treated as, an application for a loan or a request to be pre-approved, pre-qualified or any similar concept. LendingTree does not guarantee acceptance into any particular loan program or specific loan terms or conditions with any Lender, loan approval standards are established and maintained solely by individual Lenders. Likewise, LendingTree does not guarantee that the loan terms or rates offered and made available by Lenders are the best terms or lowest rates available in the market. A Lender's offer may be subject to market conditions, approval and qualification, the rates and fees actually provided by Lenders may be higher or lower depending on your complete credit profile, collateral/property considerations including but not limited to location, equity and value and income/asset consideration including but not limited to loan to value and debt to income ratios. Unless expressly stated in writing, nothing contained herein shall constitute an offer or promise for a loan commitment or interest rate lock-in agreement. Lenders may not offer all products as well as not offer products in all states. You might not be matched with the Lender making any specific offer. To help the government fight identity theft, the funding of terrorism and money laundering activities, Lenders will obtain, verify and record information that identifies each person who opens an account with them. They may ask for your name, Social Security Number, address, date of birth and other important information that will allow them to properly identify you. During the application process, they may also ask to see your driver's license or other identifying documentation.

LendingTree is paid a fee by Lenders for the goods, facilities and services provided. Regardless whether you obtain a loan from LendingTree's network of Lenders or through Home Loan Center, Inc. / LendingTree Loans, at closing you will be responsible for paying for any settlement or closing costs associated with your loan (such as loan processing, underwriting, or funding fees, title insurance premiums, notary fees, etc.). LendingTree does not charge you a fee for its service in matching you with Lenders including LendingTree Loans.

By clicking on any button indicating an acceptance or agreement to terms, a continuance of processing or submission ("submission") you understand that you are agreeing to the stated terms and conditions of that submission and that you are submitting an inquiry as to a lending product through LendingTree to each of the Lenders to whom your loan request is transmitted. By submitting the loan request LendingTree your electronic signature, you are extending an express invitation to each Lender you have been matched with to contact you by telephone at the numbers you have provided so they may assist you with your transaction, and you hereby consent to such calls even if your phone number is on any Do Not Call list, or by email at the email address you provided or at another address that may be associated with you that we receive from Lenders or other parties and you hereby consent to any such email so it will not be considered spam or unauthorized by any local, state or

federal law or regulation. By saving your information with LendingTree or by doing a submission, you give LendingTree permission to retain all such provided information and to make live or recorded calls to discuss, provide or remind you of any information in regards to your submission, including incomplete loan requests, the deliver of loan request matches, deadlines, quality of services or other matters in connection with your loan request. For any service, you represent that all of the information you have provided in your submission and loan request is true and complete.

8.   Traditional (Full-Form) LendingTree Loan Request Service

LendingTree seeks to provide you multiple conditional loan offers either through its network of nonaffiliated Lenders or through its affiliate, Home Loan Center, Inc. (doing business as LendingTree Loans, as defined in this section). By submitting the full-form LendingTree loan request form, you authorize LendingTree to provide information provided by you or third parties either to Lenders on the LendingTree network or to LendingTree Loans, along with any additional Lenders or investors necessary to complete your loan transaction. You also authorize LendingTree, its Lenders and LendingTree Loans, along with any additional Lenders or investors necessary to complete your loan transaction, to request from one or multiple credit bureaus reporting agencies, your credit bureau report including any ancillary credit scores or ratings and to check your credit and employment history. At the present time, Fair Isaac Corporation (the company that provides "FICO" credit scores) reports that, for mortgage or auto loans, it disregards those inquiries made in the 30 days prior to the lender receiving the credit score and that beyond the 30 days, it consolidates all credit inquiries that occur within a 14-day period into one inquiry for scoring purposes.

LendingTree Network of Lenders. LendingTree seeks to provide you multiple conditional loan offers through its network of nonaffiliated Lenders (U.S. based banks, thrifts, mortgage brokers, mortgage bankers and finance companies). To view LendingTree's network of Lenders, click here.

To determine which Lenders may be matched with you, Lenders provide to us criteria about the type of loan (for example, loan amount, whether purchase, refinance, or equity loan) and the type of loan customer (for example, state of residence or creditworthiness) in which the Lender is interested. LendingTree will provide your information to up to five Lenders whose criteria match your profile. If fewer than five Lenders match your profile, you will receive conditional loan offers from fewer than five Lenders. If more than five Lenders match your profile, LendingTree will match you with five Lenders with a preference for those Lenders that have the highest customer satisfaction scores and the best record of making loans to previous LendingTree customers. If you are requesting a home equity loan or home equity line of credit, we may match you with up to four Lenders based on the above criteria as well as LendingTree Loans.

If offered to you, you can also authorize LendingTree to simultaneously submit a loan request to its GetSmart network if LendingTree cannot match you with five Lenders who make you with five Lenders who make you with conditional loan offers. LendingTree will attempt to match you with Lenders that can make conditional loan offers first then use its GetSmart network using the process described in the section below entitled "QuickMatch and GetSmart Services". NOTE - If you chose a loan with a Lender that does not provide an initial conditional loan offer (that is, from the QuickMatch or GetSmart programs), you will not be eligible for any incentives related to closing your loan. You are only eligible for such incentives by going through an affinity partner, filing out the full-form loan request, closing with a Lender from the traditional (full-form) LendingTree loan request service, and meeting all other requirements for the incentive. In the QuickMatch and GetSmart services, you may be matched with other Lenders including LendingTree Loans.

LendingTree Loans. LendingTree, LLC has an affiliate, Home Loan Center, Inc, which, depending on the state, is licensed in different names and which does business as LendingTree Loans (referred to collectively as "LendingTree Loans"). Depending on your credit history and the type of loan you request, you may be matched solely with LendingTree Loans instead of with the LendingTree network of Lenders. If matched with LendingTree Loans, you will speak with a simple loan officer and

will be provided with up to four conditional loan offers based on the rates and terms provided to LendingTree Loans by its wholesale mortgage banks and investors. These wholesale mortgage banks and investors update their pricing with LendingTree Loans from time-to-time (often daily) and compete for LendingTree's customer business by changing their products and pricing periodically.

The conditional loan offers you initially receive typically will be offers based on the interest rates set by the wholesale mortgage lenders or investors willing to acquire the types of loan that you requested. On occasion, LendingTree Loans may not be allowed to initially acknowledge the name of the wholesale mortgage bank or investor, in which case the conditional loan offer may be simply listed under the name "Home Loan Center". All loans are originated and closed by Home Loan Center, Inc., then sold to the wholesale mortgage bank or investor named in the final loan offer you select.

As always with LendingTree, you may review the conditional loan offers and talk to a LendingTree Loans loan officer at no cost. As in the case of most lenders, once you select a conditional loan offer, LendingTree Loans may require a fee to lock-in your rate or to start the appraisal or application process and to complete the processing and underwriting of your loan application.

*Affiliated Business Arrangement Disclosure.* By law, we are required to disclose that Home Loan Center, Inc. is an affiliate of LendingTree and we are required to provide you an Affiliated Business Arrangement Disclosure (click here for the disclosure form). If you are matched with LendingTree Loans, you are not required to use it. If you would prefer to receive conditional loan offers from multiple lenders and speak with multiple loan officers from the LendingTree network of Lenders, please contact LendingTree Customer Care at 1.888.272.1355, to have your loan request provided to the LendingTree network of Lenders.

c.   QuickMatch and GetSmart Loan Request Services

By submitting the shorter LendingTree QuickMatch or GetSmart loan request form, you authorize LendingTree to provide your information to up to five Lenders including its affiliate, Home Loan Center, Inc., which, depending on the state, is licensed in different names. The Lenders in this program will be on LendingTree's QuickMatch or GetSmart network (QuickMatch and GetSmart are services offered by LendingTree). These Lenders may not be shown on LendingTree's Lender Scorecard. NOTE – If you use the QuickMatch or GetSmart program, you will not be eligible for any incentives related to filling out the traditional (full-form) LendingTree loan request or closing your loan. You are only eligible for such incentives by going through an affinity partner, filling out the traditional (full-form) loan request and meeting all other requirements for the incentive.

In the QuickMatch or GetSmart process, you may be given the option to provide your Social Security Number and/or have your credit pulled in order to improve your Lender matches. The Lenders you are matched with may later require a Social Security Number to proceed with your loan request. If you elect this option, you authorize LendingTree to provide information that you provided or that LendingTree has or may receive to up to five Lenders, along with any additional lenders or investors necessary to complete your loan transaction, on the LendingTree QuickMatch or GetSmart network. You also authorize QuickMatch, GetSmart and their Lenders, along with any additional lenders or investors necessary to complete your loan transaction, to request from one or multiple credit bureaus /reporting agencies, your credit bureau report including any ancillary credit scores or ratings and to check your credit and employment history. At the present time, Fair Isaac Corporation (the company that provides "FICO" credit scores) reports that, for mortgage or auto loans, it disregards those inquiries made in the 30 days prior to the lender receiving the credit score and that beyond the 30 days, it consolidates all credit inquiries that occur within a 14-day period into one inquiry for scoring purposes.

*Affiliated Business Arrangement Disclosure.* By law, we are required to disclose that Home Loan Center, Inc. is an affiliate of Lending Tree, LLC, and we are required to provide you an Affiliated Business Arrangement Disclosure (click here for the disclosure form). If you are matched with Home Loan Center, Inc., you are not required to use

ff.

## 4. NON-MORTGAGE LOAN REQUEST SERVICES

LendingTree offers non-mortgage (including automobile loan, commercial loan, credit card, personal loans and student loan) loan request services, explained in more detail below.

### A. Terms Applicable to All Non-Mortgage Loan Request Services

LendingTree is not a lender and does not make loans or credit decisions in connection with loans. LendingTree does not endorse or recommend the products of any particular Lender. LendingTree is not an agent of either you or any Lender. LendingTree's services are only administrative. You should rely on your own judgment in deciding which available loan product, terms or Lender best suits your needs and financial means. The Lender is solely responsible for its services to you, and you agree that LendingTree shall not be liable for any damages or costs of any type arising out of or in any way connected with your use of such services. You understand that Lenders may keep your loan request information and any other information provided by LendingTree or received by them in the processing of your loan request, whether or not you are qualified for a loan with them or if you make a loan with them. You agree to notify any particular Lender directly if you no longer want to receive communications from them.

The Websites and the services provided by LendingTree are available in connection with non-mortgage loans unless otherwise specified. Loans may only be made to residents of states where Lenders are licensed or authorized to make such loans. Lenders are not attempting to make loans outside of their authorized states or country by participating in and offering their products on the Websites. LendingTree and Lenders expressly reserve the right to discontinue, suspend or terminate the offering of any loan product in any specific state through the Websites at any time, without prior notice.

The data and other information you may provide to LendingTree is not, and is not treated as, an application for a loan or a request to be pre-approved, pre-qualified or qualified on any similar concept. LendingTree does not guarantee acceptance into any particular loan program or specific loan terms or conditions with any Lender. Loan approval standards are established and maintained solely by individual Lenders. Likewise, LendingTree does not guarantee that the loan terms or rates offered and made available by Lenders are the best terms or lowest rates available in the market. A Lender's conditional loan offer may be subject to market conditions, approval and qualification. The rates and fees actually provided by Lenders may be higher or lower depending on your complete credit profile, collateral/property considerations (if applicable) including but not limited to location, equity and value and income/asset consideration including but not limited to loan to value and debt to income ratios, unless expressly stated in writing, nothing contained herein shall constitute an offer or promise for a loan commitment or interest rate lock-in agreement. Lenders may not offer all products as well as not offer products in all states. You might not be matched with the Lender making any specific offer. To help the government fight identity theft, the funding of terrorism and money laundering activities, Lenders will obtain, verify and record information that identifies each person who opens an account with them. They may ask for your name, Social Security Number, address, date of birth and other important information that will allow them to properly identify you. During the application process, they may also ask to see your driver's license or other identifying documentation.

LendingTree is paid a fee by Lenders for the goods, facilities and services provided. Your use of the Websites and/or LendingTree's services constitutes your agreement with this compensation arrangement. At closing, you will be responsible for paying for any closing costs associated with your loan (such as loan processing, underwriting or funding fees). LendingTree does not charge you a fee for its service in matching you with Lenders.

By clicking on any button indicating an acceptance or agreement to terms, a continuance of processing or submission ("Submission") you understand that you are agreeing to the stated terms and conditions of that submission and that you are submitting an inquiry as to a lending product through LendingTree to each of the

Lenders to whom your loan request is transmitted. By submitting the loan request containing your electronic signature, you are extending an express invitation to each Lender you have been matched with to contact you by telephone at the numbers you have provided so they may assist you with your transaction, and you hereby consent to any such calls even if your phone number is on any Do Not Call list, or by email at the email address you provided or at another address that may be associated with you that we receive from Lenders or other parties and you hereby consent to any such email so it will not be considered spam or unauthorized by any local, state or federal law or regulation. By saving your information with LendingTree or by doing a submission, you give LendingTree permission to retain all such provided information and to make five of recorded calls to discuss, provide or remind you of any information you have provided in connection, including incomplete loan requests, the deliver of loan request matches, deadlines, qualify of services or other matters in connection with your loan request. For any service, you represent that all of the information you have provided in your submission and loan request is true and complete.

B. **LendingTree and GetSmart Non-Mortgage Loan Request Services**

The LendingTree and GetSmart services provide for multiple loan conditional offers through their networks of nonaffiliated Lenders. By submitting the loan request form, you authorize LendingTree to provide information provided by you or that LendingTree including GetSmart has or may received from others, to Lenders on their networks, along with any additional Lenders or investors necessary to complete your loan transaction. You also authorize LendingTree including GetSmart and its Lenders along with any additional Lenders or investors necessary to complete your loan transaction, to request from one or multiple credit bureaus /reporting agencies, your credit bureau report including any ancillary credit scores or ratings and to check your credit and employment history. At the present time, Fair Isaac Corporation (the company that provides "FICO" credit scores), reports that, for mortgage or auto loans, it disregards these inquiries made in the 30 days prior to the lender receiving the credit score and that beyond the 30 days, it consolidates all credit inquiries that occur within a 14-day period into one inquiry for scoring purposes. In the GetSmart process, you may be given the option to provide your Social Security Number and/or have your credit pulled in order to improve your Lender matches. The Lenders you are matched with may later require a Social Security Number to proceed with your loan request.

To determine which Lenders may be matched with you, Lenders provide us criteria about the type of loan (for example, loan amount or credit terms) and the type of loan customer (for example, state or residence or creditworthiness) in which the Lender is interested. LendingTree will provide your information up to five Lenders whose criteria match your profile. If fewer than five Lenders match your profile, you will receive conditional loan offers from fewer than five Lenders.

NOTE - If you use the GetSmart program, you will not be eligible for any incentives related to filling out the full-form LendingTree loan request or closing your loan. You are only eligible for such incentives by going through an affinity partner, filling out the full-form loan request and meeting all other requirements for the incentive.

C. **Additional Terms Applicable to Auto Loan Request Services**

If you request an auto or motorcycle loan and qualify for the Car.com, CarLoan.com, or RoadLoans, LendingTree may also provide your information with one of the lenders, providers or third party marketing companies in that program. In addition, you may be matched with one or more lenders offering unsecured conditional loans with which you could finance your auto or motorcycle.

D. **Additional Terms Applicable to Credit Card, Personal Loan and Commercial Loan Request Services**

If you request a credit card, personal loan or commercial loan, LendingTree may also provide your information with one of the lenders or providers in that program.

06/18/2008 07:14:32 PM ET    BOND,    PAUL,    ReedSmithPGH    Page 11

LendingTree -- Terms of Use

Page 9 of 15

E. Additional Terms Applicable to Student Loan Request Service

Private student loans offered through LendingTree's lenders do not require school certification and the proceeds are disbursed in the form of a check mailed directly to you, or if more than one person, the person with the stronger credit profile.

The interest rates and loan fees associated with private student loans are generally higher than the interest rates and loan fees associated with federal certified loans. The proceeds of your loan must be used for educational purposes.

All loans are subject to credit approval. Interest rates and loan fees vary and are based upon borrower and/or cosigner (where applicable), credit score and other underwriting criteria.

When Lenders receive your loan request, they are not agreeing to lend you money and there will not be such an agreement until the time that the loan is actually disbursed to you. Lenders have the right to accept or reject your cosigner and lend an amount less than the amount requested.

In addition, by submitting your loan request, you authorize the Lenders to verify the accuracy and authenticity of all information supplied by you both internally and with the assistance of non-affiliated third parties. Specifically, you authorize the Lenders to verify your enrollment status with your school and other organizations and to verify your employment status by contacting your employer. Lender may also verify any income information that you provide. In all cases, Lender may disclose the fact that you are applying for credit from Lender.

If your loan request is conditionally approved, the amount and other details of your offered loan, including the interest rate and loan fee, will be disclosed to you in a Truth-in-Lending Disclosure Statement that you will receive with your Student Loan Promissory Note. If after reviewing the terms of the Promissory Note, you determine that you want the offered loan, you will:

1. Review and sign the Promissory Note along with your cosigner (if applicable),
2. Return the signed original Promissory Note within sixty (60) days of receipt; and
3. Return any additional documentation requested by Lender.

**Notice For Married Wisconsin Residents.**

No provision of a marital property agreement (pre-marital agreement), a unilateral statement under Section 766.59 of the Wisconsin Statutes, or a court decree under Section 766.70 of the Wisconsin Statutes adversely affects the interest of the creditor unless, prior to the time the credit is granted, the creditor is furnished a copy of the marital property agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the creditor is incurred. If the loan for which you are applying is granted, your spouse will also receive modification that credit has been extended to you.

5. NON-LOAN REQUEST PRODUCTS AND SERVICES

LendingTree offers numerous non-loan request products and services on the Websites. You can access these products and services when you complete a request and get matched with third party providers ("Provider" includes any third-party affiliate or finder of a Provider) who will respond with conditional offers for products or services. The Providers may not respond with customized offers (if available) until they speak with you to get additional information.

A. Terms Applicable to All Non-Loan Request Products and Services

LendingTree is not a provider of products or services and does not make any decisions in connection with the

http://www.lendingtree.com/stmrc/termsofuse.asp?inline=true

06/18/2008

products or services offered by Providers. LendingTree does not endorse or recommend the products or services of any particular Provider on any of its Websites. LendingTree is not an agent of either you or any Provider. LendingTree's services are only administrative. You should rely on your own judgment in deciding which available product or service and Provider best suits your needs and financial means. The Provider is solely responsible for its services to you, and you agree that LendingTree shall not be liable for any damages or costs of any type arising out of or in any way connected with your use of such products or services. You understand that Providers may keep your request information and any other information provided by LendingTree or received by them in the processing of your request, whether or not you are qualified for the product or service with them or if you acquire a product or service with them. You agree to notify any particular Provider directly if you no longer want to receive communications from them.

Products and services may only be made to residents of states where Providers are licensed or authorized to make such products or services available. LendingTree and Providers expressly reserve the right to discontinue, suspend or terminate the offering of any loan product or service in any specific state through the Websites at any time, without prior notice.

The data and other information you may provide LendingTree is not, and is not treated as, an application for that product or service. LendingTree does not guarantee acceptance into any particular program or specific term or condition with any Provider; approval standards are established and maintained solely by individual Providers. Likewise, LendingTree does not guarantee that the terms or rates for the products or services offered and made available by Providers are the best terms or lowest rates available in the market. A Provider's products or services may be subject to market conditions, approval and qualification. The terms and rates actually provided by Providers may be higher or lower depending on your particular financial profile, your location and other considerations. Unless expressly stated in writing, nothing contained herein shall constitute an offer or promise for a product or service. Providers may not offer all products or services as well as not offer products or services in all states. You may not be matched with any specific offer.

LendingTree is paid a fee by either the Provider or a third party "finder" (if the finder markets for or to the Provider) for the goods, facilities and services LendingTree provided. Your use of the Websites and/or LendingTree's services constitutes your agreement with this compensation arrangement. You will be responsible for paying for any cost associated with the product or service. **LendingTree does not charge you a fee for its services.**

By clicking on any button indicating an acceptance or agreement to terms, a continuance of processing or submission ("submission") you understand that you are agreeing to the stated terms and conditions of that submission and that you are submitting an inquiry as to a product or service through LendingTree to each of the Providers to whom your request is transmitted. By submitting the request containing your electronic signature, you are extending an express invitation to each Provider to contact you by telephone at the numbers you have provided so they may assist you with your transaction, and you hereby consent to any such calls even if your phone number is on any Do Not Call list, or by email at the email address you provided or at another address that may be associated with you that we receive from Providers or other parties and you hereby consent to any such email so it will not be considered spam or unauthorized by any local, state or federal law or regulation. By saving your information with LendingTree or by doing a submission, you give LendingTree permission to retain all such provided information and to make live or recorded calls to discuss, provide or remind you of any information in regards to your submission, including incomplete requests, the deliver of request matches, deadlines, quality of services or other matters in connection with your request. For any service, you represent that all of the information you have provided in your submission and request is true and complete.

LendingTree seeks to provide products and services offered through its network of nonaffiliated Providers or their third party finders. By submitting the request form, you authorize LendingTree to provide information that you provided or that LendingTree has or may received from others to Providers or their finders, along with any

Case 1:08-cv-02300    Document 18-5    Filed 06/23/2008    Page 15 of 19

additional providers necessary to complete your transaction. You also authorize LendingTree and its Providers and finders along with any additional providers necessary to complete your transaction, to request from one or multiple credit bureaus /reporting agencies, your credit bureau report including any ancillary credit scores or ratings.

## 6. REALTY SERVICES

By clicking on any button indicating an acceptance or agreement to terms, a continuance of processing or submission ("Submission") you understand that you are agreeing to the stated terms and conditions (that submission and that you are submitting an inquiry to LendingTree and its network of real estate professionals ("real estate professionals"). Further, that you are representing all of the information you have provided in the referral form is true and complete. You authorize LendingTree to forward your information to its network of real estate professionals. You further understand and agree that by selecting a real estate company or professional, you are extending an express invitation for them to contact you by telephone at the numbers you have provided, and you hereby consent to any such calls even if your phone number is on the Do Not Call list. In addition, by completing and submitting a request for more information regarding a real estate listing or requesting contact with a real estate professional, you understand and agree that you are extending an express invitation to real estate professionals to call you by telephone at the numbers you have provided, and you hereby consent to any such calls even if your phone number is on the Do Not Call list. You understand that these real estate professionals may keep the information you submit whether or not you communicate with them regarding a real estate listing and whether or not you complete a real estate transaction with them. Real estate programs are administered by LendingTree, a licensed real estate broker.

In certain geographic areas, LendingTree lists and sells homes. However, in connection with its Find a REALTOR® program, LendingTree does not list or sell homes. Instead, real estate brokerage activities are performed by local licensed real estate brokers. In connection with its Find a REALTOR® program LendingTree acts as a referring broker by referring you to a local real estate broker, and for its services, LendingTree receives a real estate brokerage referral fee of up to 35% of the local broker's commission. Your use of the Websites and/or LendingTree's services constitutes your agreement with this compensation arrangement. Cash, gift certificates, points or mileage incentives are only available to customers who use a LendingTree Network real estate professional to buy or sell their home. Customers must have been connected with the real estate professional through LendingTree's Find a REALTOR® program to be eligible for incentives. Certain states require that incentives be given either as a credit at closing or as a reduction of your real estate commission. The programs may be available on modified terms, or may be prohibited, in certain jurisdictions. Other restrictions may apply.

*Real Estate: Create an Account/Registration.* By creating an account or otherwise registering with this site, you hereby understand and agree that you have established a business relationship between you and LendingTree, LLC, which is the owner of this site. As such, you agree that LendingTree may contact you using information you provided with information and offers of services available through LendingTree and the Websites. You hereby consent to any such communication or phone calls even if your phone number is on any Do Not Call list.

## 7. COPYRIGHT, TRADEMARK AND SERVICE MARK NOTICES

All contents of the Websites are: Copyright © 1996 - 2006 LendingTree, LLC and/or its suppliers, Lenders, Providers or real estate professionals, 11115 Rushmore Dr., Charlotte, NC 28277, U.S.A. All rights reserved. LendingTree is a service mark of LendingTree, LLC. Other product and company names mentioned herein, including the names of Lenders, may be the trademarks of their respective owners.

Nothing on the Websites should be construed as granting, by implication, estoppel or otherwise, any license or right to use any service mark or trademark (individually and collectively, "Mark" or "Marks") displayed on the Websites. without the prior written permission of the LendingTree or the applicable Mark holder specific for each such use. The Marks may not be used to disparage LendingTree, the Lenders, the applicable third party or the products or services of such parties, nor shall they be used in any manner that may damage any goodwill in the Marks. Use of any Mark as

part of a link to or from any site is prohibited unless establishment of such a link is approved in advance by LendingTree in writing.

The Websites contain copyrighted material, trademarks and other proprietary information, including, but not limited to, text, software, photos, video, graphics, music and sound, and the entire contents of the Websites are copyrighted as a collective work under the United States copyright laws. LendingTree owns a copyright in the selection, coordination, arrangement and enhancement of such content, as well as in the content original to it. You may not modify, publish, transmit, participate in the transfer or sale, create derivative works or in any way exploit, any of the content, in whole or in part. Except as otherwise expressly permitted under copyright law, no copying, redistribution, retransmission, publication or commercial or non-commercial exploitation of downloaded material will be permitted without the express written permission of LendingTree and the copyright owner. Elements of the Websites are protected by trade dress, trademark, unfair competition, and other state and federal laws and may not be copied or imitated in whole or in part, by any means, including but not limited to, the use of framing or mirrors.

## 8.   DISCLAIMERS AND LIABILITY

LendingTree intends that the information contained in the Websites be accurate and reliable; however, errors sometimes occur. In addition, changes and improvements to the information provided herein may be made by LendingTree at any time. Under no circumstances will LendingTree be liable for any loss or damage caused by your reliance on information obtained through the Websites. It is your responsibility to evaluate the accuracy, completeness or usefulness of any information, opinion, advice or other content available through the Websites.

THE WEBSITES AND THE INFORMATION, SOFTWARE, PRODUCTS AND SERVICES ASSOCIATED WITH IT ARE PROVIDED "AS IS". LENDINGTREE AND/OR ITS SUPPLIERS, LENDERS, PROVIDERS OR REAL ESTATE PROFESSIONALS DISCLAIM ANY WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER RELATING TO THE WEBSITES AND ANY INFORMATION, SOFTWARE, PRODUCTS AND SERVICES PROVIDED HEREIN, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NONINFRINGEMENT. USE OF THE WEBSITES AND/OR LENDINGTREE'S SERVICES IS AT YOUR OWN RISK. LENDINGTREE AND/OR ITS SUPPLIERS, LENDERS, PROVIDERS OR REAL ESTATE PROFESSIONALS ARE NOT LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR OTHER INJURY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OR THE INABILITY TO USE THE WEBSITES AND/OR LENDINGTREE'S SERVICES OR WITH THE DELAY OR INABILITY TO USE THE WEBSITES, OR FOR ANY INFORMATION, SOFTWARE, PRODUCTS AND SERVICES OBTAINED THROUGH THE WEBSITES, INCLUDING BUT NOT LIMITED TO RELIANCE BY YOU ON ANY INFORMATION OBTAINED AT THE WEBSITES, OR THAT RESULT FROM MISTAKES, OMISSIONS, INTERRUPTIONS, DELETION OF FILES OR EMAILS, ERRORS, DEFECTS, VIRUSES, WORMS, TROJAN HORSES, TRAP DOORS, BACK DOORS, EASTER EGGS, TIME BOMBS, CANCELBOTS OR OTHER CODE OR COMPUTER PROGRAMMING ROUTINES THAT CONTAIN CONTAMINATING OR DESTRUCTIVE PROPERTIES OR THAT ARE INTENDED TO DAMAGE, DETRIMENTALLY INTERFERE WITH, SURREPTITIOUSLY INTERCEPT OR EXPROPRIATE ANY SYSTEM, DATA OR PERSONAL INFORMATION, DELAYS IN OPERATION OR TRANSMISSION, OR ANY FAILURE OF PERFORMANCE, WHETHER OR NOT RESULTING FROM ACTS OF GOD, COMMUNICATIONS FAILURE, THEFT, DESTRUCTION OR UNAUTHORIZED ACCESS TO LENDINGTREE RECORDS, PROGRAMS OR SERVICES, OR OTHERWISE ARISING OUT OF THE USE OF THE WEBSITES, WHETHER RESULTING IN WHOLE OR IN PART, FROM BREACH OF CONTRACT, TORTIOUS BEHAVIOR, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF LENDINGTREE AND/OR ITS SUPPLIERS, PROVIDERS OR REAL ESTATE PROFESSIONALS HAVE BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

## 9.   ELECTRONIC COMMUNICATIONS/NOTICES AND INFORMATION DELIVERED ELECTRONICALLY.

LendingTree, Lenders, Providers and real estate professionals may choose to electronically deliver all information related to its services and your requests. LendingTree, Lenders, Providers and real estate professionals electronic communications in you may transmit or convey information about action taken on your request, portions of your request that may be incomplete or require additional explanation, any notices required under applicable law, which may include any Federal Truth-in-Lending disclosures, other terms, conditions and documents, and the privacy policies of LendingTree, Lenders, Providers and real estate professionals.

You agree to receive all current and future notices, disclosures, communications and information, and to do business electronically with LendingTree, Lenders, Providers and real estate professionals. This means that LendingTree, Lenders, Providers and real estate professionals may communicate with you by sending a message to the email address you provided or at another address that may be associated with you that we receive from Lenders, Providers and real estate professionals or other parties. You agree that you meet the below technical requirements and are able to access and retain copies of notices and information sent or made available electronically. The Consent for Electronic Disclosures, hereby incorporated by reference into this Agreement, is the disclosure that provides greater detail.

**Technical Requirements**

To access and retain information and notices we send or make available to you electronically, you will need:

- Internet access with 128-bit encryption
- Adobe Acrobat Reader 6 or higher
- Ability to Print Internet Explorer 6 or higher
- Netscape 8.04 and above (Use in IE mode)
- Email Access or Firefox version 1.5

## 10. PRIVACY POLICY

The LendingTree Privacy Policy, hereby incorporated by reference into this Agreement, explains the policy applicable to the information that is collected through the Websites or received directly from you.

## 11. INDEMNITY

As a condition of use of the Websites and/or LendingTree's services, you agree to indemnify LendingTree and its suppliers, Lenders, Providers or real estate professionals from and against any and all liabilities, expenses (including attorneys' fees) and damages arising out of claims resulting from your use of the Websites, including without limitation any claims alleging facts that if true would constitute a breach by you of this Agreement.

## 12. LINKS TO THIRD PARTY WEBSITES

The Websites may contain links to websites maintained by third parties. Such links are provided for your convenience and reference only. LendingTree does not operate or control in any respect any information, software, products or services available on such websites. LendingTree's inclusion of a link to a website does not imply any endorsement of the services or the website, its contents, or its sponsoring organization. When you leave the Websites please note that LendingTree is not responsible for the accuracy or content of the information provided by that website, nor is it liable for any direct or indirect technical or system issues arising out of your access to or use of third party technologies or programs available through that website.

## 13. ERRORS AND DELAYS

LendingTree is not responsible for any errors or delays in responding to a request or referral form caused by, including but not limited to, an incorrect email address provided by you or other technical problems beyond our reasonable control.

## 14.   DISPUTE RESOLUTION

Any claim or controversy arising out of or relating to the use of the Websites, to the goods or services provided by LendingTree, or to any acts or omissions for which you may contend LendingTree is liable, including but not limited to any claim or controversy as to arbitrability ("Dispute"), shall be finally, and exclusively, settled by arbitration. The arbitration shall be held before one arbitrator under the commercial arbitration rules of the American Arbitration Association ("AAA") in force at that time. The arbitration shall be venued in Mecklenburg County, North Carolina except for Maine consumers for whom the location shall be a place reasonably convenient to the consumer. The arbitrator shall be selected pursuant to the AAA rules. Should no AAA rule regarding the selection of an arbitrator be in effect, the consumer shall select an arbitrator from a panel of arbitrators acceptable to LendingTree. In any arbitration, LendingTree will pay the filing fee, plus the costs associated with the first day of arbitration, with the remaining costs of arbitration paid by the non-prevailing party, provided, however, that in Maine any cost to the consumer shall be limited to the cost of filing a court case. To begin the arbitration process, a party must make a written demand therefor.

Any judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction in Mecklenburg County, North Carolina. The arbitrators shall not have the power to award actual damages or award consequential, punitive or exemplary damages, and each party irrevocably waives any claim thereto, except in Maine where state law will control all rights and remedies in the arbitration. The agreement to arbitrate shall not be construed as an agreement to the joinder or consolidation of an arbitration under this agreement with an arbitration of disputes or claims of any non-party, regardless of the nature of the issues or disputes involved. To the fullest extent permitted by applicable law, no arbitration under this Agreement shall be joined to an arbitration involving any other party subject to this Agreement, whether through class arbitration proceedings or otherwise.

THIS AGREEMENT PROVIDES THAT ALL DISPUTES BETWEEN YOU AND LENDINGTREE WILL BE RESOLVED BY BINDING ARBITRATION. YOU THUS GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS. YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS. YOUR RIGHTS WILL BE DETERMINED BY NEUTRAL ARBITRATORS AND NOT A JUDGE OR JURY. You are entitled to a fair hearing, and the arbitration procedures are simpler and more limited than rules applicable in court. Arbitrator decisions are enforceable as any court order and are subject to very limited review by a court. By using LendingTree's goods, facilities and services, you consent to these restrictions.

Should a Dispute arise and should the arbitration provisions herein become inapplicable or unenforceable, or in any instance of any lawsuit between you and LendingTree, the parties agree that jurisdiction over and venue of any suit shall be exclusively in the state and federal courts sitting in Mecklenburg County, North Carolina. If either party employs attorneys to enforce any right in connection with any Dispute or lawsuit, the prevailing party shall be entitled to recover reasonable attorneys' fees.

## 15.   OTHER TERMS

This Agreement (which hereby incorporates by reference any other provisions applicable to use of the Websites, including, but not limited to, any supplemental terms governing the use of certain specific material contained in the Websites and any operating rules for the Websites established by LendingTree) constitutes the entire agreement

LendingTree -- Terms of Use

Page 15 of 15

between you and LendingTree and it supersedes all prior or contemporaneous communications, promises and proposals, whether oral, written or electronic, between you and LendingTree with respect to the Websites and information, software, products and services associated with it. This Agreement shall be subject to and construed in accordance with the laws of the State of North Carolina, excluding its conflict of laws principles. If any part of this Agreement is determined to be invalid or unenforceable pursuant to applicable law including, but not limited to, the warranty disclaimers and liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid enforceable provision that most closely matches the intent of the original provision, and the remainder of the Agreement shall continue in effect. A printed version of this Agreement and of any notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to this Agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. All rights not expressly granted herein are reserved.

**PLEASE PRINT AND RETAIN A COPY OF THIS AGREEMENT FOR YOUR RECORDS.**

Privacy Policy | Security | Terms of Use | Licenses & Disclosures | Sitemap

Publications | For the Media | News Releases

Jobs | Partnership Programs | Get Internet Mortgage Leads from LendingTree | Get Internet Mortgage Leads from GetSmart

Join Our Real Estate Network | Post Home Listings | Affiliate Program | House Prices at Domania

Home Equity Loans | Refinancing | Mortgages | High Yield Savings

Partner Sites: Condo Direct | Domania | GetSmart | Home Loan Center | iNest | RealEstate | HomeConnections | Improvenet

ServiceMagic | Admission | ReserveAmerica | The Camping Club | Ticketmaster | TicketWeb | Expedia | Hotels | Hotwire

LendingTree technology and processes are patented under US Patent Nos. 6,385,594 and 6,611,816. © 1998 - 2008 LendingTree, LLC. All Rights Reserved. This site is directed at, and made available to, persons in the continental U.S., Alaska and Hawaii only. Conversion to LendingTree, LLC.

* Click here for LendingTree Promotional Offer Terms
* Gift Card Terms and Conditions
*† Based on loan requests since inception in 1998.
⁴ Based on total asset size of bank holding company as of 9/30/2007 as reported on the National Information Center web site for the Federal Reserve System.

REALTOR ® -- A registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS ® and subscribes to its strict Code of Ethics.

Find REALTORS ® | Look for Houses for Sale | New Homes | Mortgage Calculator | Refinance at GetSmart
Find Real Estate | LendingTree Free Credit Report | Homes for Sale





http://www.lendingtree.com/stm/aboutus/termsofuse.asp?flisttime

06/18/2008 07:21:35 PM ET    'BOND,    PAUL    ReedSmithPGH    Page 18

# Exhibit E

# ReedSmith

Reed Smith LLP
Princeton Forrestal Village
136 Main Street - Suite 250
Princeton, NJ 08540-7839
+1 609 987 0050
Fax +1 609 951 0824
reedsmith.com

**Mark S. Melodia**
Direct Phone: +1 609 520 6015
Email: mmelodia@reedsmith.com

June 18, 2008

**<u>Via Fax and Overnight Mail</u>**

Larry D. Drury
James R. Rowe
Larry D. Drury, Ltd.
205 W. Randolph, Suite 1430
Chicago, Illinois 60606

     Re:  **Miller v. Lending Tree LLC, No. 1:08-cv-2300 (N.D. Ill.)**

Dear Counsel:

     Reed Smith LLP has been retained by LendingTree, LLC ("LendingTree") to act as national counsel in the defense of the above-captioned suit and several other suits.  Craig Varga, pursuant to your conversations with him today, has filed a motion to substitute counsel.  While we would have liked to discuss the below matter informally with you before sending a formal letter, the deadline for LendingTree's response to the above-captioned action is quickly approaching.

     Please consider this letter a formal demand that your client, Eugene Miller, Jr., dismiss his current suit, <u>Miller v. Lending Tree LLC</u>, now docketed in the United States District Court for the Northern District of Illinois, #1:08-cv-2300 (N.D. Ill.) and submit any disputes he may have with LendingTree to binding, individual (non-class) arbitration with the American Arbitration Association ("AAA").  This Demand is made pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et. seq,.* and the Terms of Use which your client accepted in the course of submitting his application to LendingTree. The Terms of Use (attached) clearly require that disputes between your client and LendingTree be submitted to binding, individual (non-class) arbitration.  Binding federal statutory and case law empowers the Court to compel enforcement of all such provisions.

     Please be further advised that the Terms of Use specify Mecklenburg County, North Carolina as the sole and exclusive venue for arbitration or litigation of these matters.  Therefore, Mr. Miller's action has also been filed in an improper venue.

     LendingTree intends to Move to Dismiss your case, with citation to the arbitration and forum selection clauses of the Terms of Use.  If, in breach of his contract with LendingTree, your client opposes the motion and seeks to evade binding, individual (non-class) arbitration, please be advised we will additionally seek costs and attorney's fees incurred by LendingTree to prosecute the motion.

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH
OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

Patrick E. Bradley ♦ Office Administrative Partner ♦ A Limited Liability Partnership formed in the State of Delaware

Larry D. Drury
June 18, 2008
Page 2

ReedSmith

As LendingTree must respond to your complaint by Monday, I would ask that you or one of your colleagues let me know by the close of business Friday if Mr. Miller will dismiss his case voluntarily.  If not, we will proceed as outlined above.

Very truly yours,

Mark S. Melodia

MSM:ks

cc:    Craig Varga, Esq.
       David Smith, Esq.
       Marina Santini, Esq.

# Exhibit F

**LARRY D. DRURY, LTD.**
ATTORNEYS AT LAW
SUITE 1430
205 WEST RANDOLPH STREET
CHICAGO, ILLINOIS 60606

TEL (312) 346-7950
FAX (312) 346-5777
E-MAIL: ldrurylaw@aol.com

DATE: _6/19/08_          TIME:_____

FAX NO. _609 951 0824_

TO: _Reed Smith_

FROM: LARRY D. DRURY          RE: _Miller v Gardeng Tree_

PLEASE DELIVER TO:

_Mark Meladia_

MESSAGE:

_____

_____

_____

_____

_____


THE FOLLOWING DOCUMENT CONSISTS OF _2_ PAGES INCLUDE THE COVER SHEET.

IF YOU HAVE ANY QUESTIONS OR PROBLEMS WITH TRANSMISSION, PLEASE CALL THE ABOVE NUMBER. OUR FAX NUMBER IS 312/346-5777.

IMPORTANT: THIS MESSAGE IS INTENDED FOR THE USE OF THE ADDRESSEE AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND PROHIBITED FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

# LARRY D. DRURY, LTD.

### ATTORNEYS AT LAW
#### SUITE 1430
## 205 WEST RANDOLPH STREET
### CHICAGO, ILLINOIS 60606

TEL (312) 346-7950
FAX (312) 346-5777
E-MAIL: ldrurylaw@aol.com

VIA TELECOPIER (609) 9591-0824

June 19, 2008

Mark S. Melodia
Reed Smith, LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540-7839

Re:    Miller v. Lending Tree
No. 1:08-cv-2300

Dear Mr. Melodia:

I have read your letter of June 18, 2008 and, being that your position is not well founded, your demand is rejected. Please keep in mind that the filing of a spurious motion for costs and attorneys' fees subjects you and your firm to attorneys' fees and costs.

Very truly yours,

Larry D. Drury

LDD/mcm

# Exhibit G



2005 WL 1285615 (U.S.)

For Opinion See 126 S.Ct. 1204, 2006 A.M.C. 512, 126 S.Ct. 544, 125 S.Ct. 2937

Supreme Court of the United States.
BUCKEYE CHECK CASHING, INC., et al.,
Petitioners,
v.
John CARDEGNA, et al., Respondents.
No. 04-1264.
May 23, 2005.

On Petition for a Writ of Certiorari to the Supreme Court of the State of Florida

Brief in Opposition to Petition for a Writ of Certiorari
F. Paul Bland, Jr., Counsel of Record, Trial Lawyers for, Public Justice, P.C., 1717 Massachusetts Avenue, NW, Suite 800, Washington, DC 20036, Telephone (202) 797-8600.E. Clayton Yates, Yates & Mancini, LLC., 311 Second Street, Suite 102, Fort Pierce, Florida 34950, Telephone (772) 465-7990.Christopher C. Casper, James, Hoyer, Newcomer &, Smiljanich, P.A., 4830 West Kennedy Blvd., Suite 550, Tampa, Florida 33609, Telephone: (813) 286-4100.Richard A. Fisher, Richard Fisher Law, Office, 1510 Stuart Road, Suite 210, Cleveland, Tennessee 37312, Telephone (423) 479-7009, Counsel for Respondents.

**\*ii TABLE OF CONTENTS**

INTRODUCTION ... 1

STATEMENT OF THE CASE AND OF THE FACTS ... 4

REASONS FOR DENYING THE PETITION ... 7

I. THE DECISION BELOW IS CONSISTENT WITH THE DECISIONS OF THIS COURT. ... 7

 A. The Decision Below is Consistent With this Court's Guidance that Arbitration Clauses Are Subject to State Laws Applicable to All Contracts ... 7

 1. This Court Has Directed That Arbitration Clauses Are Governed By Generally Applicable State Law ... 7

 2. Florida Law Providing That Illegal Contracts Are Void *Ab Initio* Is Longstanding and Generally Applicable Law ... 10

 B. The Decision Below Is Consistent With the *Prima Paint* Decision ... 13

 \*iii 1. *Prima Paint* Involves Contracts that Are Voidable, And Not Contracts that Are Void *Ab Initio* ... 13

 2. The Decision Below Is Consistent With this Court's Direction that Arbitration Clauses Be Placed On the Same Footing as Other Contracts ... 15

 C. Petitioners' Proposed Rule of Law Would Lead to Anomalous and Absurd Results ... 18

 D. Petitioners' Position Also Is Contrary to this Court's Direction in *Howsam* that Gateway Questions Relating to the Existence of an Arbitration Clause Are for the Court, Not the Arbitrator ... 23

II.THIS CASE DOES NOT PRESENT AN ISSUE WORTHY OF CERTIORARI ... 24

CONCLUSION ... 25

**\*iv TABLE OF AUTHORITIES**

Cases

Allied-Bruce Terminix Co.'s, Inc. v. Dobson, 513 U.S. 265 (1995) ... 2, 7, 16

Armendariz v. Foundation Health Psychcare Services, Inc., 99 Cal. Rptr. 2d 745 (2000) ... 9

Banc One Acceptance Corp. v. Hill, 367 F.3d 426 (5th Cir. 2004) ... 9

Bess v. Check Express, 294 F.3d 1298 (11th Cir.

2002) ... 21-22

Buehler v. LTI Int'l, Inc., 762 So.2d 530 (Fla. 2d DCA 2000) ... 11

Camacho v. Holiday Homes, Inc., 167 F. Supp. 2d 892 (W.D. Va. 2001) ... 9

Carll v. Terminix Int'l Co., L.P., 793 A.2d 921 (Pa. Super. Ct. 2002) ... 9

Chandris, S.A. v. Yanakaksis, 668 So.2d 180 (Fla. 1995), reh'g denied (1996) ... 12

Chastain v. Robinson Humphrey Co., Inc., 957 F.2d 851 (11th Cir. 1992) ... 20-21

Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681 (1996) ... 16

*vD.R. Horton, Inc. v. Green, 96 P.3d 1159 (Nev. 2004) ... 9

Dumais v. American Golf Corp., 299 F.3d 1216 (10th Cir. 2002) ... 8

Edwards v. Trulis, 212 So.2d 893 (Fla. 1st DCA 1968) ... 11

Equal Employment Opportunity Comm'n v. Waffle House, Inc., 122 S. Ct. 754 (2002) ... 16

First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) ... 7

The Florida Bar-In re Amendment to the Code of Professional Responsibility Contingent Fees, 349 So.2d 630 (Fla. 1977) ... 12

Freightliner Corp. v. Myrick, 514 U.S. 280 (1995) ... 17

Gourley v. Yellow Transp., LLC, 178 F. Supp. 2d 1196 (D. Colo. 2001) ... 9

Green Tree Fin. Corp. v. Bazzle, 123 S. Ct. 2402 (2003) ... 8

Howsam v. Dean Witter, 537 U.S. 79 (2002) ... 23

I.S. Joseph Co., Inc. v. Michigan Sugar Co., 803 F.2d 396 (8th Cir. 1986) ... 21

*viIwen v. S. West Direct, 977 P.2d 989 (Mont. 1999) ... 9

Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868 (11th Cir. 2005) ... 23

Kaiser Steel Corp. v. Mullins, 455 U.S. 72 (1982) ... 11

Mazzoni Farms, Inc. v. E.I. DuPont DeNemours & Co., 761 So.2d 306 (Fla. 2000) ... 14

McMullen v. Hoffman, 174 U.S. 639 (1899) ... 11

McMullen v. Meijer, 355 F.3d 485 (6th Cir. 2004) ... 9

Murray v. United Food & Comm. Workers Int'l Union, 289 F.3d 297 (4th Cir. 2002) ... 9

Popovich v. McDonald's Corp., 189 F. Supp.2d 772 (N.D. Ill. 2002) ... 9

Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967) ... passim

Quigley v. KPMG Peat Marwick, LLP, 749 A.2d 405 (N.J. Super. Ct. App. Div. 2000) ... 8-9

Sandvik AB v. Advent Int'l Corp., 220 F.3d 99 (3rd Cir. 2000) ... 19

Sosa v. Paulos, 924 P.2d 357 (Utah 1996) ... 9

*viiSperry v. Florida ex rel. Florida Bar, 140 So.2d 587 (Fla. 1962), rev[]d on other grounds, 373 U.S. 379 (1963) ... 12

Sphere Drake Ins. Ltd. v. All American Ins. Co., 256 F.3d 587 (7th Cir. 2001) ... 15, 20

State ex rel. Dunlap v. Berger, 567 S.E.2d 265 (W.Va. 2002) ... 9

*Taylor v. Butler,* 142 S.W.3d 277 (Tenn. 2004), *cert. denied,* 125 S.Ct. 1304 (2005) ... 9

*Thomas v. Ratiner,* 462 So.2d 1157 (Fla. 3rd DCA 1984) ... 10

*Three Valleys Municipal Water Dist. v. E.F. Hutton & Co., Inc.,* 925 F.2d 1136 (9th Cir. 1991) ... 21

*Transit Casualty Co. in Receivership v. Certain Underwriters at Lloyd's of London,* 963 S.W.2d 392 (Mo. Ct. App. 1998) ... 9

*In re Turner Bros. Trucking Co., Inc.,* 8 S.W.3d 370 (Tex. Ct. App. 1999) ... 9

*Umbel v. Foodtrader.Com, Inc.,* 820 So.2d 372 (Fla. 3rd DCA 2002) ... 11

*Victoria v. Superior Court,* 222 Cal. Rptr. 1 (1985), *reh'g denied* (1986) ... 8

**\*viii***Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468 (1989) ... 7, 16, 17

*Williams v. Aetna Finance Co.,* 700 N.E.2d 859 (Ohio 1998) ... 9

*Worldwide Inc. Group v. Klopp,* 603 A.2d 788 (Del. 1992) ... 9

Statutes and Legislative Materials

Federal Arbitration Act, 9 U.S.C. 1, et seq. ... *passim*

Florida's Lending Practices Act, Chapter 687, Florida Statutes ... 5, 6

Florida's Consumer Finance Act, Chapter 516, Florida Statutes ... 5, 6

Florida's Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ... 5, 6

Florida's Civil Remedies for Criminal Practices Act, Chapter 772, Florida Statutes ... 5, 6

Other Authorities

Blacks Law Dictionary (6th ed. 1991) ... 10

Restatement 2d Contracts § 7 ... 10

INTRODUCTION

In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395 (1967), this Court held that when two parties have agreed to arbitrate disputes arising out of a contract, and one party raises a defense against the enforceability of the entire contract (as opposed to the arbitration clause in particular), that the arbitrator - not the court - should resolve the challenge to the enforceability of the entire contract. Petitioners Buckeye Check Cashing, Inc. *et al* ("Petitioners" or "Buckeye") claim that the decision of the court below contradicts the holding of *Prima Paint.* Petitioners claim that the plaintiffs' argument in this case that the contract between the parties was illegal - indeed, that it was criminal - under Florida law, is a contract defense to a contract that has already been legally formed, and that since the defense relates to the entire contract (and not just the arbitration clause), that this defense should have been decided by an arbitrator, and not by the court.

Petitioner's argument is wrong for several reasons. First, Buckeye conveniently overlooks a central premise that underlay this Court's holding in *Prima Paint:* "the purpose of Congress [in enacting the Federal Arbitration Act ("FAA")] in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so." 388 U.S. at 404 n. 12. While Buckeye tends to suggest that this Court was establishing a new federal law of contract enforcement that should find that it is easier for parties to create an agreement to arbitrate than it is to form other types of contracts, this is not correct. In *Prima Paint,* there was no dispute that the parties had formed an agreement to arbitrate. There only question in *Prima Paint* was whether one party might be able to assert a defense against that agreement. As this Opposition will explain, the situation in this case is entirely different. Plaintiffs' arguments in this case go to the creation of the contract in the first instance, and thus are very different from the contract defense at issue in *Prima Paint.*

Second, Petitioners ignore another subsequent line of decisions from this Court, that inform the way that

*Prima Paint* must be understood. In these cases, this Court has repeatedly stated that agreements to arbitrate are subject to generally applicable principles of contract law. *See, e.g., Allied-Bruce Terminix Co.'s, Inc. v. Dobson,* 513 U.S. 265, 281 (1995). Petitioners ignore generally applicable principles of state contract law, and rely upon the hope that this Court will create a new doctrine of contract law that applies only to agreements to arbitrate.

In the decision below, the Florida Supreme Court followed this Court's guidance in both *Prima Paint* and the subsequent cases. Under generally applicable principles of Florida law that date back more than 100 years and that have been repeatedly applied in cases that have nothing to do with arbitration, no contract is ever formed, and no contract ever comes into existence, from an agreement to perform a criminal act. App. at 7a-8a. Accordingly, as the Court below correctly recognized, App. at 5a-6a, *Prima Paint* does not speak to this situation. Petitioners repeatedly state that the doctrine barring the enforcement of illegal agreements is a contract defense, rather than a doctrine of contract formation. *E.g.,* Pet. at 11. In making this assertion, Petitioners simply misunderstand core principles of contract law. The doctrine that criminal contracts are void *ab initio* is thus fundamentally different from the law relating to *voidable* contracts. The latter body of law relates to a defense to a contract that has been formed, not whether a contract has ever come into existence in the first place.

In this case, plaintiffs allege a colorable claim that Petitioners are loan sharks that charge outrageous interest rates that violate Florida's criminal laws. Indeed, one of the consumer plaintiffs in this case was charged interest of over 1,300%. Accordingly, the court below faithfully applied this Court's guidance and held that where, as here, there is an issue under generally applicable principles of state contract law as to whether a contract was formed in the first instance, this gateway question must be resolved by a court.

As the Petition reflects, Petitioners do not like the normal principles of state law relating to contract formation. Instead, Petitioners would like this Court to declare that federal law overrides normal state laws relating to illegal contracts that are void *ab initio*. In demanding this result, Petitioners would have this Court re-write the principles applicable to the formation of all contracts, so that documents that would not form a contract in any other circumstance would form an enforceable contract if they contained an arbitration clause. Petitioners would have this Court delve into (and re-write) normal state law principles governing contract formation.

As the Court below noted, App. at 8a, Petitioners' position would lead to absurd results. Under Petitioners' logic, courts would be required to find that legally cognizable contracts existed (if they contained arbitration clauses) even if they provided for murder-for-hire, the sale of child pornography or the sale of illegal drugs. Under Petitioners' approach, documents establishing such relationships that contained agreements to arbitrate would have to be enforced to the extent of the arbitration clause, notwithstanding generally applicable state contract law to the contrary.

Petitioners' position also would lead to incoherence in contract law. Even Petitioners acknowledge that no arbitration contract comes into existence if there is no assent to that contract. Pet. at 11. To make this admission concrete, imagine a case where there is an allegation that Party A has forged Party B's name on a document that contains an arbitration clause. Petitioners would concede that a court, not an arbitrator, should and would decide whether the allegation of forgery was true. Nonetheless, Petitioners insist that questions of assent are the *only* type of contract formation question that a court, as opposed to an arbitrator may decide. According to Petitioners, all other questions that states might consider to be ones of contract formation under their generally applicable law of contracts - questions that go to whether a contract has come into existence in the first place - are reserved for the arbitrator. Pet. at 11-12. Petitioners' argument not only contradicts the FAA as interpreted by this Court, but leads to anomalous results. The FAA simply does not preempt some parts of normal state law relating to contract formation (those parts relating to assent), while nonetheless preempting other portions of state law relating to contract formation (those portions that are not consistent with Petitioners' interests, as loan sharks).

This case also does not merit this Court's intervention because the nature of the issue raised will affect very

few disputes, in very few jurisdictions.

## STATEMENT OF THE CASE AND OF THE FACTS

This action was brought by respondents Cardegna and Reuter ("Plaintiffs") on behalf of a class of Florida consumers against Petitioners Buckeye Check Cashing, Inc. and Buckeye **\*5** Check Cashing of Florida Inc. and unknown entities and individuals (collectively "Petitioners"or "Buckeye"). The Plaintiffs allege an unlawful scheme in which Buckeye, under the guise of what it falsely portrayed as a check cashing service, in reality charged and collected unconscionably usurious interest from thousands of customers for consumer loans through systematically repeated violations of Florida's Lending Practices Act, Chapter 687, Florida Statutes; Florida's Consumer Finance Act, Chapter 516, Florida Statutes; Florida's Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes; and Florida's Civil Remedies for Criminal Practices Act, Chapter 772, Florida Statutes.

Buckeye loaned money to its customers in exchange for a written document in the form of a personal check, and a form agreement to repay money in an amount larger than the borrower received within a short period of time, usually two to four weeks. These loans were then continued through loan extensions or roll-over transactions. In each transaction, the Plaintiffs gave Buckeye a personal check and agreed that the face value of the check would be paid within a short time period, usually two weeks. In exchange, Buckeye gave the Plaintiffs cash in an amount less than the face value of the check. In each transaction, Buckeye agreed to hold the check until the next payday or until the customer received her or his next social security or other government check.

Customers unable to repay these loans when due were permitted to extend their debt or roll-over their loans with Buckeye by paying "service fees" when they became due, usually every two weeks. In each transaction, once the Plaintiffs paid the "fee" to Buckeye, then Buckeye would again **\*6** forbear collection of the debt. The "fee" on each extension was interest for allowing Plaintiffs and members of the class to defer payment on the original extension of credit. The rate of interest charged by Buckeye on

each initial transaction and on each rollover ranged from approximately 137% to 1,317% A.P.R., and the rate was usually over 300% A.P.R.

The plaintiffs here allege that the essence of the transaction is loaning money at highly usurious rates of interest and that the contracts were criminal on their face. In another case currently pending, the Florida Supreme Court is considering whether these transactions are loans. *McKenzie Check Advance of Fl. v. Betts,* No. SC04-1825. If that Court rejects the claims of McKenzie plaintiffs, that will render the instant case moot.

In any case, the plaintiffs here case allege that the policy of the State of Florida to protect its needy citizens from predatory lenders is set out in Chapter 687 of the Florida Statutes, which provides felony sanctions for such lending practices. The threshold for criminal usury is 25% per annum at which point violations constitute a first degree misdemeanor, § 687.071(2), Fla. Stat.(2001). Loaning money at an interest rate in excess of 45% per annum, is a third degree felony. § 687.071(3), Fla. Stat.(2001). Lending money at either the misdemeanor or felony levels of usury is defined as "loan sharking." § 687.071(1)(f), Fla. Stat.(2001), The instant agreements provide for interest rates as high as twenty-nine times the felony threshold!

## \*7 REASONS FOR DENYING THE PETITION

### I. THE DECISION BELOW IS CONSISTENT WITH THE DECISIONS OF THIS COURT.

A. The Decision Below is Consistent With this Court's Guidance that Arbitration Clauses Are Subject to State Laws Applicable to All Contracts.

1. This Court Has Directed That Arbitration Clauses Are Governed By Generally Applicable State Law.

The FAA contains a savings clause that subjects arbitration clauses to the same state contract laws that apply to other types of contracts. This Court repeatedly has stressed that arbitration clauses are governed by state, not federal, contract law except in those instances where state contract laws target arbitration clauses for treatment that is inferior to other types of contracts. Indeed, this Court has noted

that the rules of state contract law provide the primary source of protection for consumers against corporate over-reaching in cases governed by the FAA.[FN1]

> FN1. *See, e.g., Allied-Bruce Terminix Co's, Inc. v. Dobson,* 513 U.S. 265, 281 (1995) ("In any event, § 2 gives States a method for protecting consumers against unfair pressure to agree to a contract with an unwanted arbitration provision. States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.' "). *Cf., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938 (1995) (courts "should apply ordinary state-law principles that govern the formation of contracts"); *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 474 (1989) ("the interpretation of private contracts is ordinarily a question of state law").

**\*8** This Court has recently reiterated the importance of state contract law under the FAA's scheme. In *Green Tree Fin. Corp. v. Bazzle,* 123 S. Ct. 2402 (2003), the bank argued that the FAA preempted South Carolina's state contract laws as they applied to the question of whether an arbitration could proceed as a class action. The decision rejected the federal preemption argument and stated that the question of contract interpretation is "a matter of state law…." 123 S. Ct. at 2405.[FN2]

> FN2. This Court also held that the contract interpretation question was a matter for the arbitrator to decide. This is not surprising, given that there was an agreement by both parties that the arbitration contract was legal and binding. The Court stated that "The question here … [does not] concern … the validity of the arbitration clause…." 123 S. Ct. at 2407. "Rather the relevant question here is what kind of arbitration proceeding the parties agreed to. That question does not concern a state statute or judicial procedures, … [i]t concerns contract interpretation and arbitration procedures.

Arbitrators are well situated to answer that question." *Id.* This case, by contrast, involves both the validity of the arbitration clause and a state statute.

The Court below held that Florida's generally applicable law relating to illegal and void *ab initio* contracts applies to arbitration clauses. This is hardly an unusual position. There are numerous illustrations of courts applying generally applicable state contract law to arbitration clauses, even when the application of those laws will bar the enforcement of a given arbitration clause. For example, the generally applicable rule of contract law that ambiguities in contracts will be interpreted against the drafter will be applied to arbitration clauses, even where it results in not requiring a party to arbitrate her or his claims. *See, e.g., Victoria v. Superior Court,* 222 Cal. Rptr. 1 (1985), *reh'g denied* (1986); *Dumais v. American Golf Corp.,* 299 F.3d 1216, 1219-20 (10th Cir. 2002); *Quigley v. K.PMG*\*9*Peat Marwick, LLP,* 749 A.2d 405,416 (N.J. Super. Ct. App. Div. 2000). Similarly, the generally applicable rule of contract law that specific contract provisions will govern over general provisions applies to disputes over the construction of arbitration clauses, for example, even when it has the effect that a party will not be required to arbitrate her or his claims. *See, e.g., Transit Casualty Co. in Receivership v. Certain Underwriters at Lloyd's of London,* 963 S.W.2d 392, 399 (Mo. Ct. App. 1998). Finally, the generally applicable rule of contract law that unconscionable contracts will not be enforced applies to arbitration clauses, and while the vast majority of arbitration clauses are enforced by courts, courts have refused to enforce part or all of particularly abusive arbitration clauses that were grossly one sided and that explicitly or effectively stripped individuals of important rights.[FN3]

> FN3. *See, e.g., Murray v. United Food & Comm. Workers Int'l Union,* 289 F.3d 297 (4th Cir. 2002); *Banc One Acceptance Corp. v. Hill,* 367 F.3d 426 (5th Cir. 2004); *McMullen v. Meijer,* 355 F.3d 485 (6th Cir. 2004); *Popovich v. McDonald's Corp.,* 189 F. Supp.2d 772 (N.D. Ill. 2002); *Gourley v. Yellow Transp., LLC,* 178 F. Supp, 2d 1196 (D. Colo. 2001); *Camacho v. Holiday Homes, Inc.,* 167 F. Supp. 2d 892 (W.D. Va. 2001); *Armendariz v. Foundation Health Psychcare Services, Inc.,* 99 Cal. Rptr. 2d

745 (2000); *Worldwide Inc. Group v. Klopp, 603 A.2d 788 (Del. 1992)*; *Iwen v. S. West Direct, 977 P.2d 989 (Mont, 1999)*; *D.R. Horton, Inc. v. Green, 96 P.3d 1159 (Nev. 2004)*; *Williams v. Aetna Finance Co., 700 N.E.2d 859 (Ohio 1998)*; *Carll v. Terminix Int'l Co., L.P., 793 A.2d 921 (Pa. Super. Ct. 2002)*; *Taylor v. Butler, 142 S.W.3d 277 (Tenn. 2004)*, *cert. denied,* *125 S.Ct. 1304 (2005)*; *In re Turner Bros. Trucking Co., Inc., 8 S.W.3d 370 (Tex. Ct. App. 1999)*; *Sosa v. Paulos, 924 P.2d 357, 262 (Utah 1996)*; *State ex rel Dunlap v. Berger, 567 S.E.2d 265 (W.Va. 2002).*

**\*10** 2. Florida Law Providing That Illegal Contracts Are Void *Ab Initio* Is Longstanding and Generally Applicable Law.

As the Court below held, "Florida's law has long held that contracts which are determined to be against public policy and void should not be enforced." App. at 7a. This statement of law is entirely consistent with generally applicable principles of Florida contract law. Contracts which violate Florida criminal laws and public policy are illegal and void *ab initio* and cannot be enforced:

The right to contract is subject to the general rule that the agreement must be legal and if either its *formation* or its performance is criminal, tortious or otherwise opposed to public policy, the contract or bargain is illegal. *See*11 Fla. Jur.2d, Contracts 81, Restatement of the Law, Contracts 512.... Where a statute imposes a penalty for an act, a contract founded upon said act is considered void in Florida.

*Thomas v. Ratiner, 462 So.2d 1157, 1159 (Fla. 3rd DCA 1984)*, *reh'g denied* (1985) (emphasis in original).

Notwithstanding Petitioners' amplified rhetoric, Pet. at 16, this is hardly a new body of law that arises from a hostility to arbitration. Indeed, all standard texts acknowledge the general principle that an agreement that is void *ab initio* is one that "has at no time had any legal validity." Blacks Law Dictionary (6th ed. 1991). *See also*Restatement 2d Contracts § 7 ("A promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promissory **\*11** is often called a void contract. Under § 1, however, such a promise is not a contract at all; it is the 'promise' or 'agreement'

that is void of legal effect."). On a number of occasions, moreover, this Court has reached the same conclusions on this basic question of contract law. It is particularly incongruous for Buckeye to claim that federal law preempts Florida contract law providing that courts may enforce no part of void *ab initio* contracts, because Florida law is entirely consistent with this Court's own jurisprudence on the subject. This Court has held, for example, that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. *McMullen v. Hoffman, 174 U.S. 639 (1899)*. This Court has also held that illegal promises will not be enforced in cases controlled by federal law. *Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 102 S. Ct. 851, 70 L.Ed.2d 833 (1982)*. There is no indication that the FAA was intended to disrupt this fundamental principle.

Under general principles of Florida contract law (like the law elsewhere), the rule against the enforcement of void contracts is not a partial one that selectively invalidates parts of contracts. Instead, it is an absolute rule that invalidates void contracts in their entirety. "[I]t must be held that as a matter of law any contract made in violation of [the Act's] terms, provisions or requirements is void and confers **no enforceable rights** on the contracting parties." *Umbel v. Foodtrader.Com, Inc., 820 So.2d 372, 374 (Fla. 3rd DCA 2002)* (emphasis added) (citing *Edwards v. Trulis, 212 So.2d 893, 895 (Fla. 1st DCA 1968)* and *Buehler v. LTI Int'l, Inc., 762 So.2d 530 (Fla. 2d DCA 2000)*).

**\*12** In cases arising in entirely different contexts, the Florida Supreme Court has explained in some detail the corrosive effect upon the entire legal system of treating an illegal contract as merely voidable, rather than void:

If we were to hold a Florida contingent fee contract entered into by a person or attorney who is not a member of The Florida Bar to be voidable rather than void, we would be recognizing the validity of a contract entered into by an attorney not subject to our regulations. This would afford viability to an unregulated contract of the very kind that we have determined to be in the public interest to regulate. *The* *Florida Bar-In re Amendment to the Code of Professional Responsibility Contingent Fees, 349 So.2d 630, 632 (Fla. 1977)*. Additionally, recognizing such an agreement would be directly contrary to the reasons we have expressed for prohibiting the

unauthorized practice of law. *Sperry v. Florida ex rel. Florida Bar,* 140 So.2d 587, 595 (Fla. 1962), *rev []d on other grounds,* 373 U.S. 379 (1963).

*Chandris, S.A. v. Yanakaksis,* 668 So.2d 180, 185 (Fla. 1995), *reh'g denied* (1996).

Under generally applicable Florida contract law, therefore, an agreement which itself violates Florida's public policy and criminal law and is illegal is void *ab initio*; no valid agreement ever comes into existence in the first place.

**\*13 B. The Decision Below Is Consistent With the *Prima Paint* Decision.**

1. *Prima Paint* Involves Contracts that Are Voidable, And Not Contracts that Are Void *Ab Initio.*

Buckeye does not present any authority denying that generally applicable Florida contract law renders criminal contracts void ab initio. Instead, Buckeye effectively argues that an exception to this rule exists for arbitration clauses, suggesting that arbitration clauses are subject to a special and separate set of rules from other types of contract terms. Buckeye derives this proposition from the FAA and this Court's decision in *Prima Paint,* 388 U.S. 395. According to Buckeye, under *Prima Paint* no Court may consider whether Buckeye's contract is illegal and void *ab initio,* because that is a decision for the arbitrator. Pet. at 2. Buckeye's position is flatly wrong.

Buckeye's reading of *Prima Paint* ignores the crucial distinction between a void and voidable contract. Buckeye keeps insisting, without providing any basic contract law authority for the proposition, that the doctrine refusing to recognize illegal contracts is not a doctrine relating to contract formation. Pet. at 11-12. Buckeye further insists that the distinction between voidable contracts and void ab initio contracts is one without a difference. Pet. at 1. These arguments can only be advanced if one disregards core principles of contract law.

A voidable contract, unlike a void *ab initio* contract, is "one where one or more parties have the power, by a **\*14** manifestation of election to do so, to avoid the legal relations created by the contract, or by

ratification of the contract to extinguish the power of avoidance." Restatement 2d Contracts § 7. With a voidable contract, a valid contract has come into legal existence, although it is possible that one party might successfully defend against its enforcement. For example, under Florida law, "[i]t is axiomatic that fraudulent inducement renders a contract voidable, not void." *Mazzoni Farms, Inc. v. E.I. DuPont DeNemours & Co.,* 761 So.2d 306, 312 (Fla. 2000).

As set forth above, under Florida contract law (like the law in most if not all other states), a contract that is fraudulently induced is merely voidable; a valid contract exists, but is potentially subject to a defense from one party. In such a setting, enforcing the arbitration clause so that the arbitrator may decide this defense is entirely consistent with generally applicable contract law. Contracts that are void *ab initio* pose an entirely different situation. A void *ab initio* contract never comes into existence, and no part of such a contract may ever be enforced by a court, and thus no arbitration clause ever comes into existence. There is nothing to arbitrate. Petitioner misreads the *Prima Paint* rule to sanction the extreme result of requiring a court to enforce an arbitration clause that is embedded in and part of a contract with a singularly illegal purpose and which is, in and of itself, illegal and void.

Judge Easterbrook of the U.S. Court of Appeals for the Seventh Circuit has stressed the importance of this factor: "Fraud in the inducement does not negate the fact that the parties actually reached an agreement. *That's what was critical in Prima Paint.* But whether there was *any* agreement is a **\*15** distinct question." *Sphere Drake Ins. Ltd. v. All American Ins. Co.,* 256 F.3d 587 (7th Cir. 2001) (first emphasis added, second in original). Because Buckeye ignores this fact, properly described by Judge Easterbrook as "critical," Buckeye's proposed extension of *Prima Paint* misunderstands that case, misunderstands federal arbitration law, and is simply wrong.

2. The Decision Below Is Consistent With this Court's Direction that Arbitration Clauses Be Placed On the Same Footing as Other Contracts.

Petitioner effectively insists that *Prima Paint* requires courts to treat arbitration clauses are different than any other terms to any contract. As set forth above,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Florida's generally applicable rules of state contract law provide that illegal contracts are void *ab initio*, meaning that they never come into existence in the first place. Buckeye argues that among all types of contracts, arbitration clauses alone are exempt from this longstanding body of Florida law, because the FAA supposedly preempts Florida's contract law.

This Court has repeatedly rejected such an approach, however. In interpreting the FAA, this Court has repeatedly given meaning to the language of the Savings Clause and instructed that federal policy regarding arbitration is simply one of enforcing contracts and that the FAA does no more or less than place arbitration agreements on the same footing as other agreements. For all of its discussion of *Prima Paint*, Buckeye never addresses the crucial part of that opinion which undermines all of Buckeye's arguments here. See page 1, *supra*, citing 388 U.S. at 404 n. 12.

**\*16** In *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 122 S. Ct. 754 (2002), similarly, the Court refused to enforce an arbitration provision in an employment contract in a case where claims were asserted by a federal agency that was not a party to that contract. In the *Waffle House* case, the lower court had effectively treated arbitration clauses as some sort of super contract especially favored under federal law. This Court rejected the notion that the FAA embodied a policy goal that would form arbitration agreements in circumstances where no other type of contract could be formed. 122 S. Ct. at 764. Instead, this Court directed, the FAA requires courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so.' *Id.* at 764 (*quoting Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

This Court also stressed that arbitration clauses are to be treated the same as other contracts in *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996). In *Casarotto*, the Court held that the FAA preempted a state statute that imposed specific disclosure requirements applicable only to arbitration agreements. The Court echoed its earlier decisions in explaining that, through the FAA, Congress precluded states from singling out arbitration provisions for suspect treatment, requiring instead

that such provisions be placed upon the same footing as other contracts, *Id.* at 687 (internal quotation omitted). *See also Allied-Bruce Terminix Co., Inc. v. Dobson*, 513 U.S. 265, 281 (1995):

States may regulate contracts, including arbitration clauses, under general contract law **\*17** principles and they may invalidate an arbitration clause upon such grounds as exist at law or in equity for the revocation of *any* contract.[] 9 U.S.C. 2 (emphasis added). What states may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal footing,[] directly contrary to the Act's language and Congress' intent.

Petitioner's arguments rely upon the implicit and faulty notion that the FAA preempts generally applicable state contract laws, as they apply to arbitration. Indeed, Petitioners re-write *Prima Paint* into a federal preemption case. This suggestion conflicts with the remainder of this Court's preemption jurisprudence. As this Court has recognized, however, "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Sciences*, 489 U.S. at 477. Therefore, the FAA can only displace state law through the doctrine of implied conflict preemption. *Id.* at 477-78. In order to establish that the FAA impliedly preempts Florida's contract law relating to void *ab initio* contracts, Buckeye must demonstrate that there is an "actual conflict" between federal and state law, either because it is "impossible for a private party to comply with both … requirements" or because the state laws "stand [] as an obstacle to the accomplishment and execution of full purposes" of Congress. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations omitted). Implied conflict **\*18** preemption cannot lie here because the FAA contains no independent rules of federal law for governing these questions of contract law.

C. Petitioners' Proposed Rule of Law Would Lead to Anomalous and Absurd Results.

Generally applicable principles of Florida contract law - like the law in other states - define and give meaning to the phrase void *ab initio*. As set forth above, any contract that is void *ab initio* is not even a

contract, and never comes into existence in the first place. This section will discuss a number of cases that support the logic of the decision below, and that even Petitioners acknowledge are correctly decided. In their unprincipled effort to distinguish these cases, Petitioner argues that the FAA requires that states contort their law of contracts in an illogical way. According to Petitioners, the FAA provides that certain types of void *ab initio* contracts (such as those with an unauthorized signature) may be treated as all void *ab initio* contracts have been treated for more than 100 years, but that for no principled reason, parts of other types of void *ab initio* contracts (such as illegal contracts) must be recognized by courts and forced (at least to the extent of any arbitration clause).

As the Court below noted, App. at 6a, and as even Petitioner has acknowledged, Pet. at 11, a host of courts have refused to extend *Prima Paint*'s holding to cases involving allegations that no contract ever came into existence in the first place. These courts have held that this latter type of allegation by definition implicates the making of the agreement for arbitration and therefore must be decided by a court as a **\*19** precondition to any arbitration order under the FAA. A particularly important precedent is *Sandvik AB v. Advent Int'l Corp.,* 220 F.3d 99 (3rd Cir. 2000) (Becker, J.). While *Sandvik* did not involve an illegal contract, the court's analysis of the importance of the distinction between void and voidable contracts closely tracks the logic employed by the Florida Supreme Court in this case. In *Sandvik*, the Third Circuit held that a party cannot enforce an arbitration clause while denying that it is bound by the contract containing that clause because, "[e]ven under the severability doctrine [of *Prima Paint*], there may be no arbitration if the agreement to arbitrate is non-existent." *Id.* at 101. The Third Circuit construed *Prima Paint* as applying only to allegations that would render a contract *voidable*, and held that courts must resolve all allegations that would render an entire contract (and therefore its arbitration clause) *void*:

Mindful of the doctrine announced in *Prima Paint*, which did not consider a situation in which the *existence* of the underlying contract was at issue, we draw a distinction between contracts that are asserted to be void or non-existent, as is contended here, and those that are merely voidable, as was the contract at issue in *Prima Paint*, for purposes of evaluating whether the making of the arbitration agreement is in

dispute.

*Id.* at 107.

Several other courts have followed the same analysis as *Sandvik* in holding that courts, not arbitrators, must evaluate challenges that an entire contract never came into valid **\*20** existence in the first place. In *Sphere Drake*, for example, the Seventh Circuit faced the question of whether an arbitrator or a court should resolve allegations that the person who signed a contract on behalf of one party had the authority to make that commitment. The party attempting to enforce the arbitration clause invoked *Prima Paint*, and claimed that this was a generalized challenge to the entire contract that the arbitrator should resolve. Focusing on the difference between void and voidable contracts, the Seventh Circuit rejected this claim, and held that the question was one for the court:

This is not a defense to enforcement, as in *Prima Paint*; it is a situation in which no contract came into being; and as arbitration depends on a valid contract an argument that the contract does not exist can't magically be resolved by the arbitrator (unless the parties agree to arbitrate this issue after the dispute arises).

*Sphere Drake,* 256 F.3d at 591.

In *Chastain v. Robinson Humphrey Co., Inc.,* 957 F.2d 851 (11th Cir. 1992), similarly, the court held that a court, not an arbitrator must decide allegations that a signature to a contract was forged. The Eleventh Circuit focused on the difference between arguments that are contract defenses and arguments that go to the existence of a contract:

The calculus changes when it is undisputable that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of *any***\*21** agreement, *including the existence of an agreement to arbitrate*. Under these circumstances, there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act.

*Chastain,* 957 F.2d at 854.*See also Three Valleys Municipal Water Dist. v. E.F. Hutton & Co., Inc.,* 925 F.2d 1136, 1140 (9th Cir. 1991) (court decides whether signatory to contract had authority to bind

party, we read *Prima Paint* as limited to challenges seeking to *avoid* or *rescind* a contract not to challenges going to the very existence of a contract) (emphasis in original); *I.S. Joseph Co., Inc. v. Michigan Sugar Co.,* 803 F.2d 396 (8th Cir. 1986) (court decides whether assignee can enforce contract).

The cases relied upon by Buckeye, by contrast, fragment state contract law in indefensible ways. This is illustrated by one of Buckeye's leading cases. In *Bess v. Check Express,* 294 F.3d 1298 (11th Cir. 2002), the Court acknowledged that arbitration clauses are not to be enforced when they are embedded in contracts that are void *ab initio* because one party did not have the authority to sign the contract. The Court then implicitly created a new rule of federal law (in an area plainly to be governed by state law), that illegal contracts are subject to a different rule because the issue of illegality only goes to "the *content* of the contracts, not their *existence.*" *Bess,* 294 F.3d at 1305 (emphasis in original). The *Bess* opinion never explains the rationale or cites any authority for this conclusory statement. Florida's generally applicable contract law is to the contrary. Buckeye never challenges this conclusion as to Florida law. Given that *Bess*'s characterization of illegality as unrelated to **\*22** the existence of a contract is simply wrong as a matter of contract law, *Bess*'s holding relies upon the mistaken conclusion that federal law preempts and overrides a state's generally applicable and longstanding rules of contract law.

Buckeye gives no convincing explanation for why the Congress, when it passed the FAA in 1925, could have possibly intended to honor generally applicable state law as to contracts that are void *ab initio* in some settings but to sweep it aside in others.

Petitioners' insistence that arbitration clauses are somehow above or exempt from this well-established body of law could readily lead to absurd results. Imagine hypothetical contracts for the sale of cocaine, or the making of child pornography, or a murder-for-hire, that included (a) a liquidated damage provision; and (b) an arbitration agreement. Obviously such contracts would violate any number of criminal laws and be void *ab initio*. No legal agreement has ever come into being and no court or arbitrator could order or otherwise authorize

performance - any performance - under the contract. Similarly, it is obvious that no court would, could or should ever enforce the liquidated damages provision. Under the position advocated by Buckeye, however, the arbitration clause is somehow different from and better than all other provisions in this wholly illegal contract, and the arbitration clause would be enforced. Indeed, under Petitioner's position, any question concerning the illegality of the entire contract would be one that only the arbitrator could adjudicate. These hypotheticals demonstrate the extreme and unjustified nature of Buckeye's position.

**\*23** D. Petitioners' Position Also Is Contrary to this Court's Direction in *Howsam* that Gateway Questions Relating to the Existence of an Arbitration Clause Are for the Court, Not the Arbitrator.

Petitioners' position also conflicts with this Court's decision in *Howsam v. Dean Witter,* 537 U.S. 79, 123 S. Ct. 588 (2002). In *Howsam*, this Court unsurprisingly held that an arbitrator, not a court, should determine whether a party violated an arbitration rule. After all, as the Court noted, "the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it." *Howsam,* 123 S. Ct. at 593. There was no question that the parties were bound by a legally valid arbitration agreement, however, and this Court explained that disputes on *that* question are for the court. "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide." 123 S. Ct. at 592. This case involves precisely the type of "gateway question" that this Court has said is for the court, not the arbitrator.

Petitioner asserts repeatedly that there are six federal courts of appeal that support its position and conflict with the decision below. *E.g.,* Pet. at 2. It is notable, however, that only one of those decisions came after this Court handed down *Howsam*. The only exception is *Jenkins v. First Am. Cash Advance of Ga., LLC,* 400 F.3d 868 (11th Cir. 2005), and that case offers no convincing explanation of how its ruling could be consistent with *Howsam*.

**\*24** II. THIS CASE DOES NOT PRESENT AN ISSUE WORTHY OF CERTIORARI.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Buckeye employs a great deal of high octane rhetoric about how the entire structure of the FAA will come undone if courts rather than arbitrators decide the question of whether a contract is illegal. *See* Pet. at 15. This argument ignores the unique nature of the allegations in this case. The rather unusual allegations in this case argue that Buckeye's contracts violated Florida's *criminal* laws, and that Buckeye was engaged in felonious loansharking.

This sort of issue rarely arises in civil cases. Civil plaintiffs regularly argue that some particular conduct of a defendant breaks a contract or gives rise to a remedy under some remedial statute, but it is quite rare to encounter a civil plaintiff arguing that an entire line of business operated contrary to the rule of law and is per se illegal. It is particularly rare to see a case, such as this, where there are substantive arguments that the entire enterprise is *criminal.* A ruling for the plaintiffs here will have no effect upon traditional banks, or any other legitimate business enterprise. A ruling for the plaintiffs here will only impact upon businesses whose contracts are wholly illegal, such as the loanshark defendants here, or the cocaine sellers or child pornographers hypothesized above. The ruling of the court below is highly unlikely, as a practical matter, to be applicable in many cases. It is hard to perceive how the decision could apply to the activities of credit card issuers, for example: their operations are not generally even arguably criminal(as normal lenders never charge interest rates of 300% to 1,300%). In short, the ruling below is likely to largely only relate to the payday lending industry.

**\*25** In short, the issue posed by this case is unlikely to recur often. Petitioners ask this Court to find that an arbitration clause embedded in a criminally illegal contract is not subject to generally applicable state contract law providing that illegal contracts are void *ab initio* and thus never come into existence in the first place. The self-evident fact is that Buckeye's rhetoric about the grave nature of the assault on the architecture of the FAA is greatly exaggerated.

CONCLUSION

For all the reasons set forth above, this Court should deny the Petition for certiorari.

Buckeye Check Cashing, Inc. v. Cardegna
2005 WL 1285615 (U.S.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H

Search ▶
Checkout ▶

| ABOUT US | DISPUTE RESOLUTION SERVICES | FILE A CASE | AAA UNIVERSITY | NEUTRALS |
| CONTACT US | | | | |

PRINT VERSION

## Consumer-Related Disputes Supplementary PROCEDURES

Effective September 15, 2005

About the AAA

The AAA's Consumer Rules

Availability of Mediation

Administrative Fees

Arbitrator's Fees

Glossary of Terms

Claimant

Respondent

ADR Process

Arbitration

Desk Arbitration

Telephone Hearing

In Person Hearing

Mediation

Neutral

Case Manager

ADR Agreement

ADR Program

Independent ADR Institution

Resolution of Consumer-Related Disputes Supplementary Procedures

C-1. Agreement of Parties and Applicability

C-2. Initiation Under an Arbitration Agreement

C-3. Initiation Under a Submission

C-4. Appointment of Arbitrator

C-5. Proceedings on Documents ("Desk Arbitration")

C-6. Expedited Hearing Procedures

C-7. The Award

C-8. Administrative Fees and Arbitrator Fees*

Administrative Fees

Arbitrator Fees

Fees and Deposits to be Paid by the Consumer:

Fees and Deposits to be Paid by the Business:

INTRODUCTION

Millions of consumer purchases take place each year. Occasionally, these transactions lead to disagreements between consumers and

businesses. These disputes can be resolved by arbitration. Arbitration is usually faster and cheaper than going to court.

The AAA applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

About the AAA

The American Arbitration Association (AAA) is a not-for-profit, private organization. We offer a broad range of conflict management services to businesses, organizations and individuals. We also provide education, training and publications focused on ways of settling disputes out of court.

The AAA's Consumer Rules

The AAA has developed the Supplementary Procedures for Consumer-Related Disputes for consumers and businesses that want to have their disagreements resolved by arbitrators. People throughout the world can make use of our services.

Availability of Mediation

Mediation is also available to help parties resolve their disputes. Mediations are handled under AAA's Commercial Mediation Procedures.

Administrative Fees

The Association charges a fee for its services under these rules. The costs to the consumer and business depend on the size and nature of the claims. A fee schedule is included at the end of this Supplement. In certain cases, fees paid by the consumer are fully refundable if the dispute is settled before the arbitrator takes any action.

Arbitrator's Fees

Arbitrators get paid for the time they spend resolving disputes. The arbitrator's fee depends on the type of proceeding that is used and the time it takes. The parties make deposits as outlined in the fee schedule at the end of this Supplement. Unused deposits are refunded at the end of the case.

GLOSSARY OF TERMS

Claimant

A Claimant is the party who files the claim or starts the arbitration. Either the consumer or the business may be the Claimant.

Respondent

A Respondent is the party against whom the claim is filed. If a Respondent states a claim in arbitration, it is called a counterclaim. Either the consumer or the business may be the Respondent.

ADR Process

An ADR (Alternative Dispute Resolution) Process is a method of resolving a dispute out of court. Mediation and Arbitration are the most widely used ADR processes.

Arbitration

In arbitration, the parties submit disputes to an impartial person (the arbitrator) for a decision. Each party can present evidence to the arbitrator. Arbitrators do not have to follow the Rules of Evidence used in court.

Arbitrators decide cases with written decisions or "awards." An award is usually binding on the parties. A court may enforce an arbitration award, but the court's review of arbitration awards is limited.

Desk Arbitration

In a Desk Arbitration, the parties submit their arguments and evidence to the arbitrator in writing. The arbitrator then makes an award based only on the documents. No hearing is held.

Telephone Hearing

In a Telephone Hearing, the parties have the opportunity to tell the arbitrator about their case during a conference call. Often this is done after the parties have sent in documents for the arbitrator to review. A Telephone Hearing can be cheaper and easier than an In Person Hearing.

In Person Hearing

During an In Person Hearing, the parties and the arbitrator meet in a conference room or office and the parties present their evidence in a process that is similar to going to court. However, an In Person Hearing is not as formal as going to court.

Mediation

In Mediation, an impartial person (the mediator) helps the parties try to settle their dispute by reaching an agreement together. A mediator's role is to help the parties come to an agreement. A mediator does not arbitrate or decide the outcome.

Neutral

A Neutral is a word that is used to describe someone who is a mediator, arbitrator, or other independent, impartial person selected to serve as the independent third party in an ADR process.

Case Manager

The Case Manager is the AAA's employee assigned to handle the administrative aspects of the case. He or she does not decide the case. He or she only manages the case's administrative steps, such as exchanging documents, matching schedules, and setting up hearings. The Case Manager is the parties' contact point for almost all aspects of the case outside of any hearings.

ADR Agreement

An ADR Agreement is an agreement between a business and a consumer to submit disputes to mediation, arbitration, or other ADR processes.

ADR Program

An ADR Program is any program or service set up or used by a business to resolve disputes out of court.

Independent ADR Institution

An Independent ADR Institution is an organization that provides independent and impartial administration of ADR programs for consumers and businesses. The American Arbitration Association is an Independent ADR Institution.

SUPPLEMENTARY PROCEDURES FOR THE RESOLUTION OF CONSUMER-RELATED DISPUTES

C-1. Agreement of Parties and Applicability

(a) The Commercial Dispute Resolution Procedures and these Supplementary Procedures for Consumer-Related Disputes shall apply whenever the American Arbitration Association (AAA) or its rules are used in an agreement between a consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. The AAA's most current rules will be used when the arbitration is started. If there is a difference between the Commercial Dispute Resolution Procedures and the Supplementary Procedures, the Supplementary Procedures will be used. The Commercial Dispute Resolution Procedures may be found on our Web site. They may also be obtained from the Case Manager.

(b) The Expedited Procedures will be used unless there are three arbitrators. In such cases, the Commercial Dispute Resolution Procedures shall apply.

(c) The AAA may substitute another set of rules, such as the Real Estate or the Wireless Industry Arbitration Rules, for the Commercial Dispute Resolution Procedures in some cases.

(d) Parties can still take their claims to a small claims court.

C-2. Initiation Under an Arbitration Agreement

(a) The filing party (the "claimant") must notify the other party (the "respondent"), in writing, that it wishes to arbitrate a dispute. This notification is referred to as the "demand" for arbitration. The demand should:

' briefly explain the dispute,

' list the names and addresses of the consumer and the business,

' specify the amount of money involved,

' state what the claimant wants.

The claimant must also send two copies of the demand to the AAA at the time it sends the demand to the respondent. When sending a demand to the AAA, the claimant must attach a copy of the arbitration agreement from the consumer contract with the business. The claimant must also send the appropriate administrative fees and deposits. A fee schedule can be found in Section C-8 at the end of this Supplement.

(b) The AAA shall confirm receipt of the demand to the parties.

(c) The respondent may answer the demand and may also file a counterclaim. The answer must be sent to the AAA within ten calendar days after the AAA acknowledges receipt of claimant's demand. The answer must:

' be in writing,

' be sent, in duplicate, to the AAA,

' be sent to the claimant at the same time.

' If the respondent has a counterclaim, it must state the nature of the counterclaim, the amount involved, and the remedy sought.

(d) If no answer is filed within the stated time, the AAA will assume that the respondent denies the claim.

(e) The respondent must also send the appropriate administrative fees and deposits. A fee schedule can be found in Section C-8 at the end

of this Supplement. Payment is due ten calendar days after the AAA acknowledges receipt of claimant's demand.

C-3. Initiation Under a Submission

Where no agreement to arbitrate exists in the contract between the consumer and the business, the parties may agree to arbitrate a dispute. To begin arbitration, the parties must send the AAA a submission agreement. The submission agreement must:

> ' be in writing,

> ' be signed by both parties,

> ' briefly explain the dispute,

> ' list the names and addresses of the consumer and the business,

> ' specify the amount of money involved,

> ' state the solution sought.

The parties should send two copies of the submission to the AAA. They must also send the administrative fees and deposits. A fee schedule can be found in Section C-8 at the end of this Supplement.

C-4. Appointment of Arbitrator

Immediately after the filing of the submission or the answer, or after the deadline for filing the answer, the AAA will appoint an arbitrator. The parties will have seven calendar days from the time the AAA notifies them, to submit any factual objections to that arbitrator's service.

C-5. Proceedings on Documents ("Desk Arbitration")

Where no claims or counterclaims exceed $10,000, the dispute shall be resolved by the submission of documents. Any party, however, may ask for a hearing. The arbitrator may also decide that a hearing is necessary.

The arbitrator will establish a fair process for submitting the documents. Documents must be sent to the AAA. These will be forwarded to the arbitrator.

C-6. Expedited Hearing Procedures

A party may request that the arbitrator hold a hearing. This hearing may be by telephone or in person. The hearing may occur even if the other party does not attend. A request for a hearing should be made in writing within ten calendar days after the AAA acknowledges receipt of a claimant's demand for arbitration. Requests received after that date will be allowed at the discretion of the arbitrator.

In a case where any party's claim exceeds $10,000, the arbitrator will conduct a hearing unless the parties agree not to have one.

Any hearings will be conducted in accordance with the Expedited Procedures of the Commercial Dispute Resolution Procedures. These procedures may be found on our Web site. They may also be obtained from the Case Manager.

C-7. The Award

(a) Unless the parties agree otherwise, the arbitrator must make his or her award within fourteen calendar days from the date of the closing of the hearing. For Desk Arbitrations, the arbitrator has fourteen calendar days from when the AAA sends the final documents to the arbitrator.

(b) Awards shall be in writing and shall be executed as required by law.

(c) In the award, the arbitrator should apply any identified pertinent contract terms, statutes, and legal precedents. The arbitrator may grant any remedy, relief or outcome that the parties could have received in court. The award shall be final and binding. The award is subject to review in accordance with applicable statutes governing arbitration awards.

C-8. Administrative Fees and Arbitrator Fees*

Administrative fees and arbitrator compensation deposits are due from the claimant at the time a case is filed. They are due from the respondent at the time the answer is due. The amounts paid by the consumer and the business are set forth below.

*Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under of oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-877-528-0879, if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003)

Administrative Fees

Administrative fees are based on the size of the claim and counterclaim in a dispute. They are based only on the actual damages and not on any additional damages, such as attorneys' fees or punitive damages. Portions of these fees are refundable pursuant to the Commercial Fee Schedule.

Arbitrator Fees

For cases in which no claim exceeds $75,000, arbitrators are paid based on the type of proceeding that is used. The parties make deposits as set forth below. Any unused deposits are returned at the end of the case.

Desk Arbitration or Telephone Hearing $250 for service on the case
In Person Hearing $750 per day of hearing

For cases in which a claim or counterclaim exceeds $75,000, arbitrators are compensated at the rates set forth on their panel biographies.

Fees and Deposits to be Paid by the Consumer:

If the consumer's claim or counterclaim does not exceed $10,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $125. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim is greater than $10,000, but does not exceed $75,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $375. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non-monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule. A portion of this fee is refundable pursuant to the Commercial Fee Schedule. The consumer must also deposit one-half of the arbitrator's compensation. This deposit is used to pay the arbitrator. This deposit is refunded if not used. The arbitrator's compensation rate is set forth on the panel biography provided to the parties when the arbitrator is appointed.

Fees and Deposits to be Paid by the Business:

*Administrative Fees:*

If neither party's claim or counterclaim exceeds $10,000, the business must pay $750 and a Case Service Fee of $200 if a hearing is held. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

If either party's claim or counterclaim exceeds $10,000, but does not exceed $75,000, the business must pay $950 and a Case Service Fee of $300 if a hearing is held. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

If the business's claim or counterclaim exceeds $75,000 or if the business's claim or counterclaim is non-monetary, the business must pay an

Administrative Fee in accordance with the Commercial Fee Schedule. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

*Arbitrator Fees:*

The business must pay for all arbitrator compensation deposits beyond those that are the responsibility of the consumer. These deposits are refunded if not used.

If a party fails to pay its fees and share of the administrative fee or the arbitrator compensation deposit, the other party may advance such funds. The arbitrator may assess these costs in the award.

For more information please contact our customer service department at 1-800-778-7879

Rules, forms, procedures and guides are subject to periodic change and updating.

AAA236



- AAA MISSION & PRINCIPLES
- PRIVACY POLICY
- TERMS OF USE
- TECHNICAL RECOMMENDATIONS
- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED